MITCHELL KAMIN (SBN 202788)
mkamin@cov.com
AARON LEWIS (SBN 284244)
alewis@cov.com
BRITTANY BENJAMIN (SBN 323968)
bbenjamin@cov.com
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
Facsimile: (424) 332-4749

CASSANDRA STUBBS (SBN 218849)
cstubbs@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701
Telephone: (919) 682-5659
Facsimile: (919) 682-5961

*Attorneys for Plaintiffs*

[Additional Counsel continued on next page]

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

## SOUTHERN DIVISION

| | |
|---|---|
| MELISSA AHLMAN, DANIEL KAUWE, MICHAEL SEIF, JAVIER ESPARZA, PEDRO BONILLA, CYNTHIA CAMPBELL, MONIQUE CASTILLO, MARK TRACE, CECIBEL CARIDAD ORTIZ, and DON WAGNER, on behalf of themselves and all others similarly situated, <br><br> *Plaintiffs*, | Case No.: 8:20-cv-835 <br><br> **CLASS ACTION** <br><br> **PETITION FOR WRIT OF HABEAS CORPUS AND COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |

v.

DON BARNES, in his official capacity as
Sheriff of Orange County, California; and
ORANGE COUNTY, CALIFORNIA

      Defendant.

**IMMEDIATE RELIEF SOUGHT**

[Additional Counsel continued from first page]

STACEY GRIGSBY*
sgrigsby@cov.com
AMIA TRIGG** (SBN 282890)
atrigg@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5906

OLIVIA ENSIGN*
oensign@aclu.org
CRISTINA BECKER*
cbecker@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701
Telephone: (919) 682-5659
Facsimile: (919) 682-5961

JOHN WASHINGTON (SBN 315991)
jwashington@sshhlaw.com
SCHONBRUN, SEPLOW, HARRIS,
HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Telephone: (310) 399-7040
Facsimile: (310) 399-7040

PETER ELIASBERG (SBN 189110)
peliasberg@aclu.org
AMERICAN CIVIL LIBERTIES
FUND OF SOUTHERN
CALIFORNIA
1313 W 8th St
Los Angeles, CA 90017
Telephone: (213) 977-9500

PAUL HOFFMAN (SBN 71244)
hoffpaul@aol.com
UNIVERSITY OF CALIFORNIA,
IRVINE SCHOOL OF LAW CIVIL
RIGHTS LITIGATION CLINIC
401 E. Peltason Dr., Suite 1000
Irvine, CA 92687
Telephone: (949) 824-0066

CARL TAKEI
ctakei@aclu.org
SOMIL TRIVEDI*
strivedi@aclu.org
CLARA SPERA*
cspera@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 607-3300
Facsimile: (212) 607-3318

ZOE BRENNAN-KROHN** (SBN
324912)
zbrennan-krohn@aclu.org
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
Disability Rights Program
39 Drumm Street
San Francisco, CA 94111
Telephone: (415)-343-0769
Facsimile: (415) 255-1478


ATTORNEYS FOR PLAINTIFFS

*pro hac vice application forthcoming

**C.D. California admission application forthcoming

**INTRODUCTION**

1.      Plaintiffs, who are all confined in the Orange County Jail, bring this action because the conditions of their incarceration have put them all at imminent risk of serious illness and death from COVID-19.

2.      We are in the midst of the most dangerous pandemic in generations.[1]  The effects of the COVID-19 pandemic have rippled through local communities across the country, including Orange County.  While COVID-19 has spread through community, jails, such as the Orange County Jail, have become hotbeds for  COVID-19 cases, threatening the lives of people inside the jail and the broader community.[2]  As of April 29, 2020,  117 people in the Orange County Jail have tested positive for COVID-19 out of 227 people who were tested.[3]   All indications are that this number will continue to rise unchecked absent urgent intervention.

---

[1] John M. Barry, *The Single Most Important Lesson from the 1918 Influenza*, New York Times (March 17, 2020), https://cutt.ly/PtQ5uAZ (Opinion piece by author of "The Great Influenza: The Story of the Deadliest Pandemic in History," noting comparison between current COVID-19 outbreak and the 1918 influenza outbreak widely considered one of the worst pandemics in history).

[2] The Orange County Jail has this in common with jails all over the country. From a public health perspective, jails are particularly dangerous environments.  The rate of infection in the Cook County Jail in Chicago "is higher than most anywhere else in the country." Cheryl Corley, *The COVID-19 Struggle in Chicago's Cook County Jail*, NPR (Apr. 13, 2020), https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail. One of the largest outbreaks in the United States is in the Ohio prison system. *Virus outbreak in Ohio prisons highlights risk at US lockups*, Boston Herald, April 21, 2020 (last visited April 21, 2020), https://www.bostonherald.com/2020/04/21/virus-outbreak-in-ohio-prisons-highlights-risk-at-us-lockups/.

[3] COVID-19 in OC Jails, https://www.ocsd.org/documents/sheriff/COVIDStats4.28.20.pdf.

3.     COVID-19 is a novel communicable virus that has proved unusually fatal.[4] Many have been sickened, and many have died.  Those with certain underlying conditions are at increased risk of COVID-19-related complications and death.

4.     There is no vaccine or cure for COVID-19.[5]  Public health experts have issued detailed recommendations to prevent the spread of COVID-19 and to save lives. These recommendations include: maintaining social distancing of at least six feet; wearing masks when venturing out to complete essential tasks;  cleaning and disinfecting communal surfaces regularly; and proper handwashing.[6]  Many, if not all, of these precautions are impossible in the Orange County Jail facilities at the current population levels.  The Orange County Jail sees regular turnover of detainees, and staff come and go from the jail and into the community daily.  People incarcerated in the Orange County Jail cannot isolate and

---

[4] As of April 28, over 981,000 people in the United States have contracted COVID-19 and more than 55,000 people have died. Centers for Disease Control and Prevention, *Cases in the U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html. *See also* Michael Rothfeld et al., *The Heartbreaking Last Texts of a Hospital Worker on the Front Lines*, NY Times (Apr. 15, 2020) (describing the final texts from a hospital worker who died after contracting coronavirus to her daughter, "Love you[.] Mom be back[.]").  *See also* Exhibit A, Declaration of Don Wagner ¶ 21 ("I am 68 years old and I don't want to get a life sentence by catching the virus and dying.").  *Counsel have been unable to secure wet signatures for certain declarations, and were instructed by the clerk's office to include a declaration to this effect. *See* Exhibit B, Declaration of Brittany Benjamin.

[5] World Health Organization, *Coronavirus*, https://cutt.ly/ztWyf7e ("At this time, there are no specific vaccines or treatments for COVID-19.").

[6] Center for Disease Control, *How Coronavirus Spreads*, https://cutt.ly/CtYRkkC ("The virus that causes COVID-19 is spreading very easily and sustainably between people.").

have no ability to maintain safe social distance.[7]  Efforts to regularly disinfect common surfaces and maintain personal hygiene are difficult and inadequate.[8]

5.     The steps Sheriff Barnes has taken to date are manifestly inadequate in the face of the ongoing outbreak of COVID-19 inside the jail.  At the current population levels, people detained in the Orange County jail are unable to socially distance themselves from others.  While the jail staff provide some cleaning supplies, "[t]here are never enough supplies to clean throughout the day."[9]  The masks given to detained people are "cheap and made of paper, and rip easily."[10]  Jail staff do not always wear protective equipment, like gloves and masks, and detainees have not been given gloves at all.

6.     Compounding the problem, people continue to be booked into the jail for low-level offenses that pose little or no public safety risk: public intoxication, simple drug possession, and motor vehicle offenses such as driving with one's lights off.[11]  These bookings, as well as the transportation of these defendants to court in close proximity to deputies, create unnecessary exposure risks for everyone involved.[12]

7.     Perhaps most dangerously of all, the Orange County Jail has identified, but not released, over 500 detainees who are medically vulnerable and at heightened risk of serious infection and death.  Defendants have arbitrarily decided only to proceed with the release of a small sub-group of the medically-vulnerable people detained.

---

[7] Exhibit C, Declaration of Melissa Ahlman ¶ 24 ("All of the woman [sic] in the medical tank share two toilets.  Sometimes we have to wait in line for these.  If we have to wait in line we can not [sic] space out six feet apart."); Exhibit D, Declaration of Enrique Hernandez ¶ 7-8.

[8] Exhibit E, Declaration of Praney Saem ¶ 19 ("The jail is not giving us enough hygiene or cleaning products.").

[9] Exhibit F, Declaration of Monique Castillo ¶ 19.

[10] Exhibit D, Hernandez Decl. ¶ 17.

[11] Exhibit G, Declaration of William Webster ¶ 7.

[12] *Id*. at ¶ 8.

8.    To prevent the further infections and unnecessary fatalities, the Orange County Jail must align its operations with public health principles by immediately releasing the medically-vulnerable population and then releasing others in sufficient numbers so that the jail can adhere to the medically-recommended quarantining, testing, distancing, hygiene, and treatment protocols.  Public health expertise tells us that aggressive measures, including reducing the jail population, are our last and best chance to slow the growth of new infections in the jail and in the surrounding community.

9.    Preventing the Orange County Jail outbreak from getting worse will have clear benefits not only for the people inside the jail, but also for the community at large. Jails are not closed off from the communities around them; every day, custody, medical, and support staff and contractors who have direct contact with detainees enter and leave the facility, along with detainees who are newly booked into the jail, leave and return for court hearings, and leave upon release.[13]  For this reason, an outbreak in the jail can spread easily to the surrounding community, often through jail staff who become infected and bring the virus home.[14]  Additionally, when an incarcerated patient's needs are too acute for the jail to provide adequate treatment, the patient must be transported to and treated at a community hospital.[15]  Thus, a continued outbreak of COVID-19 cases in the Orange County Jail will not only directly harm people infected by the jail outbreak, but will also divert finite medical resources from the general Orange County community, leading to further county-wide public health harms.[16]  The hospital resources in the Orange County

---

[13] Exhibit H, Declaration of Joe Goldenson, M.D. ¶ 33.

[14] *Id.* ¶ 34.

[15] *Id.* ¶ 25.

[16] Exhibit I, Declaration of Daniel Parker, Ph.D. ¶¶ 28-30.  *See also* Elizabeth Cohen *et al.*, *New York surgeon writes haunting letter about rationing care for patients who don't have the coronavirus*, CNN (Apr. 5, 2020, 2:22 PM), https://www.cnn.com/2020/04/05/health/rationing-care-patients-without-coronavirus/index.html ("We have had to make decisions that I personally have never had

community are limited and are not equipped to handle increased upticks in the quantity of people who need treatment for COVID-19 infection.[17]   Given the existing number of specialized beds and ventilators available in the County, a surge in the need for specialized beds could result in a humanitarian disaster.[18]   Many deaths have occurred in places where epidemics have outpaced hospital capacity.[19]   The Court can and must take action to prevent these deaths.

10.     Accordingly, Plaintiffs bring this action on behalf of themselves and all those similarly situated.   Plaintiffs seek to represent a class of all current and future people incarcerated in the Orange County Jail, and seek to represent four subclasses.   These subclasses include: two "Medically-Vulnerable" Subclasses (one pre-trial and one post-conviction), including all people detained at the Jail who, because of age, pregnancy, and/or underlying medical conditions, are particularly vulnerable to death or serious illness if they contract COVID-19; and two "Disability" Subclasses (one pre-trial and one post-conviction), including all people in the Medically-Vulnerable Subclasses who are vulnerable because of conditions that are protected under federal disability rights laws. Plaintiffs seek (1) the immediate release of all Medically-Vulnerable and Disability Subclass Members, coupled with appropriate, public-health-informed, support and conditions upon release and (2) all necessary steps to safeguard the health of those remaining in the Orange County Jail, including further population reductions that would

---

to contemplate before. . . . We have had to ration care and make decisions about who is considered an urgent or emergent case."); Joanne Kenen, *Local officials alarmed by dearth of ventilators, hospital beds*, (Mar. 14, 2020, 7:00 a.m.), https://cutt.ly/stYTDDk ("[T]here are worrisome limitations on critical care beds and the number of health care workers to staff them, public health officials said.").

[17] Exhibit I, Parker Decl. ¶ 28.

[18] *Id.* ¶ 29.

[19] *Id.* ¶ 27.

permit the jail to successfully implement the public health measures needed to prevent a massive outbreak inside—one that will inevitably spread to the surrounding communities. If this Court does not grant immediate release on the basis of this Complaint, Plaintiffs request an expedited hearing. Given the exponential spread of this highly contagious virus, time is of the essence.[20]

## I.   JURISDICTION AND VENUE

11.    Plaintiffs bring this putative class action pursuant to 22 U.S.C. § 2241 and 42 U.S.C. § 1983 for relief from both detention and conditions of confinement that violate their Eighth and Fourteenth Amendment rights under the U.S. Constitution and pursuant to 42 U.S.C. § 12131 *et seq.* and 29 U.S.C. § 794 for relief from disability discrimination.

12.    This Court has subject matter jurisdiction over these claims pursuant to 28 U.S.C. § 2241 (habeas corpus), 42 U.S.C. § 1983, and 28 U.S.C. § 1331 (federal question jurisdiction).

13.    Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 2241(d) because the Plaintiffs and all other class members are in custody in this judicial district and venue.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

## II.   PARTIES

14.    Plaintiff Melissa Ahlman is a 32-year-old woman who is currently being held pre-trial at the Central Women's Jail. She has been in OCSD custody since February 19, 2020. Ms. Ahlman is a nursing mother and has to pump milk for her seven-month-old baby. She is housed in a "medical tank" with six medically-vulnerable women who have

---

[20] COVID-19 Dashboard by the Center for Systems Science and Engineering at Johns Hopkins University, Coronavirus Resource Center, *available at* https://coronavirus.jhu.edu/map.html; *see also* Brittany Shammas et al., *Trump says quarantine for New York area 'Will not be Necessary'; U.S. coronavirus-related deaths double in two days*, Washington Post (Mar. 28, 2020, 11:27 p.m.), https://cutt.ly/ktRo8u0.

diabetes, autoimmune diseases, and other women who are nursing. Ms. Ahlman must drop her milk off with the medical unit multiple times a day, where there is a significant amount of traffic and people waiting. She comes in close contact with nurses and other incarcerated people who are at the medical unit because they feel ill, including people with COVID-19-like symptoms such as fevers and coughs. The other incarcerated people with whom Ms. Ahlman is housed similarly make regular trips between their shared housing unit and the medical facility. Ms. Ahlman has been denied the ability to maintain social distancing and has not been provided with sufficient Personal Protective Equipment ("PPE"), hygiene, or cleaning supplies. Ms. Ahlman has not been tested for COVID-19 or removed from contact with other highly-vulnerable individuals in spite of her repeated exposure to individuals with COVID-19 symptoms.

15.    Plaintiff Daniel Kauwe is a 42-year-old man who is currently being held in the Theo Lacy Facility. He has been in OCSD custody since September 25, 2019. He is in pre-trial custody and is awaiting a hearing in June.  Mr. Kauwe is medically vulnerable. He is immunocompromised and prone to infection, and is currently housed in a medical unit. While in custody, he has been unable to consistently practice social distancing and has not been provided with adequate cleaning supplies or PPE. Mr. Kauwe is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

16.    Plaintiff Michael Seif is a 35-year-old man who is currently being held in the Central Men's Jail. He has been in OCSD custody since December 5, 2019. He is in pre-trial custody and was supposed to have had a hearing on April 7, 2020. Mr. Seif is medically vulnerable; he had a heart attack and suffered a collapsed lung shortly before his incarceration and he has not had adequate follow-up care. While in custody, he has been unable to consistently practice social distancing and has not been provided with adequate cleaning supplies or PPE. Mr. Seif is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

PETITION FOR WRIT OF HABEAS CORPUS
AND COMPLAINT FOR INJUNCTIVE
AND DECLARATORY RELIEF

17.     Plaintiff Javier Esparza is a 35-year-old man who is currently being held in the Theo Lacy Facility.  He has been in OCSD custody since February 25, 2019.  While in custody, Mr. Esparza has been repeatedly placed in close contact with others.  He has also been moved into new housing during the pandemic, increasing the risk of spreading the virus throughout the facility.  He is unable to consistently practice social distancing and has not been provided with adequate cleaning supplies or PPE.

18.     Plaintiff Pedro Bonilla is a 36-year-old man who is currently being held in the Theo Lacy Facility.  He has been in OCSD custody since August 12, 2018 and his expected release date is August 5, 2020.  While in custody, Mr. Bonilla has been repeatedly placed in close contact with others, including individuals who have been exposed to COVID-19.  He is unable to consistently practice social distancing and has not been provided with adequate cleaning supplies or PPE.  Mr. Bonilla contracted Hepatitis C during a previous period of incarceration.  Mr. Bonilla is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

19.     Plaintiff Cynthia Campbell is a 64-year-old woman who is currently being held at the Central Women's Jail.  She has been in the custody of the OCSD since October 15, 2019.  Ms. Campbell has—and receives immunosuppressants for—rheumatoid arthritis which makes her medically vulnerable.  She is housed in a designated medical unit.  In spite of her vulnerable condition, she has not received prompt medical attention while in custody.  Other individuals with whom Ms. Campbell is housed make regular trips between their shared housing and the medical facility in order to receive routine treatments.  During these trips, these women are exposed to large numbers of (often sick) individuals.  Ms. Campbell has similarly had to travel between her unit and the medical office on multiple occasions, and has been in close contact with others while doing so.  In her housing unit, Ms. Campbell has been denied the ability to maintain social distancing or proper hygiene.  She has not been tested for COVID-19 or removed from contact with other highly-vulnerable individuals.  Ms. Campbell is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

20.    Plaintiff Monique Castillo is a 43-year-old woman who is currently being held at the Central Women's Jail.  She has been in OCSD custody since December 19, 2019.  Ms. Castillo is medically vulnerable.  She has—and is medicated for—Type 1 diabetes and anxiety.  As a result of her medical needs, she is housed in a "medical tank" with six other medically-vulnerable women.  In order to receive insulin, she is brought to the medical office four times per day, each time finding herself in close contact with incarcerated people from other parts of the jail, many of whom are ill and show symptoms consistent with COVID-19.  Other incarcerated people with whom Ms. Castillo is housed similarly make regular trips between their shared housing and the medical facility.  Ms. Castillo has been denied the ability to maintain social distancing or proper hygiene, and has not been tested for COVID-19 or removed from contact with other highly-vulnerable incarcerated people in spite of her repeated exposure to individuals with COVID-19 symptoms.  Ms. Castillo is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

21.    Plaintiff Mark Trace is a 53-year-old man who is currently being held in the Central Men's Jail.  He has been in OCSD custody for approximately six months and is set to be released on June 23, 2020.  Before being transferred to his current housing, he was held at the Theo Lacy Facility.  Mr. Trace is medically vulnerable.  He has multiple, significant underlying health conditions.  These include sclerosis of the liver, Hepatitis C and D, asthma, tuberculosis, valley fever, and seizures.  He is also currently experiencing unexplained nausea and sweats.  Several people in adjacent housing units have contracted COVID-19, but despite Mr. Trace's symptoms and vulnerability, he has been denied a test.  He is housed with approximately 12 other individuals and is unable to consistently practice social distancing.  He has also not been provided with adequate cleaning supplies or PPE.  Mr. Trace is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

22.    Plaintiff Cecibel Caridad Ortiz is a 31-year-old woman who is currently being held at the Central Women's Jail.  She has been in the custody of the OCSD since October

30, 2018.  Ms. Caridad Ortiz is medically vulnerable and is housed in a designated medical module.  She has—and receives medical treatment for—Type 1 diabetes and anxiety.  In order to receive a diabetic check, she is brought to the medical office three times per day, each time finding herself in close contact with people who are housed in other parts of the jail, many of whom are ill.  Other individuals with whom Ms. Caridad Ortiz is housed similarly make regular trips between their shared housing and the medical facility.  Ms. Caridad Ortiz has been denied the ability to maintain social distancing or proper hygiene, and has not been tested for COVID-19 or removed from contact with other highly-vulnerable individuals in spite of her repeated exposure to potentially contagious individuals.   Ms. Caridad Ortiz is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

23.    Plaintiff Don Wagner is a 68-year-old man who is currently being held at the Theo Lacy facility.  He has been in OCSD custody since the first week of March 2020.  He was transported to Theo Lacy from a federal facility in San Diego on a bus that held 30 to 40 people sitting in close proximity.  He is uncertain when his next court appearance will be held.  Mr. Wagner is medically vulnerable.  He is a cancer survivor and his blood pressure and thyroid levels are monitored by the jail's nurses.  In order to receive this monitoring, Mr. Wagner must go to the nurse's station, where he sometimes waits in line with incarcerated people from across the jail.  The nurses recently told Mr. Wagner that he needs to see a medical specialist outside of the jail due to his thyroid levels and his blood pressure, but Mr. Wagner is uncertain when he will be able to be seen by such a specialist.  Mr. Wagner has also been in close proximity with people who he suspects may have been in contact with COVID-19—with no option to distance himself.  Mr. Wagner has also been denied the means to keep himself and his surroundings clean.  He receives only a small bar of soap per week and, because he is indigent he cannot buy more.  He uses the only towel he receives to clean both himself, and his cell.  Mr. Wagner's age and his medical conditions make him particularly vulnerable to COVID-19, and he fears for his safety and

well-being.  Mr. Wagner is an individual with a disability for purposes of the ADA and the Rehabilitation Act.

24.    The Orange County Sheriff, Don Barnes ("Sheriff Barnes"), is an Orange County Official, and the elected head of OCSD.  Sheriff Barnes currently has immediate custody over Plaintiffs and all other putative class members as the administrator of the Orange County Jail.  Sheriff Barnes is a final policymaker for running and administering the jail in Orange County.  Sheriff Barnes is sued in his official capacity.

25.    Orange County, California ("Orange County") is a municipal corporation organized under the laws of the State of California.  Orange County controls and operates the Orange County Jail, through Sheriff Barnes.  Orange County currently has immediate custody over Plaintiffs and all other putative class members.  Orange County is a public entity for the purposes of the ADA.  Orange County is a recipient of federal financial assistance for the purposes of the Rehabilitation Act.  Among others, Sheriff Barnes is a final policymaker for Orange County.

## III.    FACTUAL ALLEGATIONS

### A.    COVID-19 Poses a Significant Risk of Illness, Injury, or Death.

26.    The novel coronavirus that causes COVID-19 has led to a global pandemic.[21] As of April 28, 2020, there were more than 2,954,222 reported COVID-19 cases throughout the world[22] and more than 55,000 deaths in the United States.[23]  Projections

---

[21] Betsy McKay et al., *Coronavirus Declared Pandemic by World Health Organization*, WALL ST. J. (Mar. 11, 2020, 11:59 PM), https://cutt.ly/UtEuSLC.

[22] World Health Organization, *Coronavirus disease 2019 (COVID-19) Situation Report – 99*, https://www.who.int/docs/default-source/coronaviruse/situation-reports/20200428-sitrep-99-covid-19.pdf?sfvrsn=119fc381_2.

[23] *Cases in the U.S.*, *supra* note 4.

indicate that as many as 240,000 people in the U.S. will die from COVID-19, accounting for existing interventions.[24]

27.    The virus is known to spread from person to person through respiratory droplets, close personal contact, and contact with contaminated surfaces and objects.[25] There is no vaccine against COVID-19 and no known medication to prevent or treat infection.[26]  Social distancing—deliberately keeping at least six feet of space between persons to avoid spreading illness[27]—and a vigilant hygiene regimen, including washing hands frequently and thoroughly with soap and water, are the only known effective measures for protecting against transmission of COVID-19.[28]  Because the coronavirus spreads among people who do not show symptoms, staying away from people is the best way to prevent contracting the virus.  In other words, *everyone* (including Orange County Jail officials) must act as is if *everyone* has the disease.

28.    Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity, and it can damage tissues in other vital organs, such as the heart and liver.[29]

---

[24] Rick Noack, et al., *White House Task Force Projects 100,000 to 240,000 Deaths in U.S., Even With Mitigation Efforts*, Washington Post. (Apr. 1, 2020, 12:02 AM), https://cutt.ly/5tYT7uo.

[25] Centers for Disease Control and Prevention, *Interim Infection Prevention and Control Recommendations for Patience with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings*, https://cutt.ly/ztRAo0X.

[26] *Supra* note 5.

[27] Johns Hopkins University, *Coronavirus, Social Distancing and Self-Quarantine*, https://cutt.ly/VtYYiDG.

[28] Centers for Disease Control and Prevention, *How to Protect Yourself & Others*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html; Exhibit I, Parker Decl. ¶ 14.

[29] Centers for Disease Control and Prevention, *Interim Clinical Guidance for Management of Patients with Confirmed Coronavirus Disease (COVID-19)*, https://cutt.ly/etRPVRl.

29.     The risk of illness or death from COVID-19 is increased for older populations.[30]   In a February 29, 2020 preliminary report, individuals age 50-59 had an overall mortality rate of 1.3%; 60-69-year-olds had an overall 3.6% mortality rate, and those 70-79 years old had an 8% mortality rate.[31]

30.     People of any age who have certain underlying medical conditions, including lung disease, heart disease, chronic liver or kidney disease (including hepatitis and dialysis patients), diabetes, epilepsy, hypertension, compromised immune systems (such as from cancer, HIV, or autoimmune disease), blood disorders (including sickle cell disease), inherited metabolic disorders, stroke, developmental disabilities, and asthma, also have an elevated risk.[32]   Early reports estimate that the mortality rate for those with cardiovascular disease was 13.2%, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer.[33]   People with all of these conditions are people with disabilities protected under federal disability rights laws.

---

[30] Xianxian Zhao et al., Incidence, clinical characteristics and prognostic factor of patients with COVID-19: a systematic review and meta-analysis (Mar. 20, 2020), https://cutt.ly/etRAkmt.

[31] *Age, Sex, Existing Conditions of COVID-19 Cases and Deaths* Chart, Worldometer, https://cutt.ly/ytEimUQ (data analysis based on WHO China Joint Mission Report); Exhibit H, Goldenson Decl. ¶ 27.

[32] Exhibit I, Parker Decl. ¶ 19; Exhibit H, Goldenson Decl. ¶ 27; Centers for Disease Control and Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html ("Older adults and people who have severe underlying medical conditions like heart or lung disease or diabetes seem to be at higher risk for developing more serious complications from COVID-19 illness"); World Health Organization, *Coronavirus disease (COVID-19) advice for the public: Myth buster*s, https://cutt.ly/dtEiCyc ("Older people, and people with pre-existing medical conditions (such as asthma, diabetes, heart disease) appear to be more vulnerable to becoming severely ill with the virus.").

[33] World Health Organization, *Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19)*, 12 (Feb. 28, 2020) https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf     (finding

31.     In many people, COVID-19 causes fever, cough, and shortness of breath. However, for people over the age of fifty or with medical conditions or disabilities that increase the risk of serious COVID-19 infection, shortness of breath can be severe.[34]  Most people in higher risk categories who develop serious illness will need advanced support. This requires highly specialized equipment like ventilators that are in limited supply, and an entire team of care providers, including nurses, respiratory therapists and intensive care physicians.[35]

32.     In serious cases, COVID-19 causes acute respiratory disease syndrome ("ARDS"), which is life-threatening; those who receive ideal medical care with ARDS have a 30% mortality rate.[36]  Even in non-ARDS cases, COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, causes permanent loss of breathing capacity.[37]  COVID-19 may also target the heart, causing a medical condition called myocarditis, or inflammation of the heart muscle.  Myocarditis can reduce the heart's ability to pump.[38]  This reduction can lead to rapid or abnormal heart rhythms in the short term, and long-term heart failure that limits exercise tolerance and the ability to work.

---

fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

[34] Zhao, *supra* note 30.

[35] Exhibit I, Parker Decl. at ¶ 27.

[36] Letter from the Faculty at the Johns Hopkins School of Medicine, School of Nursing, and Bloomberg School of Public Health to Hon. Larry Hogan, Gov. of Maryland, March 25, 2020, https://cutt.ly/stERiXk.

[37] Exhibit J, *Dawson v. Asher*, 20-cv-409 (W.D. Wash.) at Doc. No. 5, Declaration of Dr. Jonathan Louis Golob at ¶ 7.

[38] *Id.*

33.     COVID-19 can also trigger an over-response of the immune system and result in widespread damage to other organs, including permanent injury to the kidneys and neurologic injury.[39]

34.     These complications can manifest at an alarming pace. Patients can show the first symptoms of infection in as little as two days after exposure, and their condition can seriously deteriorate in as little as five days or sooner.[40]

35.     Even some younger and healthier people who contract COVID-19 may require supportive care, including supplemental oxygen, positive pressure ventilation, and in extreme cases, extracorporeal mechanical oxygenation.[41]

36.     The need for care, including intensive care, and the likelihood of death, is much higher from COVID-19 infection than from the seasonal influenza.[42] According to recent estimates, the fatality rate of people infected with COVID-19 is about ten times higher than a severe seasonal influenza, even in advanced countries with highly effective health care systems.[43] For people in the highest risk populations, the fatality rate of COVID-19 infection is about 15 percent.[44]

37.     Patients who do not die from serious cases of COVID-19 may face prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity.[45]

---

[39] *Id.*

[40] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities* (Mar. 23, 2020), https://cutt.ly/atJPt5B.

[41] Exhibit J, Golob Decl., *supra* note 37 ¶ 5.

[42] *Id.* at ¶ 4.

[43] McKay, *supra* note 21.

[44] Exhibit J, Golob Decl., *supra* note 37 at ¶ 4.

[45] *Id.*

**B.    COVID-19 Poses Special Risks to People Who Are Incarcerated.**

38.    Beyond the general public health risks the COVID-19 pandemic presents, people who are incarcerated face a particularly acute threat of illness, permanent injury, and death.

39.    People in congregate environments where they live, eat, and sleep in close proximity are at increased danger of contracting COVID-19, as already evidenced by the rapid spread of the virus across the country in jails,[46] in cruise ships[47] and nursing homes.[48] In particular, it is virtually impossible for people who are confined in crowded prisons, jails, and detention centers to engage in the necessary social distancing and hygiene required to mitigate the risk of transmission.  For example, dramatic outbreaks have taken hold in the Cook County Jail[49] and Rikers Island in New York City, where the transmission rate for COVID-19 is estimated to be the highest in the world.[50]  The CDC also warns of "community spread" where the virus spreads easily and sustainably within a community where the source of the infection is unknown.[51]

---

[46] *Supra* note 2.

[47] The CDC is currently recommending that travelers defer cruise ship travel worldwide. "Cruise ship passengers are at increased risk of person-to-person spread of infectious diseases, including COVID-19." *COVID-19 and Cruise Ship Travel*, Centers for Disease Control and Prevention, https://cutt.ly/7tEEQvT.

[48] The CDC notes that long-term care facilities and nursing homes pose a particular risk because of "their congregate nature" and the residents served.  Centers for Disease Control and Prevention, *Preparing for COVID-19: Long-term Care Facilities, Nursing Homes*, https://cutt.ly/7tEEITH.

[49] *See supra* note 2.

[50] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (March 19, 2020), https://cutt.ly/ptRSnVo.

[51] Centers for Disease Control and Prevention, *How Coronavirus Spreads*, https://cutt.ly/jtEE9vG.

40.     Correctional settings further increase the risk of contracting COVID-19 due to the high numbers of people with chronic, often untreated, illnesses housed in a setting with minimal levels of sanitation, limited access to personal hygiene, limited access to medical care, presence of many high-contact surfaces, and no possibility of staying at the necessary distance from others.[52]

41.     Correctional facilities house large groups of people together, and move people in groups.[53]  They frequently have insufficient medical care for the population even outside times of crisis.[54]  Hot water, soap, and paper towels are often in limited supply. Incarcerated people, rather than professional cleaners, are responsible for cleaning the facilities[55] and often are not given appropriate supplies.  People in jails have high rates of disabilities, including the disabilities that create particular risk factors for COVID-19 complications and death.  The Bureau of Justice Statistics reports that people in jail are four times as likely as the general population to have a disability, and this is almost

---

[52] Letter from the Johns Hopkins Faculty, *supra* note 36; Exhibit K, *Velesaca v. Decker*, 20-cv-1803 (S.D.N.Y.) at Doc. No. 42 (Mar. 16, 2020) (Declaration of Dr. Jaimie Meyer) (noting, *inter alia*, that jails environments have reduced prevention opportunities, increased susceptibility, and are often poorly equipped to diagnose and manage outbreaks of infection disease).

[53] *See, e.g,* Nathalie Baptiste, *Correctional Facilities are the Perfect Incubators for the Coronavirus*, Mother Jones (Mar. 6, 2020), https://cutt.ly/GtRSi3e.

[54] *See, e.g.*, Steve Coll, *the Jail Health-Care Crisis*, The New Yorker (Feb. 25, 2019), https://cutt.ly/ftERHNg.

[55] *See, e.g.,* Wendy Sawyer, *How much do incarcerated people earn in each state?*, Prison Policy Initiative, (Apr. 10, 2017); https://cutt.ly/qtER2bh (noting that "custodial, maintenance, laundry" and "grounds keeping" are among the most common jobs for incarcerated people); North Carolina Dept. of Corrections, *North Carolina Prison Inmates at Work*, https://cutt.ly/jtERCbb (noting that cleaning the grounds and facilities is one of the jobs of incarcerated persons in North Carolina).

1  certainly an undercount.[56]   BJS also reports that people in jail are disproportionately
2  affected by many of the specific conditions that increase risk of COVID-19 complications
3  or death.[57]

4        42.    Outbreaks of the flu regularly occur in jails.  During the H1N1 epidemic in
5  2009, jails and prisons dealt with a disproportionately high number of cases.[58]

6        43.    Numerous public health experts, including Dr. Gregg Gonsalves,[59] Ross
7  MacDonald,[60] Dr. Marc Stern,[61] Dr. Oluwadamilola T. Oladeru and Adam Beckman,[62] Dr.

---

[56] Jennifer Bronson et al., *Special Report: Disabilities Among Jail and Prison Inmates, 2011-12*, U.S. Dept. of Justice Bureau of Prison Statistics (Dec. 2015) available at https://www.bjs.gov/content/pub/pdf/dpji1112.pdf.

[57] *Id.* at 2-3.

[58] *See, e.g.,* Exhibit K, Meyer Decl., *supra* note 52 at ¶ 19; Exhibit J, Golob Decl., *supra* note 37 at ¶ 13. This H1N1 "swine flu" pandemic outbreak spread dramatically in jails and prisons in 2010, but that strain of virus had a low fatality rate because of the characteristics of the virus—COVID-19's fatality rate is far higher. David M. Reutter*, Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://cutt.ly/ytRSkuX.

[59] Kelan Lyons, *Elderly Prison Population Vulnerable to Potential Coronavirus Outbreak,* Connecticut Mirror (Mar. 11, 2020), https://cutt.ly/BtRSxCF.

[60] Craig McCarthy and Natalie Musumeci, *Top Rikers Doctor: Coronavirus 'Storm is Coming,'* New York Post (Mar. 19, 2020), https://cutt.ly/ptRSnVo.

[61] Marc F. Stern, MD, MPH, *Washington State Jails Coronavirus Management Suggestions in 3 "Buckets,"* Washington Assoc. of Sheriffs & Police Chiefs (Mar. 5, 2020), https://cutt.ly/EtRSm4R.

[62] Oluwadamilola T. Oladeru, et al., *What COVID-19 Means for America's Incarcerated Population – and How to Ensure It's Not Left Behind*, HealthAffairs (Mar. 10, 2020), https://cutt.ly/QtRSYNA.

Anne Spaulding,[63] Dr. Homer Venters,[64] Jaimie Meyer,[65] the faculty at the Johns Hopkins schools of nursing, medicine, and public health,[66] and Josiah Rich[67] have all strongly cautioned that people booked into and held in jails are likely to face serious, even grave, harm due to the outbreak of COVID-19.

44.    The CDC is a federal agency that is part of the U.S. Department of Health and Human Services. It serves as the national focus for developing and applying disease prevention and control, environmental health, and health promotion and health education activities designed to improve the health of the people of the United States. The CDC is responsible for controlling the introduction and spread of infectious diseases, and provides consultation and assistance to other nations and international agencies to assist in improving their disease prevention and control, environmental health, and health promotion activities. It also provides program expertise and assistance in responding to Federal, State, local, and private organizations on matters related to disease prevention and control activities.[68]

---

[63] Anne C. Spaulding, MD MPDH, *Coronavirus COVID-19 and the Correctional Jail,* Emory Center for the Health of Incarcerated Persons (Mar. 9, 2020), http://www.chip.sph.emory.edu/documents/For%20Correctional%20Facility%20Leadership_2020.pdf .

[64] Madison Pauly, *To Arrest the Spread of Coronavirus, Arrest Fewer People*, Mother Jones (Mar. 12, 2020), https://cutt.ly/jtRSPnk.

[65] Exhibit K, Meyer Decl., *supra* note 52.

[66] *Supra* note 36.

[67] Amanda Holpuch, *Calls Mount to Free Low-risk US Inmates to Curb Coronavirus Impact on Prisons*, The Guardian (Mar. 13, 2020 3:00 p.m.), https://cutt.ly/itRSDNH.

[68] Centers for Disease Control and Prevention, Mission Statement, https://www.cdc.gov/about/organization/cio-orgcharts/pdfs/CDCfs-508.pdf (last visited Apr. 28, 2020).

45.    Because of the extraordinary danger that COVID-19 will spread in jails and prisons, the CDC has issued specific guidance for dealing with correctional and detention facilities, including local jails.[69]   The guidance was published on March 23, 2020.   It acknowledges that incarcerated people are forced to exist "within congregate environments" that "heighten[] the potential for COVID-19 to spread once introduced," especially given that "[t]here are many opportunities for COVID-19 to be introduced into a correctional or detention facility," including "daily staff ingress and egress" as well as "high turnover" of "admit[ted] new entrants."   In light of these concerns, the guidance recommends that detention facilities "explore strategies to prevent over-crowding of correctional and detention facilities during a community outbreak."   The guidance further recommends that the correctional facilities:

> a.    Post signage throughout the facility communicating COVID-19 symptoms and hand hygiene instructions, ensure such signage is understandable for non-English speaking people as well as those with low literacy, and provide clear information about the presence of COVID-19 cases within a facility and the need to increase social distancing and maintain hygiene precautions;
>
> b.    Ensure sufficient stocks of hygiene and cleaning supplies, including tissues; liquid soap where possible; hand drying supplies; alcohol-based hand sanitizer; cleaning supplies effective against the coronavirus; and recommended personal protective equipment like face masks, disposable medical gloves, and N95 respirators;
>
> c.    Provide incarcerated people no-cost access to soap (providing liquid soap where possible), running water, hand drying machines or disposable paper towels for hand-washing, and tissues (providing no-

---

[69] CDC, *Interim Guidance*, *supra* note 40.

touch trash receptacles for disposal);

d.    Suspend co-pays for incarcerated people seeking medical evaluation for respiratory symptoms;

e.    Even if COVID-19 cases have not been identified locally or inside, implement "intensified cleaning and disinfecting procedures" that clean and disinfect high-touch surfaces and objects "[s]everal times per day," and ensure adequate supplies to support intensified cleaning and disinfection practices";

f.    Perform pre-intake screening and temperature checks for all new entrants;

g.    Adopt social distancing strategies to increase space between individuals, including rearranging bunking to ensure that beds are at a minimum six feet apart in all directions, increasing space in lines and waiting areas, staggering meals and rearranging seating during meals so that detainees are sitting on only one side of the table and are separated with adequate space;

h.    Medically isolate confirmed and suspected cases and quarantine of contacts.

46.    According to the CDC, "[f]acilities should make every possible effort to place suspected and confirmed COVID-19 cases under medical isolation individually."[70] Further, quarantined individuals should be "housed separately, in single cells with solid walls . . . and solid doors that close fully."[71]  Cohorting should only be considered as a last resort, and even then all incarcerated people must have enough room to retain at least 6 feet of space between each other at all times.  If a facility has no option but to implement cohorting, it must do so while following several strict precautions. These precautions

---

[70] *Id.*

[71] *Id.*

include mandating that individuals wear face masks at all times, ensuring that individuals with laboratory-confirmed cases are not mixed with individuals who have not tested positive, and ensuring that individuals with respiratory problems are not cohorted "unless no other possibilities exist."[72]

**C.    Defendants' Actions Have Been Inadequate to Protect People Incarcerated in the Orange County Jail From These Risks of Infection.**

47.    The OCSD's response has been inadequate to curtail the rampant spread of COVID-19 through the Jail.  It has not complied with the majority of the CDC Guidelines despite the increasing number of infections in the Orange County Jail since these guidelines were first issued. Without further action, it is likely that the epidemic inside the Orange County Jail will worsen rapidly.

48.    As of April 28, 2020 there are 45,031 confirmed cases of COVID-19 in California,[73] with 2,151 confirmed cases in the Orange County area.[74]  To date, there have been 1,809 deaths from COVID-19 in California alone,[75] with 42 deaths in Orange County.[76]  The Governor of California has declared a statewide emergency,[77] as have local

---

[72] *Id.*

[73] California Department of Public Health, *California COVID-19 By The Numbers*, https://www.cdph.ca.gov/Programs/CID/DCDC/Pages/Immunization/ncov2019.aspx.

[74] OC Health Care Agency, *COVID-19 What You Should Know*, https://occovid19.ochealthinfo.com/.

[75] *Supra* note 73.

[76] *Supra* note 74.

[77] Office of Governor Gavin Newsom, *Governor Newsom Declares State of Emergency to Help State Prepare for Broader Spread of Covid-19*, (Mar. 4, 2020), https://www.gov.ca.gov/2020/03/04/governor-newsom-declares-state-of-emergency-to-help-state-prepare-for-broader-spread-of-covid-19/.

Orange County officials.[78]  Governor Newsom directed a statewide stay at home order, requiring all Californians to stay home if not performing essential activities.[79]

49.    The Orange County Jail consists of four physically separate facilities that operate as a single system. There is constant movement of staff and incarcerated people among each of the four facilities, widening the circles of potential outbreak and exposure. These facilities include the Men's Central Jail, the Women's Central Jail, the Theo Lacy Facility, and the Intake and Release Center. Each of these facilities is configured differently and has a different type of housing.[80] The rated capacity of each facility is determined on a biannual basis by the California Board of State and Community Corrections (BSCC), an independent statutory agency that, *inter alia*, inspects local correctional facilities in California for compliance with Title 15 regulations, which set minimum standards for these facilities.[81] The rated capacity of a facility means the maximum number of incarcerated occupants for which a facility's cells or dormitories, except those dedicated for health care or disciplinary separation housing, were planned and designed in conformity to Title 15 regulations (maintained by BSCC) and Title 24 regulations (maintained by the California

---

[78] Brittany Martin, *Why Orange County has Declared a Coronavirus Emergency*, Los Angeles Magazine, (Feb. 27, 2020), https://www.lamag.com/citythinkblog/orange-county-coronavirus-emergency/.

[79] Office of Governor Gavin Newsom, *Governor Gavin Newsom Issues Stay at Home Order* (Mar. 19, 2020), https://www.gov.ca.gov/2020/03/19/governor-gavin-newsom-issues-stay-at-home-order/.

[80] *See generally*, State of California Board of State and Community Corrections 2016-2018 Biennial Inspection: Orange County's Type II and Court Holding Facilities, Penal Code Section 6031 (Sep. 26. 2018), https://drive.google.com/file/d/1h-E41vMsJa3S06bW8PGSTwS3DWpPbzj5/view?usp=sharing.

[81] Board of State and Community Corrections, About the Board of State and Community Corrections (last visited Apr. 28, 2020), http://www.bscc.ca.gov/m_bsccboard/; BSCC, Title 15 Minimum Standards for Local Detention Facilities (effective Oct. 1, 2019), http://www.bscc.ca.gov/wp-content/uploads/Adult-Title-15-Regulations-Effective-10.1.2019.pdf.

Building Standards Commission).[82] Theo Lacy has a rated capacity of 2,080 occupants. It is composed of a large number of barrack style dorms, seven module units where people are housed in two-person cells that share common day rooms and shower facilities, and two module units where people are housed in single-person cells that share common day rooms and shower facilities.[83]  The Men's Central Jail has a rated capacity of 1,219 occupants. It is composed primarily of module units where people are housed in cells that vary in size from four to eight occupants; occupants share toilet and shower facilities.[84] There are also dormitory style units where occupants share common day rooms, shower, and toilet facilities.[85] The Women's Central Jail has a rated capacity of 274 occupants. It is composed primarily of dormitory style units which sleep up to 30 occupants in one unit, where occupants share toilet and shower facilities.[86] There is also one unit where people are housed in single cells and share shower facilities.[87] The Intake and Release Center has a rated capacity of 407 occupants. It is composed primarily of module units where people are housed in single-person cells that share common day rooms and shower facilities.[88] Collectively, the Orange County Jail has a total of 51 medical isolation cells.[89]

50.    Given the current population, social distancing in these facilities is not possible.  People in the Orange County jail are regularly housed in group barracks or in

---

[82] BSCC, Title 15 Minimum Standards, *supra* at 12.

[83] *See id.* at 50–56.

[84] *See id.* at 47–40.

[85] *Id.*

[86] *See id.* at 44–45.

[87] *Id.*

[88] *See id.* at 26–32.

[89] *See id.* at 26–56.  There are 15 medical isolation cells in the Women's Central Jail and 26 at the Theo Lacy Facility.  There are no medical isolation cells at the Men's Central Jail or the Intake and Release Center.

multiple-person cells (often containing as many as 8 bunks in each cell) that share dayrooms with other cells.  The largest number of people are housed in the Theo Lacy facility, which consists largely of large barrack-style dorms.[90]  People in barracks sleep in bunk beds in close proximity to each other, much closer than six feet apart.[91]  People in multi-person cells sleep in similarly close proximity.[92]  Even persons who are detained in single or double bunked cells often remain constantly in close proximity and air space with others in their modules.[93]  Housing units in jails generally lack adequate ventilation, a factor that facilitates the likelihood of airborne transmission of COVID-19.[94]  Some cells have open bars and many open directly into communal day rooms.  Detainees congregate in groups in the day rooms, often in numbers too large for social distancing.[95]  They share

---

[90] *See supra* note 81.

[91] Exhibit L, Declaration of Dalton James Cardone ¶ 7 (before quarantine, slept with a large group, may 60 people, in an open dorm); Exhibit D, Hernandez Decl. ¶ 7 ("[t]he beds are very close together, only a couple of inches apart" and his feet touch his cellmates' feet while sleeping).

[92] Exhibit C, Ahlman Decl. ¶ 7 ("Our bunks are about two feet from one another."); Exhibit D, Hernandez Decl. ¶ 7 ("The beds are very close together, only a couple of inches apart. If people sleep with their heads facing each other, their heads will touch. I sleep with my feet facing a cellmate's feet, and our feet touch each other's during the night.").

[93] Exhibit M, Declaration of Mark Trace ¶ 7 (all of the cells in the module have open bars and share the same air); Exhibit N, Declaration of Fernando Maldonado ¶ 11 ("Our bunks are so close that we can reach other's bunk when we lay down."); Exhibit O, Declaration of Sean S. Wells ¶ 9 ("It is impossible for my cellmate and I to maintain six feet distance from each other when we are confined in our cell, which is about 21 hours a day.").

[94] Exhibit H, Goldenson Decl. ¶ 19.

[95] Exhibit C, Ahlman Decl. ¶ 22.;  Exhibit A, Wagner Decl. ¶ 16 (entire module shares day room, 8 people at a time together); Exhibit P, Declaration of Cecibel Caridad Ortiz ¶ 6 (dayroom shared by 7 people in module, without enough space to keep six feet apart).

phones "basically shoulder to shoulder with each other,"[96] and share communal shower spaces.[97]  Many detainees must also share communal toilets.[98]

51.    The jail relies on incarcerated people to perform much of the work of laundry, food preparation and distribution across the jail.[99]  Incarcerated people prepare and cook the food and serve meals in the chow hall at Theo Lacy, where large groups of people continue to congregate for a hot meal.[100]  Along with jail staff, they deliver meals and laundry to modules in each of the jail buildings.[101]  They are forced to line up close together to receive mail.[102]

52.    Although court hearings have slowed, some hearings are still held in person at the court house and others are at videoconferencing.  In both instances, people are brought across the jail from their cells, put in close contact with each other in crowded

---

[96] Exhibit C, Ahlman Decl. ¶ 21; Exhibit N, Maldonado Decl. ¶ 15 (describing inability to socially distance while using telephones that are "about two feet away from each other."); Exhibit O, Wells Decl. ¶ 15.

[97] Exhibit A, Wagner Decl. ¶ 17.

[98] Exhibit C, Ahlman Decl. ¶ 24 ("All of the women in the medical tank share two toilets. Sometimes we have to wait in line for these. If we wait in line we can not space out six feet apart."); Exhibit D, Hernandez Decl. ¶ 10 "We all use the same toilet, shower, and table for eating."); *Id*. ¶ 14 ("The phones are [in the dayroom] about three feet away from the table and two feet away from the toilet.").

[99] Exhibit M, Trace Decl. ¶¶ 7, 14; Exhibit D, Hernandez Decl. ¶ 23; Exhibit Q, Declaration of Cynthia Campbell ¶ 19; Exhibit A, Wagner Decl. ¶ 13; Exhibit R, Declaration of Julian Miranda, Jr. ¶ 8.

[100] Orange County California, Grand Jury, Jail Food: Reservation Required, pp. 5-6 (describing meal preparation and by detainees).

[101] Exhibit D, Hernandez Decl. ¶ 19; Exhibit Q, Campbell Decl. ¶ 21; Exhibit S, Declaration of Michael Seif ¶ 18; Exhibit T, Declaration of Jose Armendariz ¶¶ 35 – 27 (describing observing staff and incarcerated workers handle and distribute meals without wearing masks properly, without changing gloves.).

[102] Exhibit D, Hernandez Decl. ¶ 26.

holding cells, and then returned to their cell modules or barracks without testing or screening.[103]  Incarcerated people are regularly in close contact with each other and large groups of people on a daily basis.[104]  The jail guards do not facilitate social distancing standards in common areas, and groups of over forty are regularly gathered during recreational periods.[105]  Individuals move within and between the facilities.[106]  Group movements within modules and across the jail "may cluster large numbers of people together in small spaces, increase the risk of transmission between incarcerated persons and throughout the facility."[107]

53.     When individuals at the jail require medical treatment, they must face a gauntlet of crowded lines at the nurses' stations and medical units.[108]  Medically at-risk

---

[103] Exhibit C, Ahlman Decl. ¶ 5 (describing being transported in the middle of March to court with other women, then placed with 15 people in a 10 person holding cell "all on top of each other, for close to two hours."); Exhibit S, Seif Decl. ¶ 5 (traveling to court on a bus with over 30 people from other sectors, waiting in a holding cell for 7 hours at the courthouse with 13 people, and then returning to the jail); Exhibit E, Saem Decl. ¶ 7 (transported to court in early March with 30 to 40 other people, and held in a holding cell with 30 other people); Exhibit O, Wells Decl. ¶ 12 (describing concern over cellmate's possible exposure to virus during a trip to court where he was in "close contact with about 20 other people during the day.")

[104] Exhibit C, Ahlman Decl. ¶ 5; Exhibit A, Wagner Decl. ¶¶ 6, 8 (people moved into his pod in a large group); Exhibit P, Caridad Ortiz Decl. ¶ 18 (discussing an outside trip to visit a doctor); Exhibit M, Trace Dec. ¶ 15 (explaining frequent transfers of inmates in and out of unit without quarantine period); Exhibit F, Castillo Decl. ¶¶ 8-11, 13, 21 (discussing exposure while seeking/transiting to and from medical treatment); Exhibit Q, Campbell Decl. ¶ 14 (describing that she takes a small elevator to rec and others take stairs).

[105] Exhibit D, Hernandez Decl. ¶ 30.

[106] Id. ¶ 14 (describing moving to a new building because his cell became a quarantine area and having to take a bus with 40 other people, "bunched up together," being searched by guards without PPE, and held again in a crowded holding cell for hours).

[107] Exhibit H, Goldenson Decl. ¶ 23.

[108] Exhibit A, Wagner Decl. ¶ 8 (when he goes for daily blood pressure if there is a line "we all sit on a set of stairs right next to each other"); Exhibit O, Wells Decl. ¶ 20

individuals are repeatedly placed in close contact with other people, including those who exhibit COVID-19 symptoms, when they seek routine medical treatment.[109]  They may be escorted in groups by a guard to the nurses' station, and must wait on crowded benches to be seen.[110]

54.    The conditions are harrowing for women who are nursing.  Until late March 2020, the women had to travel to the nurses' office to share the breast pump, even though the space was not cleaned between uses.[111]  The women decided to start pumping milk in their tanks after learning that COVID-19 had spread throughout the women's facility, but they must still travel to the nurses' station multiple times a day to transport their breastmilk. These trips make them nervous because they increase their exposure to the disease, particularly because they must come into contact with people who are seeking treatment for COVID-19 and other illnesses in the medical unit.[112]

55.    Potentially contagious persons are housed alongside asymptomatic bunk and cellmates, exacerbating the likelihood of rapid COVID-19 spread.  As more and more people in the jail become symptomatic, presumptively healthy detainees must continue to share close quarters with large numbers of symptomatic individuals who have not been isolated or tested despite having symptoms.[113]  Fever appears to be the sole metric for

---

(describing it as "impossible to maintain six feet distance from medical and custody staff."); Exhibit T, Armendariz Decl. ¶ 30 ("While we wait to be seen by an RN, we sit on small dirty benches basically shoulder to shoulder.").

[109] Exhibit F, Castillo Decl. ¶¶ 8-11.

[110] Exhibit Q, Campbell Decl. ¶ 11; Exhibit F, Castillo Decl. ¶ 10.

[111] Exhibit C, Ahlman Decl. ¶ 11.

[112] *Id*. at 12-13.

[113] Exhibit M, Trace Decl. ¶ 9 (medical personnel denied test, and said it was because Mr. Trace did not have a fever, although he shared ventilation with other detainees in nearby modules who tested positive).

treating detained persons as requiring a change in housing, despite the fact that numerous persons describe common COVID-19 symptoms like headaches, dry coughs or inability to smell.[114]

56.    The Orange County Jail has failed to follow the CDC's guidance with respect to isolation of suspected cases and its use of cohorting.[115]  Only after people test positive for COVID-19 are they removed from their barrack or modular housing and transferred to isolation.  Defendants are not making "every effort to quarantine close contacts of COVID-19 cases individually," increasing the risk that others will be infected.[116]  People who have been exposed to positive cases have not always been quarantined and are themselves often still in group settings, where new individuals are added.

57.    As the jail has sought to isolate or quarantine some symptomatic or confirmed cases, it has failed to adequately protect those who were exposed or remain in large cells or units.  Defendants inappropriately move people in and out of cohorts before waiting the full 14 days.[117]  For example, as new sick individuals are identified, groups of people have been moved between housing units and rearranged in new combinations, and individuals

---

[114] Exhibit S, Seif Decl. ¶ 7 (despite trouble breathing, headache and likely exposure to a guard who tested positive, Mr. Seif has not been seen by a doctor or tested for COVID-19); Exhibit U, Declaration of Jaime Herrera ¶ 7 (despite headache and exposure to guard with COVID, Mr. Herrera has not been tested); Exhibit M, Trace Decl. ¶ 9.

[115] Exhibit A, Wagner Decl. ¶ 5.

[116] Exhibit H, Goldenson Decl. ¶ 45.

[117] Exhibit R, Miranda Jr. Decl. ¶¶ 9 –12, 22-25 (while housed in the worker unit A-5, Mr. Miranda was exposed to a person with COVID-19, then placed under group quarantine without a mask where he eventually tested positive for COVID-19.  After testing positive, Mr. Miranda was transferred to a two-person cell in a rat-infested filthy module, M-25, where he shares phones and showers, including with some other men who do not have COVID-19); Exhibit L, Cardone Decl. ¶¶ 7-8 (after developing a fever, Mr. Cardone was moved from a 60-person barrack to the R-mod, where he was placed in a 7-day quarantine with 10 other people; he was tested for COVID-19 and when his results were negative he was moved to yet another cohort quarantine in O-41 for another 7 days).

who have not tested positive are required to use the same showers and phones with those who have tested positive.[118]  In dorm or module settings, after the infected individuals have been moved, the jail assigns other detained people to clean the cells of the suspected or confirmed cases without any PPE, increasing their risk of exposure.[119]

58.    Recent test results show the dangerous consequences of the Jail's failures to properly quarantine.  Just last week, the Jail expanded its testing to evaluate its quarantined population and 18 of 22 asymptomatic people who were being considered for reintegration into the larger population tested positive.[120]

59.    As the disease has spread, and quarantine needs grown, this has put additional pressure on non-quarantined housing units, causing them to become more crowded.  Don Wagner, a 68-year-old man with serious medical conditions, was in a unit with 16 people and no cell mate until last week, allowing him to avoid at least some of the dangerous contact of close quarters.  But on April 22, 2020, the jail added an additional 16 people to the unit, double bunking every cell, including his.[121]

60.    Even in ordinary times, the medical care system in the Orange County jail is overburdened.  The medical care system has been further encumbered due to the pandemic. People in the jail must routinely wait long periods of time to receive medical attention even

---

[118] Exhibit R, Miranda Jr. Decl. ¶ 25.

[119] *Id.*, at ¶ 9, 12.

[120] Sareen Habeshian, *18 inmates at O.C. jails test positive for COVID-19, after testing is expanded to asymptomatic people in quarantine*, KTLA 5 (Apr. 25, 2020), https://ktla.com/news/local-news/18-inmates-at-o-c-jails-test-positive-for-covid-19-after-testing-is-expanded-to-asymptomatic-people-in-quarantine/.

[121] Exhibit A, Wagner Decl. ¶ 6.

after they request care.[122]  During the current crisis, medical care in the jails has further slowed, creating heightened risks for patients.[123]

61.    Hygiene, information, and nutrition are other areas where the Jail has fallen short.  Incarcerated people have been insufficiently informed about the dangers COVID-19 poses and about the safety measures public health officials advise.  Although the CDC recommends clear informational signage be posted in all languages spoken in the facility, the Orange County Jail facilities have only provided sporadic and inadequate advisories.[124]

62.    The PPE provided by the jail is ineffective, and is used and distributed inadequately and inconsistently.  People held in the jail describe the PPE as "swatches of fabric" and not real masks, and explain that guards and workers do not consistently wear them.[125]  Even in a unit where deputies explicitly told incarcerated people that one of their colleagues had recently contracted COVID-19, many deputies do not wear gloves or

---

[122] Exhibit Q, Campbell Decl. ¶ 8; Exhibit M, Trace Decl. ¶ 8; Exhibit E, Saem Decl. ¶ 11.

[123] Exhibit C, Ahlman Decl. ¶ ¶ 10-12 (explaining that nursing mothers are no longer able to pump in the nurse's office and she can no longer get fresh milk to her baby); Exhibit E, Saem Decl. ¶ 11 (requires an eye examination and cannot get one scheduled); Exhibit Q, Campbell Decl. ¶ 8 (despite her serious medical conditions and the fact that she has felt sick for a week and filled out three medical slips, she has not been able to see the doctor).

[124] Exhibit A, Wagner Decl. ¶ 10 (describing barely audible announcements); Exhibit P, Caridad Ortiz Decl. ¶ 17; Exhibit D, Hernandez Decl. ¶ 29; Exhibit M, Trace Decl. ¶ 12 (announcement difficult to hear); Exhibit E, Saem Decl. ¶ 9.

[125] Exhibit C, Ahlman Decl. ¶¶ 15, 16, Exhibit A, Wagner Decl. ¶ 11 (describing the PPE as being "just swatches of fabric" that are not regularly replaced); Exhibit Q, Campbell Decl. ¶¶ 16-19; Exhibit D, Hernandez Decl. ¶¶ 17, 18; Exhibit M, Trace Decl. ¶¶ 14, 16 (inconsistent use of PPE by staff and jail workers); Exhibit E, Saem Decl. ¶ 12-13; Exhibit N, Maldonado Decl. ¶ 17 ("Custody staff provided us with torn sheets to use as face coverings."); Exhibit O, Wells Decl. ¶ 24; Exhibit T, Armendariz Decl. ¶ 27 (described receiving "torn sheets . . . to use as bandanas/face coverings . . .") and ¶ 28 ("I have seen several deputies not wearing masks.").

masks.[126] Incarcerated people have only received minimal PPE. Although some have received masks, those masks were not replaced and have long ceased to function effectively.[127]

63.    Incarcerated people are responsible for cleaning their cells, but they are not given adequate supplies to maintain a hygienic space.[128]

64.    People in the Jail are becoming physically weakened and more susceptible to disease because they are not receiving adequate nutrition. Many have not received hot food in weeks and are receiving three paper sack meals a day. They describe meals that consist of a few pieces of bread and a chunk of frozen meat.[129]

**D.    Existing Procedures and Protocols Will Not Be Sufficient to Ensure the Safety of Class Members or the General Public.**

65.    Because of the severity of the threat posed by COVID-19, and its potential to rapidly spread throughout a correctional setting, public health experts recommend the rapid release from custody of people most vulnerable to COVID-19.[130] Release protects the people with the greatest vulnerability to COVID-19 from transmission of the virus, and also allows for greater risk mitigation for people held or working in a jail and the broader

---

[126] Exhibit S, Seif Decl. ¶¶ 9, 12.

[127] Exhibit P, Caridad Ortiz Decl. ¶¶ 11,12; Exhibit C, Ahlman Decl. ¶ 1; Exhibit D, Hernandez Decl. ¶¶ 17-18; Exhibit M, Trace Decl. ¶ 13; Exhibit F, Castillo Decl. ¶ 18.

[128] Exhibit C, Ahlman Decl. ¶ 19, 20; Exhibit A, Wagner Decl. ¶ 15; Exhibit P, Caridad Ortiz Decl. ¶ 15; Exhibit D, Hernandez Decl. ¶¶ 11-12; Exhibit M, Trace Decl. ¶ 18; Exhibit F, Castillo Decl. ¶ 19; Exhibit E, Saem Decl. ¶ 16.

[129] Exhibit C, Ahlman Decl. ¶ 25; Exhibit P, Caridad Ortiz Decl. ¶16; Exhibit D, Hernandez Decl. ¶ 19; Exhibit M, Trace Decl. ¶ 14; Exhibit F, Castillo Decl. ¶ 20.

[130] Exhibit V, *Dawson v. Asher*, 20-cv-409 (W.D. Wash.) at Doc. No. 6, Declaration of Marc Stern at ¶¶ 9–10 (noting that release is "a critically important way to meaningfully mitigate" the risks of harm to persons who are at high risk of serious illness or death, as well as to support the broader community health infrastructure).

community.[131]  People who are medically vulnerable at the Orange County Jail are at "a heighted risk for serious illness and death" and "[g]iven the high likelihood of contagion and spread in the jail, the safety of these individuals is a pressing emergency that needs to be addressed on an urgent basis."[132]  Release of the most vulnerable people from custody also reduces the burden on the region's health care infrastructure by reducing the likelihood that an overwhelming number of people will become seriously ill from COVID-19 at the same time.[133]

66.    Notwithstanding the fact that the OCSD has released a modest number of people and adopted (at least formally) some precautionary policies to address COVID-19, large numbers of Medically-Vulnerable and Disability Subclass Members continue to be exposed to the dangers of continued detention in the Orange County Jail.  Their immediate release remains a necessary public health intervention.[134]  Further release is needed not only to prevent irreparable harm to members of the Medically-Vulnerable and Disability Subclasses, but also to reduce the incarcerated population sufficiently to ensure proper social distancing to reduce transmission for all class members and the wider public.[135]

---

[131] *Id.*

[132] Exhibit H, Goldenson Decl. ¶ 48; *see also*, Exhibit I, Parker Decl. ¶¶ 35-36.

[133] Matthew J. Akiyama et al, *Flattening the Curve for Incarcerated Populations - Covid-19 in Jails and Prisons*, New England Journal of Medicine, (Apr. 2, 2020), https://www.nejm.org/doi/full/10.1056/NEJMp2005687.

[134] *See* Exhibit H, Goldenson Decl. ¶ 50.

[135] *Id.* Further, in the prison context, the ABA urges that "Governmental authorities in all branches in a jurisdiction should take necessary steps to avoid crowding that… adversely affects the … protection of prisoners from harm, including the spread of disease." *ABA Standards for Criminal Justice: Treatment of Prisoners*  Am. Bar Ass'n § 23-3.1(b) (3d ed.     2011), https://www.americanbar.org/content/dam/aba/publications/criminal_justice_standards/Treatment_of_Prisoners.pdf.

67.    Not only has Sheriff Barnes failed to release adequate numbers of medically-vulnerable and disabled people from the jail, OCSD has continued to arrest individuals for low-level offenses and unnecessarily expose them to infection by bringing them into the Orange County Jail where an outbreak has already occurred.  Due to decreased court operations, these individuals could wait in the jail for days if not weeks before having an opportunity to see a judge and be released.  Maintaining this practice in the midst of the COVID-19 crisis needlessly risks people's lives and must be ended.

68.    As a result of the Supreme Judicial Council's March 30, 2020 Emergency Order extending deadlines for criminal cases, many people recently charged with felonies are being forced to languish in the jail for up to seven days before even being presented to a magistrate judge.[136]

69.    The Orange County Jail must respond to and manage the continued risk of harm that the COVID-19 outbreak poses by following CDC[137] and other public health guidelines.  This requires: (a) providing all incarcerated persons a six-foot radius or more of distance between any other persons, as well as during meals, transportation, court sessions, recreation, counts, and all other activities; (b) instituting a safety plan to manage the COVID-19 outbreak in the Orange County Jail, in accordance with CDC guidelines; (c) making readily available access to sanitation solutions, without charge, for the purposes of cleaning cells, dormitories, laundry, and eating areas, including sufficient soap, and lifting any ban on alcohol-based hygiene supplies (e.g., hand sanitizer, cleaning wipes); (d) providing appropriate COVID-19 testing for all class members, jail staff, and visitors; (e)

[136] Judicial Council of California Statewide Emergency Order by Hon. Tani G. Cantil-Sakauye, Chief Justice of California and Chair of the Judicial Council (Mar.  30, 2020), https://newsroom.courts.ca.gov/internal_redirect/cms.ipressroom.com.s3.amazonaws.com/262/files/20202/Statewide%20Order%20by%20the%20Chief%20Justice-Chair%20of%20the%20Judicial%20Council%203-3-2020.pdf.

[137] CDC, *Interim Guidance*, *supra* note 40.

waiving all medical co-pays for those experiencing COVID-19-like symptoms; and (f) waiving all charges for medical grievances during the COVID-19 outbreak; (g) quarantining all confirmed or suspected cases of COVID-19 without resorting to cohorting, if possible.[138]

**E. Orange County's Policies, Practices, and Procedures in the Face of COVID-19 Violate the ADA and the Rehabilitation Act.**

70.    Sheriff Barnes' and Orange County's actions and inactions in the face of COVID-19 constitute disability discrimination.   The Disability Subclasses include everyone in the Medically-Vulnerable Subclasses who is vulnerable because of a disability, as defined under federal law.   This includes everyone in the Medically-Vulnerable Subclasses except those vulnerable solely because of age or pregnancy status.   All other conditions that increase risk for COVID-19 complications or death—including lung conditions, asthma, heart conditions, diabetes, kidney disease, liver disease, HIV, immune dysfunction, autoimmune disorders, cancer treatment, and history of organ or bone marrow transplantation—are disabilities under federal disability rights laws.   People in the Orange County Jail who have any of these conditions are medically-vulnerable people with disabilities protected by the ADA and the Rehabilitation Act, in addition to being protected by the constitutional provisions that protect all medically-vulnerable subclass members. By continuing to detain members of the Disability Subclass, Defendants' policies and practices violate the ADA and the Rehabilitation Act.

71.    The ADA and the Rehabilitation Act require all covered entities to provide reasonable modifications in their policies, practices, and procedures in order to give people with disabilities an equal opportunity to benefit from the entity's programs, services, and activities.   Orange County is a covered entity under these laws.   Orange County Jail has failed to make modifications to ensure that high-risk people with disabilities can avoid contracting—and possibly dying from—COVID 19.   Release of the Disability Subclasses

---

[138] *See* Exhibit H, Goldenson Decl. ¶ 23.

is the most appropriate modification of the jail's program. Absent that, the jail must implement modifications to protect Disabled Subclass members during incarceration, including implementing meaningful social distancing in compliance with CDC guidelines, ensuring full use of PPE, regular testing, and complete quarantine of people who test positive. The ADA and the Rehabilitation Act also prohibit covered entities from using methods of administration that defeat or impair the accomplishment of the objectives of the public entity's program. For pre-trial detainees, the jail's main purpose and objectives are to provide required safety and health services while ensuring an individual's appearance at arraignment and trial. A person who is sickened, unconscious, or killed by COVID-19 will be unable to make such an appearance. By setting up a system where mass infection and resulting harm and death will disproportionately fall on people with disabilities, the jail has failed to establish methods of administration that do not discriminate against people with disabilities.

72.   As a result of the Orange County Jail's failures to make reasonable modifications, including release, and its failure to establish a non-discriminatory method of administering its program, people with disabilities are being denied an equal opportunity to participate in the adjudication of their cases and are denied the reasonable modifications they may need to survive this pandemic.

## IV.   CLASS ACTION ALLEGATIONS

73.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a class of similarly situated individuals.

74.   Plaintiffs Melissa Ahlman, Daniel Kauwe and Michael Seif seek to represent a class of all current and future detainees in pre-trial custody at the Orange County Jail, including alleged violations of probation or parole, ("Pre-trial Class"), including a subclass of all persons who, by reason of age or medical condition, the CDC has identified as particularly vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Pre-trial Subclass"), and a subclass of all persons within the Medically-Vulnerable Pre-trial Subclass who are vulnerable because of a disability as defined in

federal law ("Disability Pre-trial Subclass").  Plaintiffs Daniel Kauwe and Michael Seif are also representatives and members of the Medically-Vulnerable Pre-trial Subclass and the Disability Pre-trial Subclass.

75.    Plaintiffs Javier Esparza,  Pedro Bonilla, Cynthia Campbell, Monique Castillo, Mark Trace, Cecibel Caridad Ortiz and Don Wagner seek to represent a class of all current and future detainees in post-conviction custody, including those serving a term of incarceration pursuant to an adjudicated violation of probation or parole, at the Orange County Jail ("Post-conviction Class"), including a subclass of persons who, by reason of age or medical condition, are particularly vulnerable to injury or death if they were to contract COVID-19 ("Medically-Vulnerable Post-conviction Subclass"), and a subclass of all persons within the Medically-Vulnerable Post-conviction Subclass who are vulnerable because of a disability as defined in federal law ("Disability Post-conviction Subclass"). Plaintiffs Pedro Bonilla, Cynthia Campbell, Monique Castillo, Mark Trace, Cecibel Caridad Ortiz, Don Wagner are also representatives and members of the Medically-Vulnerable Post-conviction Subclass and the Disability Post-conviction Subclass.

76.    The "Medically-Vulnerable" subclasses are defined as all current and future persons held at the jail over the age of 55, as well as all current and future persons held at the Orange County Jail of any age who experience (a) lung disease, including asthma, chronic obstructive pulmonary disease (e.g. bronchitis or emphysema), or other chronic conditions associated with impaired lung function; (b) heart disease, such as congenital heart disease, congestive heart failure and coronary artery disease; (c) chronic liver or kidney disease (including hepatitis and dialysis patients); (d) diabetes or other endocrine disorders; (e) epilepsy; (f) hypertension; (g) compromised immune systems (such as from cancer, HIV, receipt of an organ or bone marrow transplant, as a side effect of medication, or other autoimmune disease); (h) blood disorders (including sickle cell disease); (i) inherited metabolic disorders; (j) history of stroke; (k) a developmental disability; and/or (l) a current or recent (last two weeks) pregnancy.

77.     The "Disability" subclasses are defined as all current and future members of the Medically-Vulnerable Subclasses who are vulnerable because of a disability as defined under federal disability rights laws.  The Disability Subclasses include all members of the Medically-Vulnerable Subclasses except those who are vulnerable solely by reason of age or current or recent pregnancy.  People with all other conditions listed in the preceding paragraph are people with disabilities and members of the Disability Subclasses.

78.     This action has been brought and may properly be maintained as a class action under federal law.  It satisfies the numerosity, commonality, typicality, and adequacy requirements for maintaining a class action under Fed. R. Civ. P. 23(a).

79.     Joinder is impracticable because (1) the classes and subclasses are numerous; (2) the classes and subclasses include future members, and (3) the classes and subclass members are incarcerated, rendering their ability to institute individual lawsuits limited.

80.     Based on available information, there are at least 40 people in the proposed Pre-trial Class, the proposed Post-Conviction Class, and each proposed subclass.  Everyone in the Orange County Jail is a proposed class member.  There are approximately 3,336 individuals currently incarcerated in the Orange County Jail.[139]  An estimated 40% of the Pre-trial and Post-conviction Classes would be expected to be members of the Disability subclasses, with an even greater number being a part of each Medically-Vulnerable Subclass.[140]

81.     Common questions of law and fact exist as to all members of the proposed classes: all are at unreasonable risk of serious harm from contracting COVID-19 due to the conditions in the Orange County Jail and Defendants' failure to take reasonable measures

[139] BSCC, Supplemental JPS Reporting Dashboard (last visited Apr. 29, 2020)https://app.smartsheet.com/b/publish?EQBCT=82b29a92ea9a4a0ea7aa480f1287e137.

[140] U.S. Department of Justice, *Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-2012*, https://www.bjs.gov/content/pub/pdf/mpsfpji1112.pdf (39.9% of people in jail have a chronic conditions).

to assure their safety from the disease, and all have a right to receive adequate COVID-19 prevention, testing, and treatment.

82.    Questions of fact common to all proposed class members include whether the conditions in the Orange County Jail expose them to heightened risk of contracting COVID-19, and whether social distancing is possible with the current jail population. Questions common to all members of the subclasses include whether the conditions in the Orange County Jail expose them to heightened risk of serious illness, injury, or death and whether the jail's policies and practices discriminate against people with disabilities in violation of federal disability rights laws.  Questions of law common to all proposed class and subclass members include what relief is necessary to mitigate the risks posed by their confinement in the Orange County Jail.

83.    Plaintiffs' claims are typical of the class and the subclass members' claims. Defendants have placed them at significant risk of harm by failing to take appropriate steps to address the risk of contracting, and being rendered seriously ill or injured by, COVID-19 in the Orange County Jail.  Plaintiffs, like every person in the Jail, face heightened risk of contracting COVID-19 if they are not adequately protected by Defendants.

84.    Named Plaintiffs have the requisite personal interest in the outcome of this action and will fairly and adequately protect the interests of the class.  Plaintiffs have no interests adverse to the interests of the proposed class.  Plaintiffs retained *pro bono* counsel with experience and success in the prosecution of civil rights litigation.  Counsel for Plaintiffs know of no conflicts among proposed class members or between counsel and proposed class members.

85.    Defendants have acted on grounds generally applicable to all proposed class members, and this action seeks declaratory and injunctive relief.  Plaintiffs therefore seek class certification under Rule 23(b)(2).

86.    In the alternative, the requirements of Rule 23(b)(1) are satisfied, because prosecuting separate actions would create a risk of inconsistent or varying adjudications

with respect to individual class members that would establish incompatible standards of conduct for the party opposing the proposed classes.

## V.     ARGUMENT

### A.    Plaintiffs' Incarceration Amidst the Current COVID-19 Outbreak in the Orange County Jail Violates their Right to Constitutional Conditions of Confinement.

87.    It is well-settled that, under the Eighth and Fourteenth Amendments, jail officials have a constitutional obligation to keep detainees safe and to address their medical needs. *See DeShaney v. Winnebago Cty Dept. of Soc. Servs.*, 489 U.S. 189, 200 (1989) ("[W]hen the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs—e.g., food, clothing, shelter, medical care, and reasonable safety—it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause." ); *Youngberg v. Romeo*, 457 U.S. 307, 324 (1982) (the state has an "unquestioned duty to provide . . . adequate . . . medical care" for detained persons); *Wilson v. Seiter*, 501 U.S. 294, 300 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Brown v. Plata*, 563 U.S. 493, 531-32 (2011); *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (remanding for determination of whether correctional officer violated Eighth Amendment by failing to prevent "a substantial risk of serious harm").[141]

88.    This obligation requires jail officials, like Sheriff Barnes, to protect detainees from dangerous infectious diseases like COVID-19.  This obligation to protect detainees

---

[141] Plaintiffs and Class Members are both pre-trial and post-conviction detainees. The Fourteenth Amendment's Due Process Clause governs conditions-of-confinement claims like these for pre-trial detainees, while the Eighth Amendment governs post-conviction detainees. While it is clear that pre-trial detainees are presumed innocent and therefore merit greater protection, *see Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979), the distinction is irrelevant here: the harms of actual and potential COVID contraction alleged herein clearly satisfy the Eighth Amendment's more restrictive standard.

exists *before* any incarcerated people test positive for the virus and *before* an outbreak begins. *Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition. . . . It would be odd to deny an injunction to inmates who plainly proved an unsafe, life-threatening condition in their prison on the ground that nothing yet had happened to them"); *see also Farmer*, 511 U.S. at 833 ("[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course.").

89.    Acting fast is imperative. Before a detainee shows symptoms, they will have almost certainly have already infected many others, who may, in turn, have spread it further.[142]

90.    Jail officials violate their affirmative obligations to keep incarcerated people safe by showing "deliberate indifference" to a substantial risk of serious harm. *Wilson*, 501 U.S. at 303.[143] Corrections officials are deliberately indifferent when they "ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering [in] the next week or month or year," even when "the complaining inmate shows

---

[142] CDC, *Symptoms of Coronavirus*, (last visited Apr. 20, 2020), https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fabout%2Fsymptoms.html (noting a 2-14 day incubation period for COVID-19).

[143] The Eighth Amendment sets a floor of "deliberate indifference," while the Fourteenth Amendment provides additional protections. *Youngberg v. Romeo*, 457 U.S. 307, 315-16 (1982) ("If it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed--who maybe not be punished at all--in unsafe conditions"); *Young v. King Cty.*, No. 02-cv-35181, 2003 WL 21675319, at *2 (9th Cir. July 17, 2003) ("Equal protection does not allow pretrial detainees to be *unjustifiably* held in conditions worse than those under which convicted prisoners are held."). For the purposes of this request for expedited relief, plaintiffs will demonstrate that the sheriff's actions violate the lower standard of deliberate indifference.

no serious current symptoms." *Helling*, 509 U.S. at 33 (holding that a prisoner "*states a cause of action . . .* by alleging that [corrections officials] have, with deliberate indifference, exposed him to [conditions] that pose an unreasonable risk of serious damage to his future health") *Id*. at 35 (emphasis added); *see also Hope v. Pelzer,* 536 U.S. 730, 738 (2002) (citing *Farmer,* 511 U.S. at 842) (court "may infer the existence of [deliberate indifference] from the fact that the risk of harm is obvious"); *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009) (finding that depriving an inmate of 16 meals over 23 days was a "sufficiently serious" violation of the Eighth Amendment). Under the Eighth Amendment, an official is deliberately indifferent if "he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). For pretrial detainees, the inquiry is a purely objective one, looking to the following elements and asking whether:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved--making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.[144]

91.    This is exactly what corrections officials are doing in Orange County with respect to COVID-19. Despite knowledge of the risks, they intentionally continue to incarcerate Class Members, including Medically-Vulnerable Subclass Members, in

---

[144] *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018).

circumstances that do not comply with public health recommendations.  This confinement puts the Class Members at substantial risk of contracting COVID-19.  The Defendants have not taken available mitigation measures, even though they must appreciate the obvious consequences of their conduct.[145]  Jail officials have been living under one of the nation's strictest stay-at-home orders for over five weeks;[146] the risk COVID-19 poses to the community, including Class Members, is obvious.   By failing to release Medically-Vulnerable Subclass Members and failing to implement the necessary distancing and hygiene measures, the Defendants injure Plaintiffs and Class Members by putting them at significant risk of COVID-19.  *Parsons v. Ryan*, 754 F.3d 657, 677 (9th Cir. 2014) ("[W]e have repeatedly recognized that prison officials are constitutionally prohibited from being deliberately indifferent to policies and practices that expose inmates to a substantial risk of serious harm.").[147]

92.     Defendants are well aware of the risks posed by their practices, as they have repeatedly been warned of these risks, including by Sheriff Barnes's own deputies.  In an April 27 letter, Charles G. Barfield, General Manager of the Orange County Employees Association, demanded that Orange County provide significantly more substantial PPE for jail staff.  Barfield specifically noted inadequate supplies of face masks, eye protection, respirators, and isolation gowns. He  further demanded that the County provide staff with

---

[145] Jeremy B. White, *Newsom Orders All 40M Californians to Stay Home in Nation's Strictest State Lockdown*, Politico (Mar. 19, 2020), https://www.politico.com/states/california/story/2020/03/19/newsom-orders-all-40m-californians-to-stay-home-in-nations-strictest-state-lockdown-1268248.

[146] *Id*.

[147] Diane Solis, Immigration Detention Center in North Texas Erupts in COVID-19 Cases, Dallas News (Apr. 21, 2020), https://www.dallasnews.com/news/public-health/2020/04/20/immigrant-detention-center-in-alvarado-erupts-in-covid-19-cases/ ("The evidence suggests systemwide inaction that goes beyond a mere 'difference of medical opinion or negligence.'").

free COVID-19 testing "in light of the significant COVID-19 outbreak in the jails."[148]   On March 12, 2020, Sheriff Barnes received a letter from the ACLU of Southern California regarding the risks of COVID-19 infections and urging him to adopt policies to address these risks.[149]   On March 17, 2020, Sheriff Barnes received a letter from numerous local organizations urging him to take action.[150]   On March 25, 2020, Sheriff Barnes received a letter from the Association of Orange County Deputy Sheriffs asking him to take more steps to protect staff from COVID-19.[151]   On April 6, 2020, Sheriff Barnes received another letter from numerous local organizations urging him to act immediately to release more people from custody.[152]

93.     COVID-19 is "sure or very likely to cause serious illness," and waiting even a week to aggressively implement mitigation efforts may be too long.  *See supra* ¶¶48-65.  Here, the harmful "condition of confinement" is the confinement itself.  In the face of a disease with a lengthy incubation period and a high rate of contagion, there are no mitigation efforts that can be undertaken that will prevent spread and infection and death better than immediately releasing detainees.[153]   In addition to immediately releasing, at minimum, the Medically-Vulnerable Subclass Members, the jail must implement the

---

[148] Exhibit W, Letter from Charles G. Barfield, General Manager, Orange County Employees Association to Frank Kim, County Executive Officer (Apr. 27, 2020).

[149] Exhibit X, Letter from Jacob Reisberg and Daisy Ramirez, ACLU of Southern California, to Sheriff-Coroner Donald Barnes, Re: COVID-19 Policy in Orange County Jails (Mar. 12, 2020).

[150] Exhibit Y, Letter from Transforming Justice, et al., to Sheriff Don Barnes, et al., Re: COVID-19 Containment in Orange County Jails and Courthouses (Mar. 17, 2020).

[151] Exhibit Z, Letter from Tom Dominguez, Ass'n of Orange County Deputy Sheriffs, to Sheriff Don Barnes (Mar. 25, 2020).

[152] Exhibit AA, Letter from Transforming Justice Orange County, et al., to Sheriff Don Barnes, et al., Re: COVID-19 in Orange County Jails (Apr. 6, 2020).

[153] Exhibit I, Parker Decl. ¶¶ 35-36; *see also*, Exhibit H, Goldenson Decl. ¶ 48.

CDC's guidance on preventing disease spread. Failure to release at least all Medically-Vulnerable Subclass Members and to implement these public health recommendations[154] constitutes deliberate indifference. *See, e.g.*, *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 644 (5th Cir. 1996) ("even where a State may not want to subject a detainee to inhumane conditions of confinement or abusive jail practices, its intent to do so is nevertheless presumed when it incarcerates the detainee in the face of such known conditions and practices."); *Wilson v. Williams*, No. 20-cv-794, 2020 WL 1940882 (N.D. Ohio Apr. 22, 2020) (ordering enlargement[155] of medically vulnerable prisoners after finding that the prison's failure to separate "inmates at least six feet apart, despite clear CDC guidance for some time that such measures are necessary to stop the spread and save lives" constitutes deliberate indifference).[156]

94. Relatedly, pre-trial detainees have a constitutional right to pre-trial confinement that does not amount to punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law.").[157] Punishment is established if the jailer's

---

[154] "Lack of resources is not a defense to a claim for prospective relief because prison officials may be compelled to expand the pool of existing resources in order to remedy continuing Eighth Amendment violations." *Peralta v. Dillard*, 744 F.3d 1076, 1083 (9th Cir. 2014).

[155] Enlargement is a power available to courts in habeas actions that permit it to "'enlarge' the custody of a defendant" by altering the place of custody. *Wilson*, 2020 WL 1940882 at *4. In *Wilson*, the district court ordered the defendant Bureau of Prisons to transfer the medically vulnerable prisoners out of custody by evaluating their transfer to home release, parole or community supervision, or if necessary, another BOP facility where social distancing could be accomplished. *Id.*, at *11.

[156] *See also* Public Health Experts' Declarations; CDC, *Interim Guidance*, *supra* note 40 (recommending cleaning and disinfecting surfaces several times a day, providing no cost personal hygiene items, and implementing social distancing).

[157] *Santana v. Collazo*, 714 F.2d 1172, 1180 (1st Cir. 1983) ("For an individual not convicted of a crime, however, restrictions on his liberty beyond his initial incarceration

conduct is not rationally related to, or is excessive in relation to, a legitimate, nonpunitive government purpose. *Id.* at 561; *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473–74 (2015).

95.      Both elements are satisfied here.  Even if the jail's current lack of social distancing, inadequate testing, lack of hygiene and PPE, and lack of quarantining may serve legitimate, nonpunitive interests in normal times, those procedures are now exposing people to potentially lethal risks in the Orange County Jail.[158]  *See Demery v. Arpaio*, 378 F.3d 1020, 1030 (9th Cir. 2004) ("Nothing in *Bell* requires that, to be punishment, a harm must be independently cognizable as a separate constitutional violation.").  "[T]o constitute punishment, the harm or disability caused by the government's action must either significantly exceed, or be independent of, the inherent discomforts of confinement."  *Id*.  Ongoing and increasing risk of death from a serious respiratory illness exceeds and is independent of "the inherent discomforts of confinement." *Id*. Continuing to detain Plaintiffs and putative class members in these extremely dangerous conditions is not

---

must be reasonably related to some legitimate government objective—of rehabilitation, safety or internal order and security."); *Lareau v. Manson*, 651 F.2d 96, 104 (2d Cir. 1981) ("The only conceivable purpose overcrowding in the HCCC serves is to further the state's interest in housing more prisoners without creating more prison space. This basically economic motive cannot lawfully excuse the imposition on the presumptively innocent of genuine privations and hardship over any substantial period of time."); *Vella v. State of Va.*, 805 F.2d 394, 394 (4th Cir. 1986) (allowing pre-trial detainee to prove allegations establishing conditions as punishment) ("Nor can we say on the current state of the record that it is beyond doubt that Vella can prove no set of facts entitling him to relief."); *Parker v. Carpenter*, 978 F.2d 190, 193 (5th Cir. 1992) (ordering evidentiary hearing on whether transfer to more violent wing was punitive); *Smith v. Dart*, 803 F.3d 304, 312 (7th Cir. 2015) (allegation that pre-trial detainee's "[f]ood is well below nutritional value" sufficient to survive motion to dismiss on claim that conditions of confinement amounted to punishment under Fourteenth Amendment); *White v. Monohan*, 326 Fed. Appx. 385, 388 (7th Cir. 2009) (allegations that bug bites left sores and injuries were sufficient to state a claim).

[158] Exhibit I, Parker Decl. ¶¶ 35-36; *see also*, Exhibit H, Goldenson Decl. ¶ 48.

1    rationally related to goals of health, safety, or even cost efficiency, and is excessive in

2    relation to those goals. For these reasons, the California Judicial Council has issued

3    advisories encouraging state courts to increase releases from jails, and the California

4    Attorney General has clarified that county sheriffs have full statutory authority to release

5    people from custody in response to the COVID-19 emergency.[159]

6         96.    Other Courts have granted similar relief.  Memorandum and Order, *Thakker

7    v. Doll*, No. 20-CV-0480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020), Doc. No. 47 at 2

8    (categorically releasing petitioners who "suffer[] from chronic medical conditions and

9    face[] an imminent risk of death or serious injury if exposed to COVID-19"); Temporary

10   Restraining Order and Order to Show Cause, *Castillo v. Barr*, No. CV-20-00605 (TJH)

11   (AFM) (C.D. Cal. Mar. 27, 2020), Doc. No. 32 at 10 (releasing two ICE detainees where

12   they were not "kept at least six feet apart from others at all times."); *Doe v. Barr*, No. 20-

13   cv-02141-LB, 2020 WL 1820667, at *9 (N.D. Cal. 2020) (releasing an immigration

14   detainee with COVID-19 comorbidities because those in the jail "live in close quarters,

15   cannot practice social distancing, do not have masks, and do not have access to adequate

16   disinfecting and cleaning supplies."); Memorandum and Order, *Hope v. Doll*, No. 1:20-cv-

17   562 (M.D. Pa. Apr. 7, 2020) (releasing 22 people and nothing that staff "do not reliably

18   wear gloves and masks[,] . . . temperature check are infrequently conducted," and that cell

19   blocks were not cleaned to prevent spread); *Ortuño v. Jennings*, No. 20-CV-02064-MMC,

20

21   _____

22   [159] *See* Advisory from California Chief Justice Tani Cantil-Sakauye to Presiding Judges
     and Court Executive Officers of the California Courts (Mar. 20, 2020),
23   https://newsroom.courts.ca.gov/news/california-chief-justice-issues-second-advisory-on-
     emergency-relief-measures (encouraging the state's superior courts to, among other things:
24   "[c]onsider a defendant's existing health conditions, and conditions existing at the
     anticipated place of confinement, in setting conditions of custody for adult or juvenile
25   defendants"; "[i]dentify detainees with less than 60 days in custody to permit early release,
     with or without supervision or community-based treatment."); Attorney General of
26   California, Information Bulletin: COVID-19 and Statutory Authority Under Government
27   Code         Section         8658         (Apr.         14,         2020),
     https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/2020-dle-05.pdf?.
28

2020 WL 1701724, at *4 (N.D. Cal. Apr. 8, 2020) (releasing three ICE detainees because people in the jail "cannot practice meaningful social distancing" and "have not been provided with masks."); Minute Order in Chambers, *Gray v. City. of Riverside*, No. 13-CV-00444 (C.D. Cal. Apr. 14, 2020), Doc. No. 191 (releasing defendant where government "failed to demonstrate that it is currently taking adequate precautions to protect the health of the prisoners in the county jails."); *Cameron v. Bouchard*, No. 20-cv-10494, 2020 WL 1929876, at *2 (E.D. Mich. Apr. 17, 2020) ("It cannot be disputed that COVID-19 poses a serious health risk to Plaintiffs and the putative class.").

### B.  The ADA and Rehabilitation Act Mandate Release of Disabled Subclasses Amidst the Current COVID-19 Outbreak.

97.     Title II of the ADA requires that public entities refrain from discriminating against qualified individuals on the basis of a disability.  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act imposes parallel requirements on public entities.  *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).  In order to avoid disability discrimination in the Orange County Jail in this public health emergency, the only reasonable modification and nondiscriminatory method of administration is release of the Disability Subclasses.  Disability Subclass members should be released for the constitutional reasons discussed above, because they are all members of the Medically-Vulnerable Subclass.  Disability Subclass members are also protected by federal disability rights laws, which, like the Constitution, mandate release.

#### 1.  Plaintiffs in the Disability Subclasses and Defendants are Covered by the ADA and Section 504.

98.     Plaintiffs and Class Members in the Disability Subclasses are protected people with disabilities under the ADA and Section 504.  They are all medically vulnerable to COVID-19 complications or death due to their disabilities.  "Disability" is defined broadly, to include, *inter alia*, a "physical or mental impairment that substantially limits one or more major life activities."  42 U.S.C. § 12102(1)(A).  "Major life activity" is itself

broadly defined, and includes "the operation of a major bodily function," such as "functions

of the immune system, normal cell growth . . . neurological, brain, respiratory, circulatory,

[or] endocrine" systems.  42 U.S.C. § 12102(2)(B).  All plaintiffs and Class Members in

the Disability Subclasses have disabilities that substantially limit a major life activity or

major bodily function.[160]

99.    Plaintiffs and Class Members are "qualified" for Defendants' programs,

services, and activities, including adjudication of their cases; safe, constitutional living

conditions during confinement; and medical care and rehabilitative services to prepare for

reentry after release.  42 U.S.C. § 12131(2); 28 C.F.R. § 35.104; 28 C.F.R. § Pt. 35, App.

B ("[T]itle II applies to anything a public entity does").

100.    Orange County is a "public entity" for purposes of the ADA, and is bound

to comply with Title II.  42 U.S.C. § 12131(B) ("public entity" includes "any department,

agency, special purpose district, or other instrumentality of a State or States or local

government"); *see also Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 210 (1998).

**2.    Under the ADA and Section 504, the Orange County Jail has an
Affirmative Obligation to Ensure Equal and Equally Safe Access
to Programs, Services, and Activities and to Avoid Disability
Discrimination Against Disabled Class Members.**

101.    In order to avoid disability discrimination, public entities have an affirmative

obligation to ensure that people with disabilities can participate in all of the entity's

programs, benefits, and services on an equal and equally safe basis as people without

disabilities.  28 C.F.R. §§ 35.102(a), 35.130(a)-(b); *Pierce v. D.C.*, 128 F. Supp. 3d 250,

266 (D.D.C. 2015) ("[B]ecause Congress was concerned that '[d]iscrimination against

[people with disabilities] was . . . most often the product, not of invidious animus, but rather

---

[160] Several conditions within the disability subclasses are expressly identified in regulations
as presumptively covered disabilities. 28 C.F.R. § 35.108(d)(2)(iii) ("it should easily be
concluded" that "[c]ancer substantially limits normal cell growth . . . diabetes substantially
limits endocrine function . . . epilepsy . . . substantially limits neurological function . . .
HIV infection substantially limits immune function."

of thoughtlessness and indifference – of benign neglect[,]' the express prohibitions against disability-based discrimination in Section 504 and Title II include *an affirmative obligation* to make benefits, services, and programs accessible to disabled people"); *id.* at 269 ("[N]othing in the disability discrimination statutes even remotely suggests that covered entities have the option of being passive in their approach to disabled individuals as far as the provision of accommodations is concerned."). Public entities must avoid policies, practices, criteria, or methods of administration that have the effect of excluding or discriminating against persons with disabilities. 28 C.F.R. § 35.130(b)(3), (8).

102.    These affirmative obligations include a requirement that public entities make reasonable modifications to their policies, practices, or procedures where necessary to avoid disability discrimination. 28 C.F.R. § 35.130(b)(7)(i). The ADA also prohibits public entities from "utiliz[ing] criteria or methods of administration . . . [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities." 28 C.F.R. § 35.130(b)(3)(i)-(ii).

### 3. Reasonable modifications, including release of the Disability Subclasses, are required under the ADA and Section 504.

103.    The Disability Subclasses are entitled to full constitutional protections, as discussed *supra*, Section III.E; as well as reasonable modifications under disability rights laws to ensure they can participate equally and with equal safety in Defendants' programs, services, and activities. Defendants' programs, services, and activities include the safe adjudication of pre-trial detainees' pending criminal cases, and safe, constitutionally-adequate care, medical treatment, and rehabilitative support during confinement to prepare the person for a safe return to society at the end of their sentence. Disability Subclass members cannot access these equally if they are severely ill, unconscious, or dead. Given the fast-moving, life-threatening nature of the COVID-19 pandemic, immediate release is the only reasonable modification.

104.    With respect to the Disability Pre-trial Subclass, Defendants are violating the ADA and Rehabilitation Act by failing to ensure that people incarcerated pre-trial have equal access to the safe adjudication of their cases.  Plaintiff Michael Seif and the Disability Pre-Trial Subclass are being held for purely administrative, not punitive, purposes, and are presumed innocent. *Bell*, 441 U.S. at 535.  All members of the Disability Pre-trial Subclass are at high risk of severe complications or death if they contract COVID-19.  Orange County and the Jail are in the midst of a widespread COVID-19 outbreak, whose scope is still unknown.

105.    The Disability Pre-trial Subclass members must be well enough to communicate; must be conscious, and must be *alive*, in order to have an equal opportunity to participate in the adjudication of their cases.  Given the high risk of a widespread COVID-19 outbreak in the Jail, and given this subclass's high risk of being unable to participate equally in their adjudication if they contract COVID-19, Defendants must release this subclass as a reasonable modification to its administrative detention system to ensure these class members an equal opportunity to participate in their criminal proceedings.

106.    Put another way, the jail's current method of administration of its pre-trial incarceration system—including taking no action to release people in light of COVID-19 or to adequately prevent or control the infection's spread—has the effect of discriminating against the Disability Pre-trial Subclass.  This Subclass faces disproportionate risk of serious illness, hospitalization, or death from COVID-19, all of which exclude them from participation in the adjudication of their cases on an equal basis as nondisabled people.  Release is necessary to ensure equal access to their trials.

107.    With respect to all Disability Subclass members, Defendants are violating the ADA and the Rehabilitation Act by failing to ensure that disabled detainees—pre-trial and post-conviction—have an equal opportunity to participate in the Jail's programs, services, and activities, including adequate medical and mental health care, rehabilitative programs, and ultimate release from confinement.  The Disability Subclass members cannot equally

access the jail's programs, services, or activities—including medical care, programming, meals, yard time, and religious gatherings—because all such activities require being in close quarters with other people, posing a disproportionate risk of infection and death. The Disability Subclass members cannot equally access the jail's programs, services or activities—including receipt of constitutionally adequate minimum care standards to prevent avoidable death, rehabilitative programing, and, ultimately, release—if they are severely ill, unconscious, or dead. Because of their high risk of these catastrophic outcomes—which will inevitably result in exclusion from the jail's programs—the jail must release them as a reasonable modification, and to avoid unlawful discriminatory methods of administration.

108. Release of the Disability Subclasses is a reasonable modification that is consistent with the nature and purpose of the jail, and is not a fundamental alteration. *Cf. Coleman v. Schwarzenegger*, 922 F. Supp. 2d 882, 1003 (E.D. Cal. 2009); *Inmates of Allegheny Cnty. Jail v. Peirce*, 487 F. Supp. 638, 644 (W.D. Pa. 1980). Jails across the country and the world are releasing people who are particularly vulnerable to severe illness or death from the virus. Indeed, Sheriff Barnes has already released many people as a result of COVID-19, but his actions thus far have left out many people with disabilities for whom release is especially critical. *Cf. Henrietta D. v. Bloomberg*, 331 F.3d 261, 281 (2d Cir. 2003) ("[t]he reasonableness of the modifications that plaintiffs seek . . . is evidenced by the fact that virtually all are modifications that defendants have long purported … to provide") (quoting *Henrietta D. v. Giuliani*, 119 F. Supp. 2d 181, 208 n.17 (E.D.N.Y. 2000)). Release is consistent with the jail's purposes, including administratively ensuring pre-trial detainees show up for court, and preparing post-conviction detainees for safe, healthy release into their communities.[161] Release is the most effective and reasonable

---

[161] Orange County Sheriff's Department, *Correctional Programs*, https://www.ocsd.org/divisions/custody/inmate/correctional (last visited Apr. 28, 2020) ("Mission: To provide the inmate population . . . the opportunity for an effective, rehabilitative experience following state and federal guidelines.").

modification to ensure Disability Subclass members are not subject to disability discrimination.  If any Disability Subclass members are not immediately released, the ADA and Rehabilitation Act require Defendants to implement reasonable modifications within the jail to reduce the risk of infection among the Disability Subclass members.

### C.    28 U.S.C. § 2241 is an Appropriate Vehicle to Remedy these Violations.

109.   Section 2241(c)(3) allows this Court to order the release or enlargement of incarcerated people like Plaintiffs who are held "in violation of the Constitution or the laws or treaties of the United States." 28 U.S.C. 2241(c)(3); *Preiser v. Rodriguez*, 411 U.S. 475, 484 (1973) ("It is clear, not only from the language of §§ 2241(c)(3) and 2254(a), but also from the common-law history of the writ, that the essence of habeas corpus is an attack by a person in custody upon the legality of that custody, and that the traditional function of the writ is to secure release from illegal custody."); *Peyton v. Rowe*, 391 U.S. 54, 67 (1968) (Section 2241(c)(3) can afford immediate release for claims other than those challenging the sentence itself).

110.   This Circuit has held that "mere conditions of confinement" claims may not be brought in habeas actions, a habeas action may be brought when the claim is within "the core of habeas corpus."  *See Nettles v. Grounds*, 830 F.3d 922, 933-34 (9th Cir. 2016) (en banc) (first quoting *Preiser,* 411 U.S. at 487; and then citing *Crawford v. Bell*, 599 F.2d 890, 891-92 (9th Cir. 1979)).  If a petitioner's claims would result in "immediate release if successful," the claims fall "within the core of habeas corpus."  *Id.* at 928.  The Circuit has never addressed the availability of the writ in the current context, where the conditions of confinement *themselves* render the confinement invalid because, for most Class members, there is no medically sound remedy short of release that can rectify the illegality. Petitioners' claims are squarely within the "core of habeas corpus" and this is the ideal scenario for the use of the writ.  *See Jones v. Cunningham*, 371 U.S. 236, 243 (1963) (Habeas corpus "is not now and never has been a static, narrow, formalistic remedy."); *Preiser*, 411 U.S. at 486 (the writ "has been accepted as the specific instrument to obtain release from [unlawful] confinement."); Eve Brensike Primus, *A Structural Vision of*

1    *Habeas Corpus*, 98 Cal. L. Rev. 1, 12-14 (an original purpose of habeas was to rectify

2    systemic violations by state actors).

### 1.    Exhaustion of State Remedies in the Face of COVID-19 Spread is Futile.

111.    Federal courts apply a judge-made exhaustion doctrine in § 2241 cases.    *See Braden v. 30th Judicial Cir. Ct. of Ky.*, 410 U.S. 484, 490 (1973).    Unlike the statutory exhaustion requirement in § 2254, though, the judge-made exhaustion requirement for § 2241 petitions is prudential, flexible, and non-jurisdictional. *See, e.g.*, *Laing v. Ashcroft*, 370 F.3d 994, 997-98 (9th Cir. 2004).    The Supreme Court has described the exhaustion doctrine in § 2241 cases as a "judicially crafted instrument which reflects a careful balance between important interests of federalism and the need to preserve the writ of habeas corpus as a 'swift and imperative remedy in all cases of illegal restraint or confinement.'"    *Braden*, 410 U.S. at 490 (citation omitted).

112.    This Circuit has held that "[e]xhaustion of administrative remedies is not required where the remedies are inadequate, inefficacious, or futile, where pursuit of them would irreparably injure the plaintiff, or where the administrative proceedings themselves are void." *United Farm Workers of Amer. v. Ariz. Agric. Emp't. Relations Bd.*, 669 F.2d 1249, 1253 (9th Cir. 1982); *see also SEC v. G.C. George Sec., Inc.*, 637 F.2d 685, 688 n.4 (9th Cir. 1981).    The Ninth Circuit's principles regarding waiver of exhaustion requirements have been specifically applied to find exhaustion futile, and therefore, waived, in the context of a § 2241 habeas claim. *See*, *U.S. v. Paige*, 369 F. Supp. 2d 1257, 1259-60 (D. Mont. 2005).

113.    Plaintiffs need not meet § 2241's prudential exhaustion requirement because attempting to do so under the circumstances would be futile and would cause them irreparable injury.    Courts across the state, including Orange County courthouses, have

significantly reduced operations due to the COVID-19 outbreak[162], which is inevitably causing delays in adjudicating cases. It would be not only futile, but dangerous to force Plaintiffs and Class Members to pursue the lengthy and time-consuming process of exhausting state remedies when their risk of COVID-19 contraction is increasing by the minute. Finally, exhaustion is futile for proposed class members, because requiring each member to individually petition the Court would burden the limited judicial resources during this emergency and cause further delay. Time is of the essence, the risk of irreparable harm to Plaintiffs and Class Members is simply too high to require exhaustion in this situation.

## VI.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the Fourteenth Amendment to the U.S. Constitution**

42 U.S.C. § 1983 / 28 U.S.C. § 2241

*Pre-trial Class versus All Defendants*

114.    Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

---

[162] *See* Sean Emery, *Coronavirus and Southern California Court Closures: Traffic Ticket Extensions, No Jury Duty*, Orange County Register (Apr. 14, 2020, 5:48 PM), https://www.ocregister.com/2020/04/13/coronavirus-and-southern-california-court-closures-no-jury-duty-and-traffic-ticket-extensions/ (noting that "[l]ocal superior courts . . . have ceased the bulk of their operations in the midst of the pandemic . . ."); Brandon Pho, *OC Court Officials Revise Operations and Hearings After Public Outrage, but What Happens Next is Unclear*, Voice of OC (Mar. 20, 2020), https://voiceofoc.org/2020/03/oc-court-officials-revise-operations-and-hearings-after-public-outrage-but-what-happens-next-is-unclear/ (last visited Apr. 21, 2020) (highlighting the uncertainty about the extent of the Orange County Superior Court's day-to-day operations during the coronavirus pandemic).

115.    Under the Fourteenth Amendment, corrections officials are required to provide for the reasonable health and safety of persons in pre-trial custody. *Youngberg*, 457 U.S. at 315–16, 324 (the state has an "unquestioned duty" to "provide adequate . . . medical care" for detained persons).

116.    As part of the right, the government must provide people held pre-trial with reasonable safety and address serious medical needs that arise in jail, under the same objective deliberate indifference standard that applies to failure-to-protect claims brought by people held pre-trial. *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794 (2019).  Regardless of the subjective intent of Defendants, objective deliberate indifference to the serious risk that COVID-19 poses to members of the Pre-trial Class, and particularly members of the Medically-Vulnerable Pre-trial Subclass, violates this right.

117.    The Orange County Jail has taken insufficient steps to comply with public health guidelines to manage the outbreak of COVID-19 that it is currently facing, and it must take further protective steps, including the release of some individuals, to provide for the safety of the Pre-trial Class.  Defendants' actions and inactions result in the confinement of members of the Pre-trial Class in a jail where they do not have the capacity to test for, treat, or manage COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

118.    Accordingly, Defendants, as supervisors, direct participants, and policy makers for Orange County and the Orange County Jail have violated the rights of the Pre-trial Plaintiff Class under the Fourteenth Amendment.

## SECOND CLAIM FOR RELIEF

**Unconstitutional Punishment in Violation of the Fourteenth Amendment to the U.S. Constitution**

42 U.S.C. § 1983 / 28 U.S.C. § 2241

*Pre-trial Class versus All Defendants*

119.   Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

120.   Under the Fourteenth Amendment, persons in pre-trial custody have greater due process protections than those convicted and therefore cannot be punished as part of their detention. *Bell*, 441 U.S. at 535 n.16.  Punishment is established if the jailer's conduct is either not rationally related to a legitimate, nonpunitive, government purpose or excessive in relation to that purpose.

121.   Even assuming that the Orange County Jail's spacing and provision of medical services inside the facility normally serves the legitimate, nonpunitive, purpose of maintaining the health and safety of detained persons, the Orange County Jail has failed to comply with public health guidelines to manage the outbreak of COVID-19.  In fact, the Jail has neither the capacity nor the ability to comply with public health guidelines to manage the outbreak.  Therefore, continuing to detain Pre-trial Class members without making the Orange County Jail compliant with COVID-19-specific guidance from public health experts is not rationally related to, and excessive in relation to, that purpose.

122.   Accordingly, Defendants, as supervisors, direct participants, and policy makers for Orange County and the Orange County Jail have violated the rights of the Pre-trial Plaintiff Class under the Fourteenth Amendment.

## THIRD CLAIM FOR RELIEF

**Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution**

42 U.S.C. § 1983 / 28 U.S.C. § 2241

*Post-conviction Class versus All Defendants*

123.    Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

124.    Under the Eighth Amendment, persons in carceral custody have a right to be free from cruel and unusual punishment.  As part of this right, the government must provide incarcerated persons with reasonable safety and address serious medical needs that arise in jail. *See, e.g., Estelle*, 429 U.S. at 104; *DeShaney*, 489 U.S. at 200.  Deliberate indifference to the serious risk that COVID-19 poses to members of the Post-conviction class, and particularly members of the Medically-Vulnerable Post-conviction Subclass, infringes on the protection from cruel and unusual punishment.  Defendants violate this right by subjecting members of the Post-conviction Class to conditions of confinement that do not ensure their safety and health.

125.    The Orange County Jail has failed to comply with public health guidelines to manage the outbreak of COVID-19.  The Jail has neither the capacity nor the ability to comply with public health guidelines to manage the outbreak and cannot provide for the safety of the Post-conviction Class.

126.    Defendants' actions and inactions result in the confinement of members of the Post-conviction Class in a jail where they do not have the capacity to test for, treat, or manage COVID-19 outbreaks, which violates Plaintiffs' rights to treatment and adequate medical care.

127.    By operating the Orange County Jail without the capacity to test for, treat, or manage a COVID-19 outbreak, Defendants, as supervisors, direct participants, and policy makers for Orange County and the Orange County Jail have violated the rights of the Post-conviction Plaintiff Class under the Eighth Amendment.

## FOURTH CLAIM FOR RELIEF

**Discrimination on the Basis of Disability in Violation of Title II of the ADA**

42 U.S.C. § 12131 *et seq.* / 28 U.S.C. § 2241

*Pre-trial and Post-conviction Disability subclasses versus all Defendants*

128.    Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

129.    Title II of the ADA requires that public entities refrain from discriminating against qualified individuals on the basis of disability.  42 U.S.C. § 12132.  The regulations implementing Title II of the ADA require that public entities avoid unnecessary policies, practices, criteria or methods of administration that have the effect of excluding or discriminating against persons with disabilities in the entity's programs, services, or activities.  28 C.F.R. § 35.130(a), (b)(3), (b)(8).  Further, a public entity must "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7)(i).

130.    Plaintiffs Daniel Kauwe, Michael Seif, Pedro Bonilla, Cynthia Campbell, Monique Castillo, Mark Trace, Cecibel Caridad Ortiz and Don Wagner are individuals with disabilities for purposes of the ADA.  42 U.S.C. § 12102.  As people held in the Orange County Jail, they are "qualified" for the programs, services, and activities being challenged herein.  42 U.S.C. § 12131(2).

131.    Defendants are violating Title II of the ADA by failing to make the reasonable modifications necessary to ensure equal access to adjudication, jail services, and release for people with disabilities who face high risk of complications or death in the event of COVID-19 infection.  Defendants are further violating the ADA by employing methods of administration (including a policy of non-release even in the face of COVID-19) that tend to discriminate against people with disabilities by placing them at heightened risk of severe illness and death.

## **FIFTH CLAIM FOR RELIEF**

### **Discrimination on the Basis of Disability in Violation of Section 504 of the Rehabilitation Act**

29 U.S.C. § 794 *et seq.* / 28 U.S.C. § 2241

*Pre-trial and Post-conviction Disability subclasses versus all Defendants*

132.   Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

133.   Section 504 of the Rehabilitation Act states that "no otherwise qualified individual with disability in the United States . . . shall, solely by reason of [] disability, be excluded from the participation in, be denied the benefits of, or be subject to discrimination under any program or activity receiving Federal financial assistance."  29 U.S.C. § 794(a). The regulations implementing Section 504 of the Rehabilitation Act require that entities receiving federal financial assistance avoid unnecessary policies, practices criteria or methods of administration that have the effect of discriminating against persons with disabilities.  28 C.F.R. § 41.51(b)(3)(i).

134.   Defendants receive "Federal financial assistance" within the meaning of 28 U.S.C. § 794(a).

135.   Plaintiffs Daniel Kauwe, Michael Seif, Pedro Bonilla, Cynthia Campbell, Monique Castillo, Mark Trace, Cecibel Caridad Ortiz and Don Wagner are individuals with disabilities for the purposes of the Rehabilitation Act, 42 U.S.C. § 12012, 29 U.S.C. § 705(20)(B).   As people held in the Orange County Jail, they are "qualified" for the programs, services, and activities being challenged herein.

136.   Defendants are violating section 504 of the Rehabilitation Act by failing to make the reasonable modifications necessary to ensure equal access to adjudication, jail services, and release for people with disabilities who face high risk of complications or death in the event of COVID-19 infection.   Defendants are further violating the Rehabilitation Act by employing methods of administration (including a policy of non-

release even in the face of COVID-19) that tend to discriminate against people with disabilities by placing them at heightened risk of illness and death.

## VII.   REQUEST FOR RELIEF

137.   Plaintiffs incorporate by reference each of the preceding paragraphs and allegations as if fully set forth herein.

138.   Plaintiffs and Class Members respectfully request that the Court order the following:

1.   Certification of this Complaint/Petition as a Class Action;

2.   Grant a writ of habeas corpus for members of the Medically-Vulnerable and Disability Subclasses requiring Defendants to identify all Medically-Vulnerable Subclass Members and Disability Subclass Members in both the Pre-trial and Post-Conviction Classes within six  hours of the Court's order and release all such persons within twenty-four hours of submission of the list absent proof of judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate, and requiring Defendants to provide all persons released with educational resources on COVID-19 including instructions that they should self-isolate for the CDC-recommended period of time (currently 14 days) following release;

3.   A temporary restraining order, preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Defendants to immediately adopt mitigation efforts to protect all Class Members not immediately released, including but not necessarily limited to:

   a.   Provide adequate spacing of six feet or more between incarcerated people so that social distancing can be accomplished in accordance with CDC guidelines

b.  Effectively communicate to all incarcerated people, including low-literacy and non-English-speaking people, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that individuals are able to take precautions to prevent infection;

c.  Ensure that each incarcerated person receives, free of charge, an individual supply of hand soap and paper towels sufficient to allow frequent hand washing and drying each day; an adequate supply of clean implements for cleaning such as sponges and brushes and disinfectant hand wipes or disinfectant products effective against the virus that causes COVID-19 for daily cleanings;

d.  Ensure that all incarcerated people have access to hand sanitizer containing at least 60% alcohol;

e.  Provide access to daily showers and daily access to clean laundry, including clean personal towels and washrags after each shower;

f.  Require that all Jail staff wear personal protective equipment, including CDC-recommended surgical masks, when interacting with any person or when touching surfaces in cells or common areas;

g.  Require that all Jail staff wash their hands, apply hand sanitizer containing at least 60% alcohol, or change their gloves both before and after interacting with any person or touching surfaces in cells or common areas;

h.  Take the temperature of all class members, jail staff, and visitors daily (with a functioning and properly operated and sanitized thermometer) to identify potential COVID-19 infections;

i.  Assess (through questioning) each incarcerated person daily to identify potential COVID-19 infections;

j.      Conduct immediate testing for anyone (class members, jail staff and visitors) displaying known symptoms of COVID-19;

k.      Ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly quarantined (without resorting to cohorting, if possible), in a non-punitive setting, with continued access to showers, recreation, mental health services, reading materials, phone and video visitation with loved ones, communications with counsel, and personal property;

l.      Respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

m.      Provide sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and headphones) between each use;

n.      Waive all medical co-pays for those experiencing COVID-19-related symptoms;

o.      Waive all charges for medical grievances during the COVID-19 outbreak

4.      Following immediate release of all Medically-Vulnerable and Disability Subclass Members, a plan, to be submitted to the Court in 3 days and overseen by a qualified public health expert pursuant to Fed. R. Evid. 706, which outlines:

a.      Any further mitigation efforts, in line with CDC guidelines, that will substantially reduce the risks of COVID-19 infection for Class Members not immediately released; and

b.      A housing and/or public support plan for any released Class or Subclass Members whose testing confirms they have been exposed to or infected with COVID-19 and who do not readily have a place to self-isolate for the CDC-recommended period of time (currently 14 days).

5.    A preliminary injunction, permanent injunction, and/or writ of habeas corpus requiring Defendants to:

a.    Continue to release all current and future Medically-Vulnerable and Disability subclass members absent proof of judicially-recorded findings by clear and convincing evidence that the individual poses such a serious risk of flight or danger to others that no other conditions can mitigate;

b.    Report weekly on the population of persons in the Orange County Jail who are Medically-Vulnerable and have disabilities as defined in this action;

c.    Follow the terms of the public health expert plan submitted pursuant to Fed. R. Evid. 706;

d.    Conduct an evaluation of how many people the jail can house in a safe manner consistent with public health guidance requiring all persons to maintain six feet or more of space between them, including:

i.    A description of the size of all jail cells, tanks, and dorm-style housing, noting how many people can safely be housed in each;

ii.    The distance between beds in jail cells, tanks, and dorm-style housing;

iii.    The size and location of shared toilets and showers and the number of people who use each at a time; and

iv.    The size of each dayroom and the number of people who can safely use each while maintaining six feet or more of space between them.

e.    Release additional Class Members, including those not considered medically vulnerable, or disabled until the jail is able to consistently maintain a population no larger than the safe capacity identified above.

6.    A temporary restraining order, preliminary injunction and permanent
injunction prohibiting OCSD from booking individuals for any misdemeanor
or felony offense other than the exceptions set forth in Emergency rule 4(c)
of the California Rules of Court for which bail greater than $0 may be set.

7.    If immediate release is not granted on the basis of this Complaint alone, then
expedited review of the Complaint, including oral argument, via telephonic or
videoconference if necessary;

8.    A declaration that the Orange County Jail's policies violate the Fourteenth
Amendment rights to reasonable safety and to be free from punishment prior
to conviction with respect to the Pre-trial Class;

9.    A declaration that the Orange County Jail's policies violate the Eighth
Amendment right against cruel and unusual punishment with respect to the
Post-Conviction Class;

10.    A declaration that the Orange County Jail's policies violate the Americans
with Disabilities Act and Section 504 of the Rehabilitation Act with respect
to both Disability Subclasses;

11.    An award of Plaintiffs' attorney fees and costs under 42 U.S.C. sec. 1988, 42
U.S.C. sec 12205, 29 U.S.C. sec. 794a and other applicable law; and

12.    Any further relief this Court deems appropriate.


Respectfully submitted,

/s/Cassandra Stubbs

AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Cassandra Stubbs
C.A. Bar No. 218849
Olivia Ensign*
N.C. Bar No. 50689
Cristina Becker*
N.C. Bar No. 46793
201 W. Main St., Suite 402, Durham, NC 27701
cstubbs@aclu.org
ensign@aclu.or
cbecker@aclu.org

Carl Takei
C.A. Bar No. 256229
Somil Trivedi*
D.C. Bar No. 1617967
Clara Spera*
N.Y. Bar No. 5590229
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
ctakei@aclu.org
strivedi@aclu.org
cspera@aclu.org

/s/ Peter Eliasberg

AMERICAN CIVIL LIBERTIES FUND OF SOUTHERN CALIFORNIA
Peter Eliasberg
C.A. Bar No. 189110
1313 W. Eighth St.
Los Angeles, CA 90017

/s/ Mitchell Kamin

Mitchell Kamin
C.A. Bar No. 202788
Aaron Lewis
C.A. Bar No. 284244
Brittany Benjamin
C.A. Bar No. 323968
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
(424) 332-4800
alewis@cov.com
mkamin@cov.com
bbenjamin@cov.com

Stacey Grigsby*
D.C. Bar No. 491197
Amia Trigg**
C.A. Bar No. 282890
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
sgrigsby@cov.com
atrigg@cov.com

/s/ John Washington

John Washington
C.A. Bar No. 315991
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
11543 W. Olympic Blvd.
Los Angeles, CA 90064
(310) 399-7040
jwashington@sshhlaw.com

s/ Paul Hoffman

Paul Hoffman
C.A. Bar No. 71244
UNIVERSITY OF CALIFORNIA, IRVINE SCHOOL OF LAW
CIVIL RIGHTS LITIGATION CLINIC
401 E. Peltason Dr.,
Suite 1000, Irvine, CA 92687
(949) 824-0066

Zoe Brennan-Krohn**
C.A. Bar No. 324912
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Disability Rights Program
39 Drumm Street
San Francisco, CA 94111
(415)-343-0769
zbrennan-krohn@aclu.org

ATTORNEYS FOR PLAINTIFFS
*pro hac vice application forthcoming
**C.D. California admission application forthcoming