MITCHELL KAMIN (SBN 202788)
mkamin@cov.com
AARON LEWIS (SBN 284244)
alewis@cov.com
BRITTANY BENJAMIN (SBN 323968)
bbenjamin@cov.com
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4800
Facsimile: (424) 332-4749

CASSANDRA STUBBS (SBN 218849)
cstubbs@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701
Telephone: (919) 682-5659
Facsimile: (919) 682-5961

*Attorneys for Plaintiffs*

[Additional Counsel continued on next page]

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| MELISSA AHLMAN, DANIEL KAUWE, MICHAEL SEIF, JAVIER ESPARZA, PEDRO BONILLA, CYNTHIA CAMPBELL, MONIQUE CASTILLO, MARK TRACE, CECIBEL CARIDAD ORTIZ, and DON WAGNER, on behalf of themselves and all others similarly situated,<br><br>     *Plaintiffs*,<br>     v. | Civil Case No.: 8:20-cv-835-JGB-SHK<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF FILED CONCURRENTLY WITH DECLARATIONS; EXHIBITS;**<br><br>**Date: May 18, 2020**<br>**Time: 9:00 AM** |

DON BARNES, in his official capacity as Sheriff of Orange County, California; and ORANGE COUNTY, CALIFORNIA

    Defendants.

Hon. Jesus G. Bernal

Class Action

IMMEDIATE RELIEF SOUGHT

[Additional Counsel continued from first page]

STACEY GRIGSBY*
sgrigsby@cov.com
AMIA TRIGG** (SBN 282890)
atrigg@cov.com
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
Telephone: (202) 662-6000
Facsimile: (202) 778-5906

OLIVIA ENSIGN
oensign@aclu.org
CRISTINA BECKER
cbecker@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
201 W. Main St., Suite 402
Durham, NC 27701
Telephone: (919) 682-5659
Facsimile: (919) 682-5961

JOHN WASHINGTON (SBN 315991)
jwashington@sshhlaw.com
SCHONBRUN, SEPLOW, HARRIS, HOFFMAN & ZELDES LLP
11543 W. Olympic Blvd.
Los Angeles, CA 90064
Telephone: (310) 399-7040
Facsimile: (310) 399-7040

PETER ELIASBERG (SBN 189110)
peliasberg@aclu.org
AMERICAN CIVIL LIBERTIES FUND OF SOUTHERN CALIFORNIA
1313 W 8th St
Los Angeles, CA 90017
Telephone: (213) 977-9500

PAUL HOFFMAN (SBN 71244)
hoffpaul@aol.com
UNIVERSITY OF CALIFORNIA, IRVINE SCHOOL OF LAW CIVIL RIGHTS LITIGATION CLINIC
401 E. Peltason Dr., Suite 1000
Irvine, CA 92687
Telephone: (949) 824-0066

CARL TAKEI (SBN 256229)
ctakei@aclu.org
SOMIL TRIVEDI
strivedi@aclu.org

ZOE BRENNAN-KROHN (SBN 324912)
zbrennan-krohn@aclu.org

CLARA SPERA
cspera@aclu.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
Telephone: (212) 607-3300
Facsimile: (212) 607-3318

AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
Disability Rights Program
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 343-0769
Facsimile: (415) 255-1478

ATTORNEYS FOR PLAINTIFFS

*pro hac vice application forthcoming
**C.D. California admission application
forthcoming

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................... 1

I.      THE FACTS THAT NECESSITATE THIS PETITION ............................... 2

II.     ARGUMENT ...................................................................................... 10

     A.      Plaintiffs Are Likely To Prevail On The Merits Of Their
         Constitutional And ADA Claims. ....................................................... 11

         1.      Defendants Have Violated Plaintiffs' Constitutional
            Rights To Protection From The Risks Of This Highly
            Contagious Disease. .................................................................... 11

         2.      Defendants Are Unconstitutionally Punishing Members
            Of The Pretrial Class. ................................................................ 16

         3.      Defendants Have Violated The ADA and Rehabilitation
            Act By Discriminating against the Disability Subclasses. ...... 17

     B.      Plaintiffs Are Likely To Suffer Irreparable Harm, Including
         Death, If This Court Does Not Issue The Requested Relief. ............. 19

     C.      The Potential Harms To Plaintiffs Are Much Greater Than Any
         Speculative Harm Defendants May Assert, and the Public's
         Interest Favors the Requested Injunction. ........................................ 23

     D.      Plaintiffs' Requested Relief .............................................................. 24

         1.      Release of Medically-Vulnerable and Disability Subclass
            Members ...................................................................................... 24

         2.      A Mandatory Plan To Address The Jail's COVID-19
            Crisis ........................................................................................... 25

         3.      Implementing Constitutionally Sufficient Conditions at
            the Orange County Jail ............................................................. 25

CONCLUSION ..................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Andrews v. Cervantes*,
493 F.3d 1047 (9th Cir. 2007) ...............................................................14

*Arc of California v. Douglas*,
757 F.3d 975 (9th Cir. 2014) .................................................................20

*Basank v. Decker*,
20-cv-2518, (S.D.N.Y. Mar. 26, 2020)....................................................3

*Bell v. Wolfish*,
441 U.S. 520 (1979)..........................................................................12, 16

*Bent v. Barr*,
No. 19-cv-06123-DMR, 2020 WL 1812850 (N.D. Cal. April 9,
2020) ......................................................................................................20

*Cameron v. Bouchard*,
No. CV 20-10949, 2020 WL 1929876 (E.D. Mich. Apr. 17, 2020) .................15

*Castillo v. Barr*,
20-cv-605, (C.D. Cal. Mar. 27, 2020) ......................................................3

*Coronel v. Decker*,
--- F.Supp.3d ----, 2020 WL 1487274  (S.D.N.Y. March 27, 2020)...................3

*Delgado v. Barnes*,
465 F. App'x 712 (9th Cir. 2012) ...........................................................14

*Demery v. Arpaio*,
378 F.3d 1020 (9th Cir. 2004) ..........................................................16, 17

*Duvall v. Cty. of Kitsap*,
260 F.3d 1124 (9th Cir. 2001) ...............................................................17

*Elrod v. Burns*,
427 U.S. 347 (1976)...............................................................................20

*Estelle v. Gamble,*
    429 U.S. 97 (1976) ........................................................................11, 14

*Farmer v. Brennan,*
    511 U.S. 825 (1994) ...............................................................................14

*Fraihat v. U.S. Immigration & Customs Enf't,*
    No. EDCV 19-1546-JGB, 2020 WL 1932570 (C.D. Cal. Apr. 20,
    2020) ....................................................................................................3, 20, 24

*Fraihat v. Wolf,*
    20-cv-590 (C.D. Cal. Mar. 30, 2020) ...........................................3, 18, 19

*Gordon v. Cty. of Orange,*
    888 F.3d 1118 (9th Cir. 2018) ...............................................................15

*Helling v. McKinney,*
    509 U.S. 25 (1993)............................................................................14, 15

*Henrietta D. v. Bloomberg,*
    331 F.3d 261 (2d Cir. 2003) ..................................................................19

*Hernandez v. Cty. Of Monterey,*
    110 F. Supp. 3d 929 (N.D. Cal. 2015) ...................................................15

*Kingsley v. Hendrickson,*
    135 S.Ct. 2466 (2015)......................................................................15, 16

*Lemire v. Cal. Dep't of Corr. & Rehab.,*
    726 F.3d 1062 (9th Cir. 2013) ...............................................................14

*Lopez v. McGrath,*
    No. 04-cv-4782 MHP, 2007 WL 1577893 (N.D. Cal. May 31,
    2007) ......................................................................................................14

*Northsworthy v. Beard,*
    87 F.Supp.3d 1164 (N.D. Cal. 2015) .....................................................20

*Parsons v. Ryan,*
    754 F.3d 657 (9th Cir. 2014) .................................................................15

*Pierce v. District of Columbia,*
    128 F. Supp. 3d 250 (D.D.C. 2015) .......................................................18

*In the Matter of the Request to Commute or Suspend County Jail Sentences*,
   (N.J. No. 084230 March 22, 2020) ....................................................... 3

*Roman v. Wolf*,
   No. CV 20-768, 2020 WL 1952656 (C.D. Cal. Apr. 23, 2020) .......................... 3

*Rose v. Baker*,
   No. 17-15009 (9th Cir. Apr. 9, 2020) ............................................... 12, 13

*Savino v. Souza*,
   No. 20-10617-WGY, 2020 WL 1703844 (D. Mass. Apr. 8, 2020) .................... 3

*Thakker v. Doll*,
   No. 20-cv-480 (JEJ),  2020 WL 1671563 (M.D. Pa. Mar. 31, 2020) ................. 3

*Trevizo v. Webster*,
   No. 17-cv-5868-MWF-KS, 2018 WL 5917858 ................................................. 14

*United States v. Muniz*,
   No. 4:09-CR-0199, 2020 WL 1540325 (S.D. Tex. Mar. 30, 2020) .................... 4

*Vazquez Barrera v. Wolf*,
   No. 4:20-CV-1241, 2020 WL 1904497 (S.D. Tex. Apr. 17, 2020) ................. 21

*Wilson v. Williams*,
   No. 20-cv-00794 (N.D. Ohio April 22, 2020) ...................................... 3

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008) ............................................................. 11

**Statutes**

28 C.F.R. §§ 35.102 ............................................................. 18

28 C.F.R. § 35.104 ............................................................. 18

28 C.F.R. § 35.108 ............................................................. 18

28 C.F.R. § 35.130 ............................................................. 18

28 C.F.R. § Pt. 35, App. B ..................................................... 18

42 U.S.C. § 12132 ...................................................................................17, 18

**<u>RULES</u>**

Fed. R. Evid. 706 ....................................................................................25

# INTRODUCTION

The COVID-19 pandemic has upended the nation, sickening over a million people, killing tens of thousands, and sending most Americans into isolation to avoid infection. People confined in the close quarters of jails, however, face a particularly high risk of infection unless corrections officials take reasonable and available steps to protect them. Orange County and its Sheriff have foregone critical measures recommended by the CDC for correctional facilities, putting thousands of vulnerable people in the Orange County Jail ("Jail") at imminent risk of infection and death. All of the named Plaintiffs fear that they will fall gravely ill and may die. In Mr. Wagner's words, "I don't want to get a life sentence by catching the virus and dying."[1]

Defendants have put everyone in the Jail at risk—particularly the Medically-Vulnerable and Disability Subclasses—by failing to consistently or fully implement necessary and feasible public health protections in the Jail. As of this filing, 259 people in the Jail have confirmed positive for COVID-19, out of 738 tests, and 159 results are still pending.[2] The number of positive tests has doubled in a week's time.[3] With nearly 3,000 detained people in the Jail, the true number of people infected is likely much higher and will keep growing.[4] The growing infection creates an enormous risk, not just to those within the jail, but also to the surrounding Orange County community, by contributing to the rapid spread of COVID-19 and creating a debilitating burden on its healthcare delivery system.[5]

---

[1] Exhibit B, Wagner Decl. ¶ 21.

[2] Orange County Sheriff's Department, COVID-19 in OC Jails (May 8, 2020), https://www.ocsd.org/documents/sheriff/COVIDStats5.8.20.pdf.

[3] Orange County Sheriff's Department, COVID-19 in OC Jails (Apr. 29, 2020), https://www.ocsd.org/documents/sheriff/COVIDStats4.29.20.pdf.

[4] Exhibit C, Parker Decl. ¶ 23.

[5] *Id.* ¶ 24.

The confinement of people under these life-threatening conditions violates the Eighth and Fourteenth Amendments to the U.S. Constitution, as well as the Americans with Disabilities Act ("ADA") and the Rehabilitation Act.  Only urgent action can remedy these serious violations that will lead to mass infection, complications, and even death of people in the Jail.  Plaintiffs thus respectfully ask the Court to consider this Petition on an emergency basis, grant immediate releases for members of the Medically-Vulnerable and Disability Subclasses, and order the development of a plan to prevent further spread of COVID-19 within the Jail.

## I.   <u>THE FACTS THAT NECESSITATE THIS PETITION</u>

The Jail is the midst of a serious outbreak of COVID-19 with the number of COVID cases increasing exponentially.   Without immediate intervention, the outbreak will continue to escalate, threatening the lives of detained persons within the Jail, corrections and medical staff at the Jail, and the surrounding community.[6]

Once introduced into a jail, COVID-19 spreads quickly among those inside. Jails are hotbeds for spread of COVID-19 because of: many people living in a closed space; shared ventilation; common food preparation space; communal living/bathing/toileting/eating; limited medical facilities; and limited ability to leave the facility when symptomatic or after potential exposure to the virus.[7] Moreover, jails are not closed environments; members of the community, including both staff and incarcerated people, regularly move in and out of the facility bringing illnesses with them into the jail or, after infection inside, out to

---

[6] Exhibit D, Goldenson Decl. ¶¶ 50-55; Ex. C, Parker Decl. ¶¶ 25, 31.

[7] Ex. D, Goldenson Decl. ¶¶ 17-19; *see Fraihat v. U.S. Immigration & Customs Enf't*, No. EDCV 19-1546-JGB (SHKx), 2020 WL 1932570 (C.D. Cal. Apr. 20, 2020)); *Ernesto Torres, et al. v. United States Dep't. of Homeland Sec., et al.*, EDCV 5:18-cv-2604, Dkt. No. 144 (C.D. Cal. April 11, 2020). .

the community.[8]  Numerous public health experts recommend that jails downsize to reduce the risk of infection.[9]  And courts around the country have responded to the serious risk to people confined in jails with inadequate protections by ordering their release and by requiring jails to implement measures to reduce the spread of COVID-19 within the jails.[10]

---

[8] Ex. D, Goldenson Decl. at ¶¶ 33-34.

[9] *See* Ex. C, Parker Decl.; Ex. D, Goldenson Decl.

[10] *See, e.g.*, *Wilson v. Williams*, No. 20-cv-00794, 2020 WL 1940882, at *10-11 (N.D. Ohio April 22, 2020) (ordering transfer of class of medically vulnerable people from large prison to their homes, community supervision or other facilities capable of social distancing because of the prison's failure to provide social distancing and protections against COVID), *denying motion to stay preliminary injunction*, Case No. 20-3447 (6th Cir. May 4, 2020) (finding that plaintiff prisoners properly invoked Section 2241); *Roman v. Wolf*, No. CV 20-768, 2020 WL 1952656, at *12 (C.D. Cal. Apr. 23, 2020) (granting class-wide preliminary injunction and ordering Adelanto detention facility to immediately stop accepting new detainees and to reduce detainee population to allow for social distancing, giving priority for release to persons over the age of 55 and who are medically vulnerable), *stay granted in part pending expedited appeal*, *Roman v. Wolf*, No. 20-55436, 2020 WL 2188048 (9th Cir. May 5, 2020); *In the Matter of the Request to Commute or Suspend County Jail Sentences*, Consent Order, at *2 (N.J. No. 084230 March 22, 2020) (consent order setting out the presumptive release of all people currently serving a county jail sentence); *Thakker v. Doll*, No. 20-cv-480 (JEJ), Dkt. No. 47, 2020 WL 1671563, at *21 (M.D. Pa. Mar. 31, 2020) (ordering release of detained petitioners in light of the detention facility's inability to provide social distancing and proper hygiene,  "the only effective means by which we can stop the spread of COVID-19"); *Savino v. Souza*, No. 20-10617-WGY, 2020 WL 1703844, at *1 (D. Mass. Apr. 8, 2020) (ordering availability of bail for individuals because petitioners are "held in tight quarters and unable to keep safe distance from others who may – and with time, inevitably will – carry the highly contagious virus)"; *Fraihat v. Wolf*, 20-cv-590, (C.D. Cal. Mar. 30, 2020); *Castillo v. Barr*, 20-cv-605, Dkt. No. 32, at *9 (C.D. Cal. Mar. 27, 2020); *Coronel v. Decker*, No. 20-cv-2472 2020 WL 1487274, at *3 (S.D.N.Y. March 27, 2020); *Basank v. Decker*, 20-cv-2518, Dkt. No. 11, at *4 (S.D.N.Y. Mar. 26, 2020) ("The risk that Petitioners will face a severe, and quite

Although the Jail has reduced its population since the first documented case, this reduction is not enough to protect individuals held at the Jail from the growing outbreak of COVID-19. Defendants' own Correctional Health Services staff recommended that the population be reduced by 50% in all congregate living areas in order to promote social distancing, a goal Defendants have been unable to achieve.

Members of the Medically-Vulnerable and Disability Subclasses face imminent risk of fatal infection at the Orange County Jail.[11] COVID-19 is particularly dangerous to people who are older or have certain health conditions and disabilities, including diabetes, lung disease, heart disease, and compromised immune systems.[12] Incarcerated people disproportionately experience these

---

possibly fatal, infection if they remain in immigration detention constitutes irreparable harm warranting a TRO.").

[11] Ex. D, Goldenson Decl. ¶ 48; Ex. C, Parker Decl. ¶ 19. The California Judicial Council issued an emergency order on April 6th that took several measures to reduce jail populations, including adopting a statewide Emergency Bail Schedule that reduced bail to $0 for certain offenses. *See* Judicial Council of Cal., Judicial Branch Administration: Emergency Rules in Response to the COVID-19 Pandemic (April 6, 2020), available at https://jcc.legistar.com/View.ashx?M=F&ID=8233133&GUID=4CE2DDDF-426E-446C-8879-39B03DE418B3. Plaintiffs Ahlman, Kauwe, and Seif are not eligible for zero bail under the Emergency Bail Schedule, however, because their pending charges fall under exceptions set out in the rule. *See id.* at Emergency rule 4(c)(1), (11), (13); Exhibit E, Plaintiff Ahlman Record (charged with a felony violation of 23152(A), exempted by 4(c)(11)); Exhibit F, Plaintiff Kauwe Records (charged with PC 451(B), exempted by 4(c)(1)); Exhibit G, Plaintiff Seif Records (charged with a felony violation of PC 29800(A)(1), exempted by 4(c)(13)). Additionally, it is imperative that Defendants take further action to reduce the Jail population given that Plaintiffs' court dates have been postponed for unspecified periods of time while the courts are operating on a limited basis during the ongoing pandemic.

[12] Ex. D, Goldenson Decl. ¶ 27; Ex. C, Parker Decl. ¶ 19.

conditions, and so are "particularly vulnerable to severe illness from COVID-19." *United States v. Muniz*, No. 4:09-CR-0199, 2020 WL 1540325, at *2 (S.D. Tex. Mar. 30, 2020).  Defendants recognize that persons who are medically vulnerable are at heightened risk, and adopted a policy of granting releases to some sentenced persons with medical vulnerabilities.  But Defendants have arbitrarily limited those releases to only those individuals who are within 60 days of the end date of their jail sentences, and then applied vague public safety criteria to whether to release even that category of individuals.  Defendants refuse to even consider release of Medically Vulnerable  individuals held on violations of probation or parole (including technical violations).  According to Defendants' list of all persons in the jail who are medically vulnerable to a COVID infection, there are 488 medically vulnerable people currently held in the Jail.

Defendants must take further measures to stop the spread of the disease—not only to protect people in the Jail from harm, but also to prevent a major outbreak that would overwhelm community medical resources.[13]  The CDC has announced several guidelines for prison and jails to limit the spread of COVID-19.[14]  Quarantining is critical, for 14 days after intake and for symptomatic individuals and their close contacts. Additionally, social distancing (requiring all people to stay a minimum of six feet away from one another), frequent hand washing with soap, and frequently cleaning and disinfecting shared surfaces are essential to reducing the spread of the virus.[15]  Testing is another important

---

[13] Ex. C, Parker Decl. ¶¶ 28-30

[14] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention (March 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf.

[15] Ex. D, Goldenson Decl., ¶¶ 2, 45.

component, enabling jail officials to know who is infected so they can be quarantined from the general population.

Defendants have failed to appropriately implement these safeguards. Defendants nonetheless assert that they are taking all necessary steps to protect people in the jail from COVID-19, and have made a number of factual representations to Plaintiffs about these alleged steps—some of which are extremely recent, only after Plaintiffs filed the complaint.[16] However, the actual practices in the jail continue to be dangerous:

- **Failure to Quarantine:** Defendants have not uniformly quarantined new arrivals at the Jail[17]; and even when they do quarantine people, they place many in unreasonably risky conditions. The Jail quarantines the close contacts of confirmed COVID-19 cases in cohorts—a practice that is discouraged by the CDC because it places uninfected individuals at risk.[18]  The Jail also defeats the purpose of quarantines by mixing cohorts with each other.[19] In the case of at least one of these quarantines, the Jail's ineffective quarantine practices may have contributed to a major cluster of infections.[20]

---

[16] For example, on May 7, Defendants amended their list of screening questions for COVID-19 testing. Late last week, they also began to post signs stating that detainees could request more hand soap. Exhibit H, Ramirez Decl. ¶ 13; Exhibit I, Trace May 9, 2020 Decl. ¶ 2; Exhibit J, Wagner May 8, 2020 Decl. (May 8) ¶ 6.

[17] Exhibit K, Seif Decl. ¶ 10 (stating that new incarcerated individuals are not tested before being placed in his tier); Ex. B, Wagner Decl. ¶ 14 (describing a new inmate placed in his sector whose father was in the hospital with COVID-19).

[18] Ex. C, Parker Decl. ¶ 16; Ex. D, Goldenson Decl. ¶ 46.

[19] *See* Exhibit L, Miranda Decl. ¶¶ 22, 25; Exhibit. M, Esparza Decl. ¶ 7; Exhibit N, Godinez Decl. ¶ 11 (half of quarantined dorm moved to another module and then mixed with new people).

[20] Ex. L, Miranda Decl. ¶¶ 8, 25; Ex. N, Godinez Decl. ¶¶ 8-9; Ex. D, Goldenson Decl. ¶ 45; Exhibit O, Farias Decl. ¶¶ 6-10; Exhibit P, Lentz Decl. ¶¶ 5-11.

- **Lack of Social Distancing:**  In non-quarantined housing units at the Jail, Defendants have not implemented procedures to allow Plaintiffs and putative class members to socially distance from other people.  Many people are in cells with as many as eight people to a cell.[21] In some barracks, Defendants have increased the density by adding several new individuals in recent days.[22] Plaintiffs and putative class members have constant, forced contact with many others who may have been exposed to COVID-19.[23]  People are forced to eat together, shower together, and to share common laundry and medicine delivery.  Defendants frequently move people around the jail, increasing their potential exposures.[24]

---

[21]Exhibit Q, Ahlman Decl. ¶¶ 7-8, 11-14 (describing her shared medical unit housing with 12 beds only two feet apart); Ex. P, Lentz Decl. ¶ 12; Ex. H, Ramirez Decl. ¶ 19 (impossible to socially distance in two-person cells or accompanying dayroom).

[22] Ex. H, Ramirez Decl. ¶¶ 18 (in the past two days, barracks experienced rapid population increases that make it impossible to socially distance).

[23] Ex. L, Miranda Decl. ¶ 7; Ex. M, Godinez Decl. ¶ 6.; Exhibit R, Bonilla Decl. ¶¶ 6-7 (held in two-person cell, approximately 8x12 feet and dayroom with 7 others where they use the phones one foot apart from each other); Exhibit S, Ortiz Decl. ¶¶ 5-7; (in medical module with beds approximately two to three feet apart and the dayroom with chairs a foot apart from each other); Exhibit T, Hernandez Decl.¶¶ 6-10, 30; Ex. H, Ramirez Decl. ¶¶ 21 (symptomatic individual transferred from quarantine to crowded barracks without being tested), 24 (symptomatic individual who asserts he has COVID-19 was transferred into new unit, assigned an asymptomatic cellmate, and  is mingling with others in common area)

[24] *See* Ex. L, Miranda Decl. ¶¶ 4, 6, 9-12 (moved to four different units since entering custody on January 10, 2020, being exposed to individuals with COVID-19 symptoms, and not being tested until four months later); Ex. Q, Ahlman Decl. ¶ 5 (being placed in overcrowded a holding tank that was only supposed to hold 10 people); Ex. N, Godinez Decl. ¶¶ 7, 10-13 (transferred within jail units, including being transferred from a module with exposure to individuals who had fevers and COVID-19 symptoms to a new module without being tested for nearly a month despite having a persistent cough); Ex. S, Ortiz Decl. ¶¶ 18-19 (trip to the emergency room for six hours returning without any quarantine or screening and the failure to quarantine new inmates in her medical module); Ex. K, Seif Decl. ¶ 9 (tier not tested despite exposure to deputy who tested positive for COVID-19); Exhibit U,  Herrera Decl. ¶¶ 6,10 (unit not tested despite being exposed to deputy who tested  positive for COVID-19); Ex. B, Wagner Decl. ¶ 14 (describing an inmate new person placed in his sector whose father was in the hospital with COVID-19); Exhibit V, Trace

7

- **Inadequate Hygiene**:   The Jail fails to provide sufficient hygiene and cleaning supplies at no cost to the detainees, providing 1-2 single use bars of soap once a week that barely last one day. This is not enough soap to wash their hands regularly and clean themselves.    Although Defendants represent they have posted signs throughout the jail stating that detainees could request more hand soap (and Plaintiffs confirmed that these signs were newly posted in multiple units at the end of last week), this has not translated to more soap being provided in practice. When Plaintiffs requested the soap, deputies refused to provide it.[25] Defendants also provide flimsy, improvised masks that they must reuse for days and weeks without washing.[26]   Defendants task detainees with cleaning the cells vacated by other individuals who have confirmed cases of COVID-19.   Detainees are forced to carry out this high-risk cleaning task without protective equipment like gloves or gowns.[27]

---

Decl. ¶ 15 (describing transfers of inmates people in and out of unit without quarantine period); Ex. Q, Ahlman Decl. ¶¶ 21-22; Ex. N, Godinez Decl. ¶¶ 19, 21; Exhibit W, Cardone Decl. ¶ 14.

[25] Ex. H, Ramirez Decl. ¶ 13; *see also* Ex. I Trace Decl. (May 9, 2020) ¶ 2 (despite new memo on wall about cleaning or hygiene, Mr. Trace asked for soap and was denied it, and he had only received one bar of soap for 9 days).

[26] *See* Ex. Q, Ahlman Decl. ¶ 18; Ex. R Bonilla Decl. ¶ 12; Ex. X, Baguiao Decl. ¶ 13;Ex. W, Cardone Decl. ¶¶ 11-12; Exhibit Y, Castillo Decl. ¶ 17; Ex. T, Hernandez Decl. ¶ 24; Ex. U, Herrera Decl. ¶ 11; Exhibit Z, Kauwe Decl. ¶ 10; Ex. L, Miranda Decl. ¶ 16; Ex. S, Ortiz Decl. ¶ 14; Exhibit AA, Saem Decl. ¶ 15; Ex. V, Trace Decl. ¶ 17; Ex. B, Wagner Decl. ¶ 18; Ex. O, Farias Decl. ¶ 12.  Defendants have informed Plaintiffs that they offer replacement laundered mask coverings of some kind every other day but that is inconsistent with recent reports from individuals in the Jail.  See Ex. H, Ramirez Decl. ¶¶ 10-11 & 14-15  (cloth masks not replaced for weeks), 17 (cloth mask made from blood- and feces-stained sheets).

[27] Ex. L, Miranda Decl. ¶ 10 ("Three days after the young man was removed the guards instructed me and another inmate to clean out his belongings from his bunk. We were not given gloves or masks."); Ex. N, Godinez Decl. ¶ 12; Ex. P, Lentz Decl. ¶ 13 .

- **Failure to Disinfect:** The Jail does not properly disinfect high touch surfaces to prevent the spread of the virus.  Incarcerated people themselves are responsible for cleaning the pods, including the toilets and showers, but the Jail does not provide sufficient cleaning supplies.[28]  Multiple declarants have testified that incarcerated workers are provided watered-down cleaning supplies or "dirty mop water," instead of disinfectant to clean the showers and common rooms.[29] Defendants have not contested this except as to quarantine and medical isolation units.

- **Inadequate Testing and Isolation Practices:** Despite California's directive prioritizing testing in jails, the Jail has failed to test or isolate detainees who have COVID-19 symptoms, and until very recently, only a limited number of detained individuals have been tested in the Jail.[30]  These testing practices are plainly inadequate as they expose presumptively healthy detainees to others with illness.[31]  Even when symptomatic individuals are tested, they remain in the current housing units and are only moved to isolation after a positive test result, contrary to public health guidance.[32]

---

[28] *See* Ex. Q, Ahlman Decl. ¶¶ 19-20; Ex. R, Bonilla Decl. ¶ 16; Ex. X, Baguiao Decl. ¶ 14-15; Exhibit BB, Campbell Decl. ¶ 20; Ex. Y, Castillo Decl. ¶ 19; Ex. M, Esparza Decl. ¶ 12; Ex. N, Godinez Decl. ¶ 17; Ex. T, Hernandez Decl. ¶¶ 11-12; Ex. L, Miranda Decl. ¶¶ 17, 24-25; Ex. V, Trace Decl. ¶ 18; Ex. B, Wagner Decl. ¶ 15; Ex. O, Farias Decl. ¶ 13; Ex. H, Ramirez Decl. ¶ 14 (three housing sectors must use the same spray bottle of cleaning solution, which deputies keep behind a locked door and do not consistently permit detainees to use).

[29] Ex. K, Seif Decl. ¶ 13; *see also, e.g.*, Ex. O, Farias Decl. ¶ 13; Ex. Y, Castillo Decl. ¶ 19; Ex. I, Trace May 9, 2020 Decl. ¶ 3.

[30] *See* Ex. Q, Ahlman Decl. ¶ 17; Ex. V, Trace Decl. ¶ 9 (request for testing denied); Ex. T, Hernandez Decl.  ¶¶ 13, 16; Ex. AA, Saem Decl. ¶ 10; Ex. B, Wagner Decl. ¶ 9; Ex. P, Lentz Decl. ¶ 14.

[31] Ex. C, Parker Decl. ¶ 17; Ex. H, Ramirez Decl. ¶ 20 (cellmates of symptomatic individuals not quarantined).

[32] Ex. H, Ramirez Decl. ¶¶ 22 (symptomatic individual was tested but not quarantined pending results), 23 (in unit containing multiple symptomatic

9

Named Plaintiffs Pedro Bonilla, Mark Trace, Don Wagner, Cynthia Campbell, Monique Castillo, Cecibel Caridad Ortiz, Daniel Kauwe, and Michael Seif are all people with disabilities protected under federal law, and those disabilities place them at high risk of critical illness or death if exposed to COVID-19 because of their medical vulnerability.[33]  For these medically vulnerable, disabled Plaintiffs, remaining in the Jail under these conditions increases the chance that they will develop COVID-19 and become either extremely ill or die as a result.[34]  "Given the high likelihood of contagion and spread in the jail, the safety of these [medically vulnerable] individuals is a pressing emergency that needs to be addressed on an urgent basis."[35]

## II. ARGUMENT

Given the dangerous conditions in the Jail, injunctive relief is warranted and necessary to protect Plaintiffs and the classes they represent from being

---

individuals, people were not transferred to medical isolation until receiving positive test results).

[33] Mark Trace is a 53-year-old man who has multiple, significant health conditions including sclerosis of the liver, Hepatitis C and D, asthma, tuberculosis, valley fever, and seizures that affect his breathing and lungs.  Ex. V, Trace Decl. ¶ 8.  Don Wagner is a 68-year-old man who has scar tissue and a persistent cough after surviving cancer four years ago, high blood pressure and a thyroid condition.  Ex. B, Wagner Decl. ¶¶ 2, 7.  Cynthia Campbell is a 64-year-old woman who has Rheumatoid Arthritis, an autoimmune condition that attacks the joints, liver, kidneys, and heart.  Ex. BB, Campbell Decl. ¶¶ 2, 5.  Monique Castillo is a 43-year-old woman who has Type 1 diabetes and anxiety.  Ex. Y, Castillo Decl. ¶ 2, 7.  Cecibel Caridad Ortiz is a 31-year-old woman who has Type 1 diabetes and anxiety.  Ex. S, Ortiz Decl. ¶¶ 2, 8.  Pedro Bonilla is a 36 year-old man who was diagnosed with Hepatitis C, which he contracted during a previous period of imprisonment.  Ex. R, Bonilla Decl.  ¶¶ 2, 21-22.  Daniel Kauwe is a 42-year-old man who is immunocompromised and has fungal infections on his skin.  Ex. Z, Kauwe Decl. ¶¶ 2, 13. Michael Seif is a 35 year old man who suffered a collapsed lung in June of 2018.  Ex. K, Seif Decl. ¶¶ 2, 7-8.

[34] Ex. D, Goldenson Decl. ¶ 50.

[35] Ex. D, Goldenson Decl. ¶ 48.

10

unnecessarily exposed to and potentially dying from COVID-19.  Plaintiffs meet all the requirements for injunctive relief because they are (1) likely to succeed on the merits, (2) will suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in their favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008).

### A.   Plaintiffs Are Likely To Prevail On The Merits Of Their Constitutional And ADA Claims.

Defendants' response to the dangerous conditions in the Jail is so deficient that it violates Plaintiffs' rights under the Fourteenth Amendment, Eighth Amendment, and the ADA and Rehabilitation Act.  Each violation independently satisfies a showing of likelihood of success on the merits.  Here, Plaintiffs can demonstrate that they will succeed under multiple theories.

### 1.   Defendants Have Violated Plaintiffs' Constitutional Rights To Protection From The Risks Of This Highly Contagious Disease.

Due to the conditions in the Jail, Plaintiffs could become ill or die, and defendants' failure to take appropriate precautions to protect both Plaintiffs who are sentenced and pretrial detainees, violates their rights under the Eighth Amendment and the Fourteenth Amendment.  *See Estelle v. Gamble,* 429 U.S. 97, 104 (1976) (Eighth Amendment); *Bell v. Wolfish*, 441 U.S. 520, 535 & n.16 (1979) (pretrial detainees retain greater protections than convicted counterparts).

The only defense Class Members have against this novel, deadly disease is for the Jail to implement all CDC guidelines and reduce populations to the level that will allow for social distancing.  And Defendants have been unwilling or unable to do so.  Defendants' failure to release those members of the Medically Vulnerable and Disability Subclasses whose release would not pose a danger to others creates an untenable risk of serious injury and death.  *See Wilson v. Williams*, 2020 WL

1940882, No. 4:20-cv-00794, at *1 (N.D. Ohio April 22, 2020) (granting preliminary injunctive relief and finding Defendants acted with deliberate indifference, where despite some proactive measures by Defendants, the prisoners were unable to socially distance and where the prison had "shockingly limited available testing…").

COVID-19 is "a global crisis" that heightens the risk for those in jails, one of "the most vulnerable groups among us." *Rose v. Baker*, No. 17-15009, Dkt. 54 at 2 n.1 (9th Cir. Apr. 9, 2020) (internal quotations omitted). Urgent court intervention is required. *Tre McPherson, et al. v. Ned Lamont, et al.*, Civil No. 3:20-cv-534 (D. Conn. May 6, 2020) (allowing Plaintiffs' 2241 class action to proceed after finding that "exhaustion of state remedies would be futile, because, under current conditions, Plaintiffs are at substantial risk of contracting the disease prior to completing the exhaustion process").[36]   For this reason, the Ninth Circuit has

---

[36] Plaintiffs have exhausted available administrative remedies under the Jail's official grievance process. *See* OCSD, Inmate/Detainee Grievance Procedure, § 1600.5.1 (undated). Plaintiffs filed emergency grievances requesting release or, alternatively, provision of adequate sanitation supplies, personal protective equipment, and space to be able to maintain at least 6 feet of distance from other people. Several of the Plaintiffs received verbal denials of their grievances which deputies informed them were not logged as grievances in the Jail's system and were not assigned a Jail Incident Number; because the grievance procedure instructs that appeals can only be processed if they include the original grievance's Jail Incident Number, these Plaintiffs have no other remedies available to them. *See* Exhibit CC, Ortiz Grievance Decl.; Exhibit DD, Seif Grievance Decl.; Exhibit EE Esparza Grievance Decl.; Exhibit FF, Bonilla Grievance Decl.; Exhibit GG, Wagner Grievance Decl.; *see also* Exhibit HH, Herrera Grievance Decl. One Plaintiff submitted a grievance that did not receive any response before his mental health recently decompensated. Exhibit II, Jennifer Rojas Decl. Others received written denials, which they timely appealed; these appeals were either denied or never received a response. *See* Exhibit JJ, Trace May 4, 2020 Grievance Decl.; Exhibit KK,, Trace May 5, 2020 Grievance Decl.; Exhibit LL  Campbell Appeal Decl.; Exhibit MM, Ahlman Appeal Decl.; Exhibit NN, Castillo Appeal Decl. Therefore, Plaintiffs have exhausted the available administrative remedies.*See Andres v. Marshall*, 867 F.3d 1076, 1078 (9th Cir. 2017) (holding that where prison officials improperly failed to process timely filed grievance, plaintiff exhausted available remedies).

recognized that incarcerated people face a "risk of serious consequences from the COVID-19 virus, up to and including death, because of [] underlying medical conditions." *Id.*

Defendants are well aware of the risks posed by COVID-19 infections. Those risks are "obvious" to anyone living in California, which has been under a state of emergency since March 4, 2020 and under shelter-in-place orders since March 19, 2020.[37] Sheriff Barnes has repeatedly been warned of these risks, including by his own deputies.[38] Despite these warnings, Defendants have not taken sufficient steps to curb the spread of disease, such as providing adequate amounts of soap, decreasing contact between detainees, and adopting effective practices to disinfect shared surfaces.[39]

The Eighth and Fourteenth Amendments require that Defendants take action to protect people in their custody from communicable diseases.  Putting confined persons at risk of disease is a sufficiently cruel and "unsafe, life-threatening condition" such that it can constitute "cruel and unusual punishment" under the

---

[37] Cal. Exec. Order No. N-33-20 (March 19, 2020), https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf (noting state of emergency declared March 4, 2020).

[38] *See* Letter from Jacob Reisberg and Daisy Ramirez, ACLU of Southern California, to Sheriff-Coroner Donald Barnes, Re: COVID-19 Policy in Orange County Jails (Mar. 12, 2020) (ACLU So Cal warning sheriff of risks); Letter from Transforming Justice, et al., to Sheriff Don Barnes, et al., Re: COVID-19 Containment in Orange County Jails and Courthouses (Mar. 17, 2020) (multiple community organizations); Letter from Tom Dominguez, Ass'n of Orange County Deputy Sheriffs, to Sheriff Don Barnes (Mar. 25, 2020) (deputies); Letter from Transforming Justice Orange County, et al., to Sheriff Don Barnes, et al., Re: COVID-19 in Orange County Jails (Apr. 6, 2020) (multiple community organizations).

[39] *See* Ex. Q, Ahlman Decl. ¶¶ 13, 18-20; Ex. BB, Campbell Decl. ¶¶ 10-11, 13-16, 20; Ex. Y, Castillo Decl. ¶¶ 8-11, 17-19; Ex. N, Godinez Decl. ¶¶ 6, 12, 15, 17, 19-20; Ex. T, Hernandez Decl. ¶¶ 7-8, 10-12, 24, 27; Ex. V, Trace Decl. ¶¶ 16-18; Ex. B, Wagner Decl. ¶¶ 11-13, 15-18.

Eighth Amendment.  *Helling v. McKinney*, 509 U.S. 25, 33 (1993).[40]  Accordingly, the Constitution prohibits Jail officials from acting with deliberate indifference to the risks that people in their custody will suffer harm from infectious diseases. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Farmer v. Brennan*, 511 U.S. 825, 828 (1994).  Under the Eighth Amendment, officials act with deliberate indifference when they: (1) have subjective knowledge of the risks or those risks are "obvious," and (2) fail to take reasonable action to abate those risks.  *Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1078 (9th Cir. 2013) (quoting *Farmer*, 511 U.S. at 842); *Delgado v. Barnes*, 465 F. App'x 712, 712–13 (9th Cir. 2012).  Under the Fourteenth Amendment, only the objective prong of this test must be satisfied. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2473–74 (2015).[41]

---

[40] *See also Trevizo v. Webster*, No. 17-cv-5868-MWF-KS, 2018 WL 5917858, at *4; (C.D. Cal. Sept. 6, 2018) ("It is well accepted that such substantial risks of harm include exposure of inmates to a serious, communicable disease.") (internal citation marks omitted) (quoting *Helling*, 509 U.S. at 33); *Lopez v. McGrath*, No. 04-cv-4782 MHP, 2007 WL 1577893, at *5 (N.D. Cal. May 31, 2007) ("Courts have recognized a broad range of diseases which may form the basis for a claim of deliberate indifference.") (collecting cases); *cf. Andrews v. Cervantes*, 493 F.3d 1047, 1055–56 (9th Cir. 2007) (recognizing "imminent danger" posed to prisoners by contagious "diseases [that] quite obviously cause serious health problems, and can result in death.").

[41] *Gordon v. Cty. of Orange*, 888 F.3d 1118, 1124–25 (9th Cir. 2018), *cert. denied sub nom. Cty. of Orange, Cal. v. Gordon*, 139 S. Ct. 794, 202 L. Ed. 2d 571 (2019) (holding this test applies to violations of right to adequate medical care).  In *Swain v. Junior*, the Eleventh Circuit held that because defendants did not "subjectively believe[] the measures they were taking were inadequate" and there was no evidence that "defendants are ignoring or approving the alleged lapses in enforcement of social-distancing policies," plaintiffs did not satisfy the subjective prong of deliberate indifference. *See Swain v. Junior*, No. 20-11622-C, 2020 WL 2161317, at *5 (11th Cir. May 5, 2020).  The *Swain* decision conflicts with controlling Ninth Circuit case law.  For pre-trial detainees, subjective knowledge or intent is not required. *Gordon*, 888 F.3d at 1124-25.  For sentenced prisoners, the subjective prong of deliberate indifference requires two parts: (1) that prison officials were

14

These obligations include prevention, not merely treatment of those who contract the disease. *Helling*, 509 U.S. at 33–34; *Parsons v. Ryan*, 754 F.3d 657, 676–77 (9th Cir. 2014) (rejecting defendants' argument that Eighth Amendment only applies to "current serious health problems"). Failure to follow CDC guidance and other generally-accepted medical guidelines for disease prevention is evidence of deliberate indifference. *Cameron v. Bouchard*, No. CV 20-10949, 2020 WL 1929876, at *2 (E.D. Mich. Apr. 17, 2020) (granting TRO based on jail's failure to comply with COVID-19 guidance from CDC and other public health experts), *modified on reconsideration*, *Cameron v. Bouchard,* No. CV 20-10949, 2020 WL 1952836 (E.D. Mich. Apr. 23, 2020); *Hernandez v. Cty. Of Monterey*, 110 F. Supp. 3d 929, 942–45 (N.D. Cal. 2015) (finding that "known noncompliance" with CDC tuberculosis guidelines "strongly indicates deliberate indifference to a substantial risk of serious harm" and ordering officials to implement tuberculosis prevention policies); *cf, Valentine v. Collier*, No. 20-20207, 2020 WL 1934431, *3-4 (5th Cir. April 22, 2020) (staying injunctive relief for measures beyond CDC Guidance, where plaintiffs did not contest that defendants were in compliance with CDC Guidance). Any claim that is likely to succeed under the Eighth Amendment is equally if not more likely to succeed under the Fourteenth Amendment. *See id.* at 1123–25.

Defendants' actions fall far short of the constitutional requirements by failing to protect detainees from unnecessary exposure to this potentially deadly virus. Defendants' duty requires that they protect the detainees in the Jail from the risk of

---

either subjectively aware of the risk to people in custody or it was "obvious" to them, and (2) the officials lacked a reasonable justification for exposing the people to that risk. *Lemire*, 726 F.3d at 1078. In this case, Defendants are clearly aware of the risks of harm, and—whatever their personal beliefs may be—failed to take reasonable action to abate those risks.

contracting this highly communicable disease.  Yet Defendants have ignored this duty to Plaintiffs and the Class they seek to represent, who are at serious risk of severe illness or death from COVID-19. Plaintiffs are able to show a strong likelihood of success on the merits on this basis alone.

### 2.   Defendants Are Unconstitutionally Punishing Members Of The Pretrial Class.

In addition to violating the Eighth and Fourteenth Amendment deliberate indifference standard for all Plaintiffs, Defendants' failure to secure safe conditions constitutes an impermissible punishment for the Pretrial Class. *See, e.g.*, *Bell v. Wolfish*, 441 U.S. 520, 535 ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *id.* at n.16 (people detained pretrial retain greater protections than convicted counterparts).  A jailer's conduct constitutes punishment if it is either not rationally related to a legitimate, nonpunitive government purpose or is excessive in relation to that purpose.  *Bell*, 441 U.S. at 561; *Kingsley*, 135 S. Ct. at 2473–74; *Demery v. Arpaio*, 378 F.3d 1020, 1030–33 (9th Cir. 2004).

Defendants have no legitimate, nonpunitive purpose to keep pretrial Plaintiffs and the other members of the Pretrial Class under these conditions. Choosing to violate public health guidelines during a global pandemic is not rationally related to goals of health, safety, or even cost efficiency. Because it arbitrarily inflicts harm, courts may infer it is punitive.  *See Demery*, 378 F.3d at 1032 (live webcams in jail are punitive because they are not rationally related to legitimate goals of security or public education).

Even if the Jail's failure to follow accepted practices for preventing the spread of COVID-19 had a legitimate, nonpunitive purpose, exposing pretrial detainees to lethal risks is excessive for that purpose.  For this reason, the California Judicial Council issued advisories encouraging state courts to increase releases from jails,

and the California Attorney General has clarified that county sheriffs have full statutory authority to release people from custody in response to the COVID-19 emergency.[42]

### 3.    Defendants Have Violated The ADA and Rehabilitation Act By Discriminating against the Disability Subclasses.

Defendants' actions also violate the ADA and Rehabilitation Act.  Title II of the ADA requires that public entities refrain from discriminating against qualified individuals on the basis of a disability.  42 U.S.C. § 12132.  Section 504 of the Rehabilitation Act imposes parallel requirements on entities that receive federal financial assistance.  *See Duvall v. Cty. of Kitsap*, 260 F.3d 1124, 1135 (9th Cir. 2001).  In order to avoid disability discrimination in Jail in this public health emergency, the only reasonable modification and nondiscriminatory method of administration is release of the Disability Subclasses.

Plaintiffs and class members in the disability subclasses are protected people with disabilities under the ADA and Section 504. 42 U.S.C. § 12102(1)(A), (2)(B), 28 C.F.R. § 35.108(d)(2)(iii).  Plaintiffs and class members are "qualified" for Defendants' programs, services, and activities, including adjudication of their cases; safe, constitutional living conditions during confinement; and medical care and rehabilitative services to prepare for reentry after release.  42 U.S.C. § 12131(2); 28 C.F.R. § 35.104; 28 C.F.R. § Pt. 35, App. B ("[T]itle II applies to anything a public

---

[42] *See* Advisory from California Chief Justice Tani Cantil-Sakauye to Presiding Judges and Court Executive Officers of the California Courts (Mar. 20, 2020), https://newsroom.courts.ca.gov/news/california-chief-justice-issues-second-advisory-on-emergency-relief-measures;   Attorney   General   of   California, Information Bulletin: COVID-19 and Statutory Authority Under Government Code Section        8658        (Apr.        14,        2020), https://oag.ca.gov/sites/all/files/agweb/pdfs/publications/2020-dle-05.pdf.

entity does").  The Jail is a "public entity" for purposes of the ADA, and is bound to comply with Title II.  42 U.S.C. § 12131(B).

Public entities must take affirmative steps to ensure that people with disabilities can participate in all of the entity's programs, benefits, and services on an equal and equally safe basis as people without disabilities.  28 C.F.R. §§ 35.102(a), 35.130(a), (b); *Fraihat*, 2020 WL 1932570, at \*26-27 (C.D. Ca. Apr. 20, 2020); *Pierce v. District of Columbia*, 128 F. Supp. 3d 250, 266, 269 (D.D.C. 2015). These affirmative obligations include making reasonable modifications to their policies, practices, or procedures where necessary to avoid disability discrimination.  28 C.F.R. § 35.130(b)(7)(i).  The ADA also prohibits public entities from "utiliz[ing] criteria or methods of administration … [t]hat have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability" or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities."  28 C.F.R. § 35.130(b)(3)(i)-(ii).

The Disability Subclasses are entitled to reasonable modifications to ensure they can participate equally and with equal safety in all activities, including the safe adjudication of pretrial detainees' pending criminal cases, constitutionally-adequate care, medical treatment, and rehabilitative support during confinement.  Disability Subclass members cannot access these services if they are severely ill, unconscious, or dead.  *See Fraihat*, 2020 WL 1932570, at \*26 (C.D. Ca. Apr. 20, 2020) (disabled people in ICE detention entitled to reasonable accommodations in order to participate in the "programmatic 'benefit'" of the removal process). Given the fast-moving, life-threatening nature of the COVID-19 pandemic, and its disproportionate effect on the Disability Subclasses, immediate release is the only reasonable modification. Defendants' failure to release the Disability Subclasses violates the ADA and the Rehabilitation Act.

18

Release of the disability subclasses is a reasonable modification and is not a fundamental alteration. Indeed, Defendant Barnes is already engaging in early releases as a result of COVID-19, but his actions have been insufficient to protect all medically vulnerable, disabled people for whom release is especially critical.[43] *Cf. Henrietta D. v. Bloomberg*, 331 F.3d 261, 281 (2d Cir. 2003). Release is also consistent with the Jail's purposes, including administratively ensuring pretrial detainees show up for court, and preparing post-conviction detainees for safe, healthy release into their communities.

### B. Plaintiffs Are Likely To Suffer Irreparable Harm, Including Death, If This Court Does Not Issue The Requested Relief.

Plaintiffs are likely to suffer irreparable harm, including death, if they remain incarcerated and Defendants maintain their existing policies and practices. Courts "evaluate these factors via a 'sliding scale approach,' such that 'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Arc of California v. Douglas*, 757 F.3d 975, 983 (9th Cir. 2014) (citations omitted). The nature of the potential risk to Plaintiffs--death--weighs heavily in favor of granting emergency injunctive relief.[44] Further, if Defendants maintain their current practices, COVID-19 will spread further into the Orange County community and possibly more broadly.

---

[43] Ex. D, Goldenson Decl. ¶ 48.

[44] Further, courts find that a constitutional violation in itself amounts to an irreparable injury. *See Northsworthy v. Beard*, 87 F.Supp.3d 1164, 1193 (N.D. Cal. 2015) (finding the deprivation of a prison inmate's Eighth Amendment right "sufficient to establish irreparable harm") (citing *Elrod v. Burns*, 427 U.S. 347 (1976)).

Plaintiffs are locked inside an environment that the Defendants have failed to ensure is safe.  Defendants have not fully complied with the CDC Guidelines.  More detainees test positive each day, and infection rates are increasing exponentially.  COVID-19 is highly contagious and potentially deadly; it can also cause severe health effects, including organ failure, even if the patient survives the infection.[45]  Accordingly, courts have found that detained or incarcerated persons, especially those falling into higher risk categories, are able to show likelihood of irreparable harm.  *See, e.g., Bent v. Barr*, No. 19-cv-06123-DMR, 2020 WL 1812850, at *6 (N.D. Cal. April 9, 2020) (citing *Coronel v. Decker*, 2020 WL 1487274, at *3) ("Due to their serious underlying medical conditions, all Petitioners face a risk of severe, irreparable harm if they contract COVID-19.")); *Kaur v. U.S. Dep't of Homeland Sec.*, No. 2:20-cv-03172-ODW (MRWx), 2020 WL 1939386, at *3 (C.D. Cal. Apr. 22, 2020) (Order Granting Pl.'s Mot. TRO) (citing *Fraihat v. U.S. Immigration and Customs Enf't*, No. EDCV 19-01546-JGB (SHKx), Dkt. No. 132 at 36 (C.D. Cal. April 20, 2020) (Order Granting Pls.' Mot. Prelim. Inj.)) ("Even in the early days of the pandemic, and with few exceptions, courts did not hesitate to find irreparable harm as a result of potential COVID-19 exposure in prison and detention, including in facilities where there had not been a confirmed case. At this stage of the pandemic, the threat is even clearer.").

Plaintiffs who are Medically Vulnerable are at especially grave and highly probable risk of irreparable harm.[46]  Dr. Parker concluded that it is his professional

---

[45] Ex. C, Parker Decl. ¶ 6.

[46] *Vazquez Barrera v. Wolf*, No. 4:20-CV-1241, 2020 WL 1904497, at *6 (S.D. Tex. Apr. 17, 2020) ("Plaintiffs' alleged harm is both imminent and irreparable. The COVID-19 pandemic has reached every state in our nation, and the numbers of infected and dead increase daily. According to the CDC, those with particular medical vulnerabilities, including Plaintiffs, are particularly susceptible to serious illness and death. There is currently no vaccine or cure for COVID-19.")

judgment that Medically Vulnerable individuals "are at greater risk of serious health consequences" and "face an imminent threat of death unless they are released."[47] COVID-19 can cause severe health effects, including organ failure, even if the patient survives the infection.[48]

Immediate release of the Medically Vulnerable and Disability Subclasses is the only way to effectively mitigate the grave and imminent risk of harm to these Class Members from this highly contagious, lethal disease with no treatment and no cure.[49] Without significant reductions in the jail population (as well as other mitigation measures), the disease will continue to spread in the jail.[50] Thus, continued detention will expose the Medically-Vulnerable and Disability Subclasses to unacceptably high levels of lethal risk.[51]  There is, in other words, no set of conditions of confinement at the Orange County Jail that, given the current infection prevalence and community spread of COVID-19, would be able to comply with the Constitution or the ADA or Rehabilitation Act for the Medically-Vulnerable and Disability Subclasses.

For the other Class Members, the Sheriff's refusal to undertake population reduction measures of sufficient speed and scope is causing an interacting set of failures that make it impossible for the Jail to meet the CDC Guidance. As one example, the Jail cannot effectively quarantine people it incarcerates.  Given the current number and growth of cases, it is already unlikely that there are sufficient numbers of single cells to carry out necessary isolation and quarantine procedures.[52]

---

[47] Ex. C, Parker Decl. ¶ 33.

[48] *Id.* ¶ 6.

[49] Ex. C, Parker Decl. ¶¶ 34-35; Ex. D, Goldenson Decl. ¶ 48.

[50] Ex. D, Goldenson Decl. ¶¶ 33-37.

[51] Ex. C, Parker Decl. ¶ 33.

[52] Ex. D, Goldenson Decl. ¶¶ 43-44.

In the absence of adequate isolation and quarantine bedspace, the Jail will be forced to use more cohort quarantines, thus exposing more people to infection risks.[53]

The increasing need for quarantine bedspace in turn puts additional pressure on available bedspace in other parts of the Jail, leading to greater movement and mixing that increases exposure risks.[54] Because the Jail must reserve so much space for quarantines, officials have been consolidating increasingly large groups of people in dorms, making it even harder for non-quarantined individuals to socially distance.[55]  As the number of confirmed and suspected cases grows and such crowding worsens, the only way to instantly create more available bedspace is to reduce the jail population.

The only way to relieve pressure on the system and meet the simultaneous needs for adequate quarantine beds, adequate social distancing, and adequate hygiene, PPE, and testing is to reduce the number of people in the Jail.[56]

 The likelihood of irreparable harm factor tips the scale in favor of emergency injunctive relief.  Without judicial intervention, some Plaintiffs, especially the Medically Vulnerable and Disabled, may die or suffer serious illness.  For some, incarceration in the Orange County Jail will be a death sentence, without any of the due process associated with that most final of punishments.

---

[53] *Id* at ¶¶ 45-46.

[54] *Id* at ¶ 47.

[55] Ex. N, Godinez Decl. ¶¶ 6, 18-19; Ex. B, Wagner Decl. ¶¶ 6, 16-17; Ex. T, Hernandez Decl. ¶¶ 6-10, 30.

[56] Ex. D, Goldenson Decl. ¶ 53.

### C.   The Potential Harms To Plaintiffs Are Much Greater Than Any Speculative Harm Defendants May Assert, and the Public's Interest Favors the Requested Injunction.

The threatened injury to Plaintiffs and putative Class Members—sickness up to and including organ failure and death—outweighs any theoretical injury posed by the requested Injunction to Defendants.

Although Defendants may argue that releasing Plaintiffs somehow will impact public safety, any such impact pales in comparison to the potential human cost and, anyway, is purely speculative.  Over a month ago, the California Judicial Council recommended early releases for more categories of people than Defendants are currently considering for early release.  Sheriff Barnes also has broad authority to move or release people in his custody in order to protect them from the COVID-19 pandemic.  *See* California Government Code § 8658.  That statutory authority permits him to go well beyond what he has done thus far to protect those entrusted to his care under § 8658, many of whom are still afforded the presumption of innocence.  The speculative risk that a person could commit a crime if released must be weighed against the clear evidence that the longer Sheriff Barnes holds people in the jail—particularly those in the Medically Vulnerable and Disability Subclasses— the greater the risk that they will become infected and die.

Not only do detained people risk becoming sick themselves, but allowing COVID-19 to spread in the Jail endangers the health of deputies, healthcare workers, other staff, and attorneys visiting clients, as well as the health of their families. Further, a continued outbreak in the Jail would strain hospital resources in the Orange County community, potentially creating a humanitarian disaster.  These

23

hospital resources are limited and are not equipped to handle the kind of outbreak that is likely to occur in the Orange County Jail without immediate intervention.[57]

The public interest thus leans heavily in favor of the requested injunction.

### D.    Plaintiffs' Requested Relief

Because Plaintiffs are likely to succeed on the merits, face risk of immediate harm, and the balance of harms weighs decidedly in their favor, Plaintiffs request:

### 1.    Release of Medically-Vulnerable and Disability Subclass Members

The members of the Medically-Vulnerable and Disability Subclasses all have health conditions, disabilities, or characteristics that cause them to be exceptionally vulnerable to death or serious harm to their health if they contract COVID-19.  The Orange County Jail has identified, but not released, approximately 488 detainees who are medically vulnerable and at heightened risk of serious infection and death. All people on this list are in the Medically-Vulnerable Subclass.  Most of the people on this list are also in the Disability Subclasses, including people of any age who have certain underlying medical conditions also have an elevated risk.[58]   The structure of the Jail makes it impossible to detain Medically-Vulnerable and Disability subclass members in a constitutional manner during this pandemic.[59] Given this, the Jail cannot consistently enforce social distancing and 20 second handwashing by all incarcerated people (and all those who work at the Jail) in a manner that would ensure the Medically-Vulnerable and Disability subclass

---

[57] Ex. C, Parker Decl. ¶¶ 28-30; *see Fraihat,* 2020 WL 1932570, at *28 ("Plaintiffs also attach evidence suggesting that a failure to protect the most vulnerable detainees could quickly overwhelm local hospitals with insufficient ICU beds or respirators, diminishing the available health resources for all . . . If a preliminary injunction is entered, however, survival is maximized . . . .) (internal citations omitted).

[58] *Coronavirus disease (COVID-19) advice for the public: Myth busters*, World Health Organization, https://cutt.ly/dtEiCyc (Last visited on Apr. 28, 2020).

[59] Ex. D, Goldenson Decl. ¶¶ 44-48; Ex. C, Parker Decl. ¶¶ 11-19.

24

members would not be at risk of being infected with the virus.[60]   Put simply,
Defendants cannot ensure their health and safety within the Jail.  Recognizing this
grave risk to life, courts across the country have granted emergency habeas petitions
ordering the release of medically-vulnerable and disabled people from confinement.
The Defendants should establish release procedures to identify and release within 24
hours all Medically-Vulnerability and Disability Subclass members unless there is
proof of judicially-recorded findings by clear and convincing evidence that the
individual poses such a risk of flight or danger to others that no other condition can
mitigate that risk.

### 2.   A Mandatory Plan To Address The Jail's COVID-19 Crisis

The Court also should order Defendants to submit a plan to the Court in three
(3) days and appoint a qualified public health expert under Fed. R. Evid. 706, as
further described in the Complaint.

### 3.   Implementing Constitutionally Sufficient Conditions at the Orange County Jail.

Finally, the Court should order Defendants to take further steps to mitigate the
risk to Class Members who remain in the jail, including any additional releases that
are needed to prevent the further spread of COVID-19 in the jail.

### CONCLUSION

For the foregoing reasons, this Court should grant this request for a
temporary restraining order and a preliminary injunction.

Respectfully submitted,

Dated: May 11, 2020

---

[60] Ex. C, Parker Decl. ¶¶ 18-19.

/s/Cassandra Stubbs
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Cassandra Stubbs
C.A. Bar No. 218849
Olivia Ensign
N.C. Bar No. 50689
Cristina Becker
N.C. Bar No. 46793
201 W. Main St., Suite 402, Durham, NC 27701
cstubbs@aclu.org
ensign@aclu.or
cbecker@aclu.org

Carl Takei
C.A. Bar No. 256229
Somil Trivedi
D.C. Bar No. 1617967
Clara Spera
N.Y. Bar No. 5590229
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
ctakei@aclu.org
strivedi@aclu.org
cspera@aclu.org

Zoe Brennan-Krohn**

/s/ Peter Eliasberg
AMERICAN CIVIL LIBERTIES FUND OF SOUTHERN CALIFORNIA
Peter Eliasberg
C.A. Bar No. 189110
1313 W. Eighth St.
Los Angeles, CA 90017

/s/ Mitchell Kamin
Mitchell Kamin
C.A. Bar No. 202788
Aaron Lewis
C.A. Bar No. 284244
Brittany Benjamin
C.A. Bar No. 323968
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
(424) 332-4800
alewis@cov.com
mkamin@cov.com
bbenjamin@cov.com

Stacey Grigsby*
D.C. Bar No. 491197
Amia Trigg**
C.A. Bar No. 282890
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
sgrigsby@cov.com
atrigg@cov.com

/s/ John Washington
John Washington
C.A. Bar No. 315991
Schonbrun, Seplow, Harris, Hoffman & Zeldes LLP
11543 W. Olympic Blvd.
Los Angeles, CA 90064
(310) 399-7040
jwashington@sshhlaw.com

s/ Paul Hoffman
Paul Hoffman
C.A. Bar No. 71244
UNIVERSITY OF CALIFORNIA, IRVINE SCHOOL OF LAW
CIVIL RIGHTS LITIGATION CLINIC
401 E. Peltason Dr.,
Suite 1000,
Irvine, CA 92687
(949) 824-0066

26

C.A. Bar No. 324912
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
Disability Rights Program
39 Drumm Street
San Francisco, CA 94111
(415)-343-0769
zbrennan-krohn@aclu.org

ATTORNEYS FOR PLAINTIFFS
*pro hac vice application forthcoming
**C.D. California admission application forthcoming