# EXHIBIT D

I, Dr. Joe Goldenson, declare as follows under penalty of perjury pursuant to 28 U.S.C. § 1746:

**BACKGROUND**

1.      I am a medical physician with 33 years of experience in correctional health care. For 28 years, I worked for Jail Health Services of the San Francisco Department of Public Health. For 22 of those years, I served as the Director and Medical Director.  In that role, I provided direct clinical services, managed public health activities in the San Francisco County jail, including the management of HIV, tuberculosis, Hepatitis C, and other infectious diseases in the facility, planned and coordinated the jail's response to H1N1, and administered the correctional health enterprise, including its budget, human resources services, and medical, mental health, dental, and pharmacy services.

2.      I served as a member of the Board of Directors of the National Commission on Correctional Health Care for eight years and was past President of the California chapter of the American Correctional Health Services Association. In 2014, I received the Armond Start Award of Excellence from the Society of Correctional Physicians, which recognizes its recipient as a representative of the highest ideals in correctional medicine.

3.      For 35 years, I held an academic appointment as an Assistant Clinical Professor at the University of California, San Francisco.

4.      I have worked extensively as a correctional health medical expert and court monitor. I have served as a medical expert for the United States District Court for the Northern District of California for 25 years. I am currently retained by that Court as a medical expert in *Plata v. Newsom*, Case No. 3:01-cv-01351 (N.D. Cal.), to evaluate medical care provided to inmate patients in the California Department of Correctional Rehabilitation. I have also served as a medical expert/monitor at Cook County Jail in Chicago and Los Angeles County Jail, at other jails in Washington, Texas, and Florida, and at prisons in Illinois, Ohio, and Wisconsin.

5.      My CV is attached as Exhibit A.

6.      I am not being compensated for my time reviewing materials and preparing this report.

7.      As a researcher of prisoner health care and infectious diseases, I have studied the scientific literature about COVID-19, including the literature regarding symptoms, testing, infection rates and transmission.  In addition, I have studied and am familiar with the public health guidance regarding prevention and containment of COVID-19, including U.S. Centers For Disease Control ("CDC")'s Guidance for Population in Jails and the CDC's Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings.

**8.**      I have been asked by counsel for persons detained at the Orange County Jail to describe the impact of the COVID-19 pandemic on detained persons and the surrounding community under the current population levels and conditions at the Orange County jail.  To address this question, I rely on my background and training, the public health literature and guidance about COVID-19, as well as information about COVID-19 in the Orange County Jail and community.  The information about the Orange County Jail includes publicly available information about the Orange County Jail from the Orange County Sheriff's Department's webpages, charts of the jail structure and units from the 2016-2018 biennial inspection of California Board of State and Community Corrections (BSCC)[1],  community infection information from the Orange County Department of Health, and individual declarations from persons detained at the Orange County jail.

**COVID-19**

---

[1] 2016-2018 Biennial Inspection: Orange County's Type II and Court Holding Facilities, Penal Code Section 6031, State of California Board of State and Community Corrections (Sep. 26. 2018), https://drive.google.com/file/d/1h-E41vMsJa3S06bW8PGSTwS3DWpPbzj5/view?usp=sharing.

9.      COVID-19 is a serious disease that has reached pandemic status.  As of April 21, 2020, there are at least 3,020,117 confirmed cases of COVID-19 worldwide, including 980,008 cases in the United States.[2] At least 209,799 people have died, including 54,881 in the United States.[3] As of April 21, 2020 there were 33,897 confirmed cases of COVID in California and 1,227 reported deaths.[4] These numbers have been increasing at an alarmingly rapid rate, reflecting the exponential growth of infections. Because these numbers include only laboratory confirmed cases, they likely understate the actual number of cases and deaths. Most medical and public health experts agree that the situation, which is already dire, will continue to worsen over the coming weeks to months.

10.     COVID-19 is a highly contagious respiratory illness. It is transmitted between persons in close proximity (within about six feet) by airborne droplets released by infected individuals when they cough or sneeze.[5] The droplets can survive in the air for up to three hours. It may also be possible for an individual to become infected by touching a surface or object that has the virus on it and then touching his or her own mouth, nose, or possibly eyes. Infected droplets can survive on surfaces for variable lengths of time, ranging from up to four hours on copper, to 24 hours on cardboard, to two to three days on plastic or stainless steel.

---

[2] Johns Hopkins University COVID-19 Data Center, https://coronavirus.jhu.edu/(last visited Apr. 26, 2020).
[3] *Id.*
[4] Los Angeles Times, *Tracking coronavirus in California*, https://www.latimes.com/projects/california-coronavirus-cases-tracking-outbreak/ (last visited Apr. 21, 2020); *see also* Johns Hopkins University COVID-19 Data Center, https://coronavirus.jhu.edu/(last visited Apr. 21, 2020).
[5] Centers for Disease Control and Prevention, Interim Infection Prevention and Control Recommendations for Patients with Suspected or Confirmed Coronavirus Disease 2019 (COVID-19) in Healthcare Settings, https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Finfection-control%2Fcontrol-recommendations.html.

DECLARATION OF DR. JOE GOLDENSON                                   3                                   D-4

11. Signs and symptoms of COVID-19 may appear two to 14 days after exposure and may include fever, cough, shortness of breath or difficulty breathing, chills, repeated shaking with chills, muscle pain, headache, sore throat, or new loss of taste or smell.[6] In severe cases, infection can result in respiratory failure or death.

12. A significant number of infected individuals do not exhibit symptoms, however, and asymptomatic individuals—either before the onset of symptoms or because no symptoms will ever manifest—can nevertheless transmit the disease to others. According to the CDC, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[7] Similarly, infected individuals may experience only mild symptoms. These asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread.  Because of the high risk of transmission by asymptomatic individuals, CDC recently recommended everyone wear a mask when they leave their homes.

13. There is currently no medical treatment for COVID-19, other than supportive measures. Nor is there a vaccine.[8]

14. Current preventive measures seek to slow the transmission of COVID-19 through social distancing (keeping persons separated by at least six feet), frequent handwashing, and respiratory hygiene (*e.g.*, covering mouth and nose when coughing or sneezing),  and frequent cleansing of surfaces to prevent infection and the spread of the virus.[9]

## COVID-19 IN DETENTION FACILITIES GENERALLY

---

[6] Centers for Disease Control and Prevention, Symptoms of Coronavirus, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html

[7] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html.

[8] Centers for Disease Control and Prevention, *Prevent Getting Sick* (Apr. 8, 2020), cdc.gov/coronavirus/2019-ncov/prevent-getting-sick.

[9] Centers for Disease Control and Prevention,  *How to Protect Yourself and Others* 1–2 (Apr. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention-H.pdf.

15.     For multiple reasons, the risk of exposure to and transmission of infectious diseases, as well as the potential harm to those who become infected, is significantly higher in jails than in the community, putting jail inmates and correctional staff at high risk of becoming ill with COVID-19.

16.     Close living quarters and often overcrowded conditions in jails, prisons, and detention centers facilitate the rapid transmission of infectious diseases, particularly those transmitted by airborne droplets through sneezing or coughing. In these congregate settings, large numbers of people are closely confined and forced to share bunkrooms, bathrooms, cafeterias, and other enclosed spaces. They are physically unable to practice social distancing, which the CDC has identified as a "cornerstone of reducing transmission of respiratory diseases such as COVID-19."[10] Within these facilities, space and resource limitations—and the resulting inability of inmates and employees to practice social distancing[11]—make it extremely difficult to effectively quell the explosive growth of a highly contagious virus. The CDC has recognized that correctional and detention facilities "present unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors."[12]

17.     People in detention facilities often sleep in close quarters, often sharing multiple bunk beds arranged close together in a single room in what is described as "dormitory-style" housing. Common areas are likewise shared, but by even larger groups of people. Toilets, showers, sink, and telephones are also communal, and are not adequately disinfected after each use, which is especially important during the current pandemic when more frequent cleaning and disinfecting are required.[13]  Even

---

[10] Centers for Disease Control and Prevention, *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, at 4 (Mar. 23, 2020),  https://www.cdc.gov/coronavirus/2019-ncov/downloads/guidance-correctional-detention.pdf
[11] *See id.* at 2, 11.
[12] *Id.* at 2.
[13] *See id*. at 9.

DECLARATION OF DR. JOE GOLDENSON

D-6

in housing units where detainees sleep in individual cells, or share small cells with one or more other people, the common areas and telephones are shared by all of the people in the housing unit; toilets, showers, and sinks can be communal as well. Food preparation and distribution is centralized and communal, often for an entire facility, with little opportunity for regular disinfection as called for by the CDC's *Interim Guidance*.[14] Without major population reductions and other measures such as regular cleaning of shared spaces it is impossible to socially distance and implement other important CDC Guidance in these housing units.

18.     Frequent and thorough hand washing is one of the key recommendations to reduce transmission but sufficient soap and/or hand sanitizer is often not available (for inmates and staff) to wash their hands frequently enough to prevent the risk of transmission in contravention of the CDC's *Interim Guidance.*[15]

19.     Housing units are commonly poorly ventilated, which facilitates the transmission of airborne illnesses, such as COVID-19. The CDC recommends generally after an infection in buildings that building operators open windows to allow fresh air to circulate.[16] This recommendation is not possible in jails.

20.     Current CDC recommendations for reducing the transmission of COVID-19  in jails include screening of all newly arriving arrestees,[17] quarantining all newly arriving arrestees for 14 days and performing daily symptom screening and temperature checks while they are in quarantine,[18] isolating any detainee with any symptoms consistent with COVID-19 or with fever who is currently housed in the facility,[19] and providing masks to all inmates who are "confirmed or suspected

---

[14] *See id*. at 9.
[15] *See id*.
[16] Centers for Disease Control and Prevention, *Cleaning and Disinfecting Your Facility* 2 (Apr. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility-H.pdf.
[17] *See* Centers for Disease Control and Prevention, *Interim Guidance* at 10.
[18] *See id*. at 14, 20.
[19] *See id*. at 15.

DECLARATION OF DR. JOE GOLDENSON

6

D-7

COVID-19 cases, or showing symptoms of COVID-19."[20] In addition, the CDC generally recommends providing and wearing masks in congregate settings.[21] Individuals should not be added to an existing quarantine cohort after the 14-day quarantine clock has started.[22]

21.     These are also difficult, if not impossible, to implement in jails due to space constraints, lack of sufficient respiratory isolation rooms, and lack of necessary equipment and other resources.

22.     Testing kits are widely unavailable, and it can take up to a week or more to obtain test results. And, someone who is tested shortly after he or she was infected may test negative.  Non-test based verbal screens—i.e., asking a person for a subjective report of symptoms—cannot adequately screen for new, asymptomatic or pre-symptomatic infections. COVID-19 has a typical incubation period of 2 to 14 days, commonly five days, and transmission often occurs before presentation of symptoms. According to the Centers for Disease Control and Prevention, up to 25 percent of people infected with COVID-19 will remain asymptomatic.[23] Similarly, infected individuals may experience only mild symptoms.  These newly infected, asymptomatic and mildly symptomatic individuals can, and do, transmit the virus, contributing to its rapid spread.  As a result, such inadequate screening presents a critical problem.  The possibility of asymptomatic transmission means that monitoring staff and incarcerated people for symptoms and fever is inadequate to identify all who may be infected and to prevent transmission.  Because of the problems with screening procedures, the risk of false negative tests, the unavailability of test kits and the delays in obtaining test results, one necessary means to prevent the

---

[20] *Id*. at 25.

[21] *See* Centers for Disease Control and Prevention, *Recommendations for Cloth Face Covers,* https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover.html.

[22] *See* Centers for Disease Control and Prevention, *Interim Guidance* at 19.

[23] Apoorva Mandavilli, *Infected but Feeling Fine: The Unwitting Coronavirus Spreaders*, N.Y. Times (Mar. 31, 2020), https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html

DECLARATION OF DR. JOE
GOLDENSON

7

D-8

introduction of COVID into the jails by someone who is arrested is to quarantine all arrestees for 14 days and monitor them daily for symptoms and fever before they are deemed safe to introduce into the general population of the jail.

23.    In detention facilities, groups of persons are often moved from space to space, for example, from a dormitory to a cafeteria. Persons often from multiple different housing units, congregate and come in close contact while standing in lines for medication, commissary, fresh laundry, telephones, or court appearances. These group movements, which may cluster large numbers of people together in small spaces, increase the risk of transmission between incarcerated persons and throughout the facility. It is common for detainees in a given housing unit to routinely be subjected to such group movements multiple times each day. Additionally, detention facilities often rely on detainees to perform work that supports the operation of the facility, such as food service, laundry, and cleaning. To perform these work assignments, they typically travel from their housing units to other parts of the facility.

24.    Correction officers and other detention facility staff routinely have direct physical contact with detainees, especially when handcuffing or removing handcuffs from detainees who are entering or exiting the facility. Staff members also move around within the facility, which creates opportunities for transmission both among staff in different parts of the facility and transmission to and from detainees in different parts of the facility.

25.    Correctional facilities largely lack the robust medical care infrastructure that would be necessary to deal with a COVID-19 outbreak. If a significant number of people become sick with COVID-19 the jails' health care facilities will be unable to respond appropriately to those people and those who need medical care for other reasons.  And, when an incarcerated patient's needs are too acute for a correctional facility to provide adequate treatment, the patient must be transported to and treated at a community hospital.  Once COVID-19 spreads throughout the jail, the burden of

DECLARATION OF DR. JOE
GOLDENSON

8

D-9

caring for many of these sick individuals will shift to local community medical facilities.

26.     When an outbreak strikes a correctional facility, correction and medical staff will become ill. They will not show up to work.  These vacancies can result in facilities becoming dangerously understaffed, which compromises medical care.  Healthcare staff who provide treatment are unavailable.  Correctional staff also play a vital role in delivering medical services, by escorting prisoners, responding to and alerting medical of medical emergencies, and providing security to health care staff while they provide services.  Their absence also compromises treatment.

27.     If infected, jail inmates are at greater risk for harm from COVID-19 than those in the general community.  This is due to a number of factors including the fact that people in jails have high rates of chronic illnesses, such as diabetes, heart disease, chronic lung disease, and immunosuppressive illnesses such as HIV disease that increase the risk from COVID-19, often have had poor or absent prior health care, and often have made unhealthy life-style choices, including alcohol and drug use.  For these reasons, it is well accepted within the medical community that jail inmates are physiologically 10 years older than their chronological age.  The CDC has identified people with the following medical conditions as being particularly vulnerable to severe illness from COVID-19:

- Diabetes mellitus
- Lung disease including asthma or chronic obstructive pulmonary disease (chronic bronchitis or emphysema) or other chronic conditions associated with impaired lung function or that require home oxygen
- Heart disease
- Blood disorders (e.g., sickle cell disease or on blood thinners)
- Chronic kidney disease
- Chronic liver disease

DECLARATION OF DR. JOE
GOLDENSON

9

D-10

- Compromised immune system (immunosuppression) (including seeing a doctor for cancer and treatment such as chemotherapy or radiation, received an organ or bone marrow transplant, taking high doses of corticosteroids or other immunosuppressant medications, HIV or AIDS)
- Current or recent pregnancy in the last two weeks
- Endocrine disorders
- Metabolic disorders
- Neurological and neurologic and neurodevelopment conditions [including disorders of the brain, spinal cord, peripheral nerve, and muscle such as cerebral palsy, epilepsy (seizure disorders), stroke, intellectual disability, moderate to severe developmental delay, muscular dystrophy, or spinal cord injury ][24]
- Severe obesity[25]

The CDC also deems people 65 or older to be particularly vulnerable to COVID.[26] However, in my professional opinion the proper figure for jail inmates is 55 years old because, as I explained above, they are physiologically 10 years older than their chronological age.

28.     Because of the conditions typically found in jails, jails often have particularly serious incidence of communicable disease.  For example, during the H1N1-

---

[24] Centers for Disease Control and Prevention, *Implementation of Mitigation Strategies for Communities with Local COVID-19 Transmission* (Mar. 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/community-mitigation-strategy.pdf.

[25] Centers for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness* (Apr. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html

[26] Centers for Disease Control and Prevention, *What You Can Do if You are at Higher Risk of Severe Illness from COVID-19* (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/downloads/COVID19-What-You-Can-Do-High-Risk.pdf.

strain flu outbreak in 2009 (known as the "swine flu"), jails and prisons experienced a disproportionately high number of cases.[27] Until recently the Cook County Jail in Chicago was believed to be the largest-known source of U.S. COVID virus infections.[28] As of April 13, more than 500 people had been infected at the facility, and the numbers continue to climb.[29]   Just recently it was reported that 78% of the approximately 2,500 prisoners in a prison in Ohio tested positive.[30]   The State of Ohio tested its prisoners en masse for COVID-19 so this number includes large numbers of inmates who were asymptomatic and would otherwise not have been tested.  This underscores the risk of the spread of COVID-19 by asymptomatic individuals.  In addition, 109 staff had tested positive for COVID-19.[31]

29.     For these reasons, the pandemic has prompted prisoner releases around the world. France has freed 5,000 inmates, and in the United States, 3,500 state prisoners have been granted early release in California. Thousands of prisoners in Britain will be granted early release within weeks in an effort to contain the spread of the virus in cells and facilities where social distancing rules are impossible to

---

[27] David M. Reutter, *Swine Flu Widespread in Prisons and Jails, but Deaths are Few*, Prison Legal News (Feb. 15, 2010), https://www.prisonlegalnews.org/news/2010/feb/15/swine-flu-widespread-in-prisons-and-jails-but-deathsare-few/.

[28] Timothy Williams and Danielle Ivory, *Chicago's Jail is Top U.S. Hot Spot as Cirus Spreads Behind Bars*, N.Y. Times (Apr. 8, 2020), https://www.nytimes.com/2020/04/08/us/coronavirus-cook-county-jail-chicago.html.

[29] Cheryl Corley, *The COVID-19 Struggle In Chicago's Cook County Jail*, NPR (Apr. 13, 2020) https://www.npr.org/2020/04/13/833440047/the-covid-19-struggle-in-chicagos-cook-county-jail.)

[30] Ohio Department of Rehabilitation & Correction, COVID-19 Inmate Testing (last updated Apr. 20, 2020), https://drc.ohio.gov/Portals/0/DRC%20COVID-19%20Information%2004-20-2020%20%201304.pdf,

[31] Bill Chappell and Paige Pfleger, *73% Of Inmates At An Ohio Prison Test Positive For Coronavirus,* NPR (Apr. 20, 2020), https://www.npr.org/sections/coronavirus-live-updates/2020/04/20/838943211/73-of-inmates-at-an-ohio-prison-test-positive-for-coronavirus

DECLARATION OF DR. JOE GOLDENSON

11

D-12

maintain.[32] Many cities and counties across the US, including San Francisco, Chicago, Cleveland and New York, are also releasing prisoners to reduce the risk of COVID-19.

30.     During an infectious disease outbreak, a containment strategy requires people who have known or suspected illness be isolated and that caregivers have access to personal protective equipment to protect themselves and to prevent the further transmission of the disease. During an outbreak, jails and prisons are under-resourced in being able to provide medically appropriate housing for persons with known or suspected infectious illness, and are often underequipped to provide sufficient personal protective equipment, increasing the risk of a widespread outbreak.

31.     Isolation is a complex and major concern in correctional facilities. In some prisons and jails, the only cells with solid doors for quarantine will be disciplinary or administrative segregation cells, which usually house people placed in solitary confinement. Moving people suspected of contracting COVID-19 – or those at high risk of suffering serious illness once infected – to segregation units may help quell the potentially devastating spread of illness. However, isolation of people who are ill using solitary confinement is not a completely effective way to prevent transmission of the virus because, except in specialized negative pressure rooms (rarely in medical units if available at all), air continues to flow outward from isolation cells to the rest of the facility. Segregation cells bring their own physical and mental health risks. They are most commonly used to punish people and may cause substantial psychological trauma and distress. Those with serious mental illness are at heightened risk when placed in isolation. Therefore, placing high-risk or laboratory-confirmed patients with COVID-19 in cells usually used for solitary confinement will

---

[32] Press Release, U.K. Ministry of Justice, *Measures announced to protect NHS from coronavirus risk in prisons* (Apr. 4, 2020), https://www.gov.uk/government/news/measures-announced-to-protect-nhs-from-coronavirus-risk-in-prisons.

likely deter others from reporting symptoms or seeking medical attention, thus quickly hastening the spread of the disease as symptomatic prisoners will not report themselves to staff and will remain in congregate settings. Additionally, these cells often lack intercoms or other means of communicating with a correctional officer or medical provider when patients are in need of help, resulting in decreased medical attention and increased risk of death. This may further increase patients' concerns that they will suffer, not get the care they need in a timely manner, and die in such rooms. For these reasons, it is unrealistic to believe that an effective prevention, mitigation, and treatment response to COVID-19 in correctional facilities can rely upon conditions that incarcerated people are likely to experience as punitive. When such housing cells must be used for short-term quarantine and isolation patients should have full access to telephone or tablet communication with family and friends on the outside and access to personal property, personal hygiene supplies and access to canteen.[33]

32.     In sum, current CDC recommendations for social distancing, frequent hand washing, frequent cleansing of surfaces, symptom screening, temperature checks and isolation to prevent infection and the spread of the virus are extremely difficult, if not impossible, to implement in county jails.  As a result, the risk of COVID transmission is far greater than in non-custodial institutions.

**CONDITIONS IN JAILS POSE SIGNIFICANT RISK OF TRANSMISSION OF COVID-19 IN THE COMMUNITY OUTSIDE THE JAILS**

33.     The conditions in jails pose very significant risk of transmission of communicable diseases like COVID-19 not only to inmates, employees and volunteers in the jails, but also to the community as a whole.  It has long been known that jails, prisons, and detention centers can be hotbeds of disease transmission, and

---

[33] Brie Williams, MD, et al., *Correctional Facilities in the Shadow of COVID-19: Unique Challenges and Proposed Solutions*, Health Affairs Blog (Mar. 25, 2020), https://www.healthaffairs.org/do/10.1377/hblog20200324.784502/full.

that due to the frequent ingress and egress of employees at these facilities, an outbreak within a jail, prison, or detention center can quickly spread to surrounding communities. While jails are often thought of as closed environments, this is not the case. A large number of custody, medical, and other support staff and contractors who have direct contact with detainees enter and leave the facility throughout the day. New arrestees arrive daily and detainees are released every day.  Since there is no effective way to screen for newly infected or asymptomatic individuals, they can unknowingly transmit COVID-19 to the jail population.  Detainees are often transferred to other facilities, and to and from Court. They are routinely transferred in crowded and enclosed vehicles like buses where social distancing is not possible.

34.    When there is an outbreak in a jail, staff can become infected and bring the virus home to their families and community.  For example, the tuberculosis epidemic that broke out in New York City in the early 1990s began in jails and was spread to the community by jail employees who became infected and then returned home.

35.    It is difficult to overstate the devastation that a COVID-19 outbreak could inflict on the county jail and its surrounding communities. At Rikers Island in New York, between the mornings of Wednesday, April 1 and Thursday, April 2, the number of COVID-19 positive incarcerated individuals and staff members grew by 47 and 57 people, respectively, upping the jail's total numbers of confirmed cases to 231 among the incarcerated population and 223 among staff.[34] The first known case of COVID-19 at Rikers was confirmed on Wednesday, March 18,[35] illustrating just how quickly this disease can and will overwhelm detention facilities.

---

[34] Julia Craven, *Coronavirus Cases Are Spreading Rapidly on Rikers Island*, Slate (Apr. 2, 2020), https://slate.com/news-and-politics/2020/04/rikers-coronavirus-cases-increase.html.

[35] *As Testing Expands, Confirmed Cases of Coronavirus in N.Y.C. Near 2,000*, N.Y. Times (updated Mar. 19, 2020), https://www.nytimes.com/2020/03/18/nyregion/coronavirus-new-york-update.html.

## INFORMATION ABOUT ORANGE COUNTY JAIL

36.     The available testing information about the Orange County Jail is concerning about the likelihood of a large and explosive outbreak at the Jail.   News media first reported a positive test on March 24, 2020. The person who tested positive had been detained at the jail since June 17, 2018, indicating that the person had contracted the virus from spread within the jail.[36]  The Orange County Sheriff Department (OCSD) began publicly reporting testing numbers and results for its limited testing of suspected COVID-19 cases.  On March 26, the Jail had placed 141 persons in quarantine, and had conducted 15 tests with 3 confirmed COVID-19 cases.[37]  By April 17, the jail had tested only 45 people detained in the jail, and 17 had tested positive with 4 tests pending results.[38] By April 24, 2020, the Jail had tested 147 persons, with 82 confirmed positive cases and 9 tests pending results and by April 27, 2020 the number of confirmed cases had jumped to 93 cases, with 47 tests pending results.[39]

37.     Although the Orange County Sheriff's Department has not reported the testing results for staff, news reports describe Orange County correctional staff testing positive.[40] Given the speed with which the virus is being transmitted, without

[36] ABC-7.Com Staff, *Orange County Sees First COVID-19 Death as Cases Climb to 152, Jail Inmate Tests Positive*, ABC-7 (Mar. 25, 2020) https://abc7.com/coronavirus-covid-19-death-orange-county-is-deadly/6047640/.

[37] News Release, Sheriff-Cornoner Don Barnes, *Early release of sentenced inmates from Orange County Jail* (Mar. 27, 2020), https://www.ocsd.org/civicax/inc/blobfetch.aspx?BlobID=115002.

[38] Orange County Sheriff's Department, OCSD Custody COVID-19 Stats as of April 17, 2020 (Apr. 17, 2020), https://www.ocsd.org/documents/sheriff/OCSDCustodyStatsasofApril172020.pdf

[39] Orange County Sheriff's Department, COVID-19 in OC Jails (updated Apr. 27, 2020), https://www.ocsd.org/documents/sheriff/COVIDStats4.27.20.pdf.

[40] Tony Saavedra, *Full quarantine imposed at Orange County central jail after 4 more inmates contract coronavirus*, The Orange County Register (Apr. 7, 2020), https://www.ocregister.com/2020/04/07/full-quarantine-imposed-at-orange-county-central-jail-after-4-more-inmates-contract-coronavirus/; *see also* City News Service,

(continued…)

DECLARATION OF DR. JOE
GOLDENSON

15

D-16

significant reductions in the jail population and other steps to prevent the transmission of the disease, it should be expected that the outbreak in the jail will lead to further rapid transmission within the communities around the Orange County Jail facilities.

38.     To minimize the risk of COVID-19 in the Orange County Jail the following minimum conditions are required: incarcerated persons must be able to main distance of six feet or more from each other at all times, including in communal areas; there are no barrack-style dormitories and sharing of cells is minimized; there are adequate numbers of medical isolation cells for any inmate with confirmed or suspected infection, as well as quarantine cells for close contacts of symptomatic cases and new arrivals;[41] hygiene products and clean PPE are available in adequate quantities without charge; all objects touched by multiple individuals in common areas are cleaned and disinfected several times per day and preferably between each use; and proper screening and isolation/quarantine procedures are consistently implemented for anyone attempting to enter the jail – both staff or inmates.

39.     From the information available, the Orange County Jail has not been able to achieve these benchmarks.  Persons detained report that many are sleeping in barrack style dormitories, and that there is a lack of social distancing during recreation, while waiting in lines for medicine distribution, food, and the telephone, and when traveling around the jail for court appearances or medical visits.  They also report that large numbers of symptomatic persons, including persons who have dry coughs or who have lost senses of smell, have not been isolated or tested.  They further report lack of sufficient access to cleaning supplies, disinfectants, hand soap,

---

Coronavirus Cases Rise to 1,277 in Orange County (Apr.12, 2020), https://www.nbclosangeles.com/news/coronavirus/coronavirus-cases-rise-to-1277-in-orange-county/2344836/.

[41] The CDC notes that cohorting multiple close contacts of a COVID case should only be done if there are no other available options. Centers for Disease Control and Prevention, *Interim Guidance* at 19–20.  But, in my opinion, it is a dangerous practice because it can lead to preventable infections within the cohort.

DECLARATION OF DR. JOE GOLDENSON

16

D-17

and clean PPE. These practices are putting people in the jail at a serious and
unacceptable risk of infection.

40.    According to the CDC guidelines, facilities should make every possible
effort to place suspected and confirmed COVID-19 cases under medical isolation
individually.   Each isolated individual should be assigned their own housing space and
bathroom where possible.[42]

41.    The BSCC has begun collecting and reporting data about population levels
and news arrests in California jails to track COVID-19 related impacts on the jails.[43] In
the Orange County Jail, most recent data showed the population on 4/12 was at
approximately 3,336, with 347 weekly new arrests:



42.    Although it is positive movement that the jail population has decreased
from 4587, the time of the first confirmed case, to 3,336 in the middle of April, far
more reduction will be needed to achieve the necessary social distancing.

---

[42] Centers for Disease Control and Prevention, *Interim Guidance* at 15.
[43] BSCC, Supplemental JPS Reporting Dashboard (April 27, 2020),
https://app.smartsheet.com/b/publish?EQBCT=82b29a92ea9a4a0ea7aa480f1287e137

43.     The Orange County Jail has not reported the number of close contacts of the existing confirmed and suspected cases. However, these bedspace needs are likely to be substantial. CDC has recently expanded its list of possible COVID-19 symptoms.  This will undoubtably lead to an increase in the number of suspect cases needing isolation and quarantine.

44.     It is unlikely that there are a sufficient number of single cells for isolation and quarantine given the likely large numbers of confirmed and suspect cases in the jail, especially given the recent expansion of possible symptoms of COVID-19 noted by the CDC.  Moreover, other jail functions may reduce the number of available single cells. For example, security staff may demand that these same beds be used for security purposes, such as administrative segregation, disciplinary segregation, and protective custody. Additionally, COVID-19 isolation is not the only medical need for medical isolation beds. In addition to being needed for COVID-19, medical isolation beds must also be made available as needed to isolate patients who have conditions other than COVID-19 that require medical isolation.

45.     In the absence of adequate isolation and quarantine bedspace, the Jail will be forced to use cohort quarantines that expose potentially healthy people to serious infection risks. Declarations from people incarcerated in the jail suggest this is already happening. Some of the detained persons who work across the jail were housed in the Men's Jail in the "worker dorm," C mod of CMJ.  Carlos Godinez Dec.  Some of the men in that dorm worked in the kitchen or the laundry facilities.  One of persons from the dorm tested positive for COVID-19 and the OCSD divided the unit, transferred half of the unit to a new unit, the A-Unit, instructed them not to continue working, and put the new unit on quarantine.  On April 22, 2020, the OCSD tested the entire bottom tier of the A-mod. It appears from the high testing results that some of those individuals tested positive for COVID.

46.     Such cohorting of individuals who were exposed to a confirmed case places uninfected individuals at risk.  As noted in the CDC guidelines, "Facilities

DECLARATION OF DR. JOE GOLDENSON

18

should make every possible effort to quarantine close contacts of COVID-19 cases individually.  Cohorting multiple quarantined close contacts of a COVID-19 case could transmit COVID-19 from those who are infected to those who are uninfected."[44]

47.     From the detainee's reports, it also appears that the space limitations are creating additional pressure on the available bed space, increasing movement and mixing of people in the jail, and thus increasing their exposure risks.  For example, one prisoner, Don Wanger, described being housed alone in a 2-person cell, within a 13-cell module, until last week.  He reported that on April 22, OCSD double-bunked the entire module, including adding cellmates to his cell as well as others.

48.     The OCSD's continued detention of hundreds of medically vulnerable persons is a particular cause for alarm. On April 6, the OCSD reported releasing over 300 people who had ten days or fewer left on their sentence, including 108 persons who "were designated by the Health Care Agency as medically at-risk."[45]  I am aware of reports from advocates that the Health Care Agency has compiled a list of over 500 persons in the Orange County Jail who are medically vulnerable and remain in custody.  These individuals are at a heighted risk for serious illness and death.  Given the high likelihood of contagion and spread in the jail, the safety of these individuals is a pressing emergency that needs to be addressed on an urgent basis.

49.     Hand hygiene – washing one's hands several times a day – is a critical component of stopping the spread of the virus. According to the declarations I reviewed, OCSD is not reliably and consistently supplying prisoners with free soap and other hand hygiene necessities. Many jail detainees report receiving a small hotel-size hand soap for a week, that is insufficient for more than two days of hand washing.  Few detainees have access to paper towels or hand dryers. These practices do not comply with basic CDC

---

[44] *See* Centers for Disease Control and Prevention, *Interim Guidance* at 19.
[45] Tony Saavedra, *In move to combat coronavirus spread, California judicial bosses order zero bail for low-level crimes*, The Orange County Register (Apr. 6, 2020), https://www.ocregister.com/2020/04/06/in-move-to-combat-coronavirus-spread-california-judicial-bosses-order-zero-bail-for-low-level-crime.

guidelines.  Nor is the OSCD supplying sufficient disinfectant to ensure that high touch surfaces are cleaned in common area, like phones and communal tables within dayrooms.

**CONCLUSION**

50.     For the reasons above, it is my professional opinion that persons currently detained in the Orange County Jail are at significantly greater risk of contracting COVID-19 than if they were permitted to shelter in place in their home communities.  For those infected, many are at increased risk of suffering severe complications and outcomes. In particular, many medically vulnerable persons are likely to develop COVID-19 if they remain in jail and to become either extremely ill or die as result.

51.     It is also my professional opinion that conditions in the Orange County Jail also threaten the health and safety of every individual within those jails—detained persons and staff alike—and in their surrounding communities.

52.     It is also my professional opinion that a necessary component of bringing jails into compliance with the recommendations of the CDC to minimize the risk of COVID -19 transmission within the jails and to the larger community is to substantially reduce the population of jail facilities.

53.     The current reductions from the Orange County Jail are insufficient to enable the recommendations of the CDC guidelines, particularly with respect to social distancing, to be met. To minimize the risk of COVID-19 the population must be reduced so that it is possible among other things:  for incarcerated persons to be able to main distance of six feet or more from each other at all times, including in communal areas;  there are no barrack-style dormitories and sharing of cells is minimized; there are adequate numbers of isolation cells for any inmate who is symptomatic; proper screening and isolation procedures can be put into place for anyone attempting to enter the jail – both staff or inmates.  Measures such as more regular disinfection and cleaning, wider availability of soap etc. are insufficient to address the dangers that COVID-19 poses in jail without a significant reduction of the

jail population to allow for genuine social distancing among inmates, correctional staff and other jail staff.

54.     In particular, those who are medically vulnerable (see ¶ 27) should be moved out of the jails to the absolute maximum extent possible.  In addition, population should be significantly lowered to reduce the density in the jails to allow for adequate social distancing, minimize the strain on the jail's medical care system, and ensure adequate space is available for necessary quarantining and isolation.

55.     Significantly reducing the Orange County Jail population will allow the facilities to significantly reduce the risk of infection for both incarcerated people and correctional officers, which in turn protects the communities where corrections staff live.

1

2        I declare under penalty of perjury of the laws of the State of California and the

3   United States that the foregoing 23 page declaration is true and correct. Executed on

4   April 28, 2020 in Alameda County, California.

5

6

7

8   DATED:  April 28, 2020

9                                  By: _____

10                                   Dr. Joe Goldenson

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

# Dr. Goldenson CV

# CURRICULUM VITAE

**JOE GOLDENSON, MD**
**1406 CYPRESS STREET**
**BERKELEY, CA 94703**
**(510) 557-1086**
**jgoldenson@gmail.com**

## EDUCATION

### Post Graduate Training

| | |
|---|---|
| February 1992 | University of California, San Francisco, CPAT/APEX Mini-Residency in HIV Care |
| 1979-1980 | Robert Wood Johnson Fellowship in Family Practice |
| 1976-1979 | University of California, San Francisco Residency in Family Practice |

### Medical School

| | |
|---|---|
| 1973-1975 | Mt. Sinai School of Medicine, New York M.D. Degree |
| 1971-1973 | University of Michigan, Ann Arbor |

### Undergraduate Education

| | |
|---|---|
| 1967-1971 | University of Michigan, Ann Arbor B.A. in Psychology |

## PROFESSIONAL EXPERIENCE

### Practice Experience

| | |
|---|---|
| 1993-2015 | Director/Medical Director Jail Health Services San Francisco Department of Public Health |
| 1991-1993 | Medical Director Jail Health Services San Francisco Department of Public Health |
| 1990-1991 | Chief of Medical Services, Hall of Justice Jail Health Services San Francisco Department of Public Health |
| 1987-1990 | Staff Physician Jail Health Services San Francisco Department of Public Health |
| 1980-1987 | Sabbatical |
| 1975-1976 | Staff Physician United Farm Workers Health Center, Salinas, CA |

**Consulting**

| | |
|---|---|
| 6/16-8/19 | Consultant to Los Angeles Department of Health Services re: provision of health care services in the LA County Jail |
| 4/02-Present | Federal Court Medical Expert, *Plata v. Newsome*, Class Action Lawsuit re: prisoner medical care in California State Prison System |
| 6/14-9/14 | Medical expert for the Illinois Department of Corrections and the ACLU of Illinois |
| 6/10-12/13 | Federal Court appointed Medical Monitor, U.S.A. v. Cook County, et al., United States District Court for the Northern District of Illinois, No. 10 C 2946, re: medical care in the Cook County Jail |
| 6/08-6/12 | Member, *Plata v. Schwarzenegger* Advisory Board to the Honorable Thelton E. Henderson, U.S. District Court Judge |
| 5/08-9/09 | Medical Expert for ACLU re Maricopa County Jail, Phoenix, AZ |
| 1/08 | Member of the National Commission on Correctional Health Care's Technical Assistance Review Team for the Miami Dade Department of Corrections |
| 9/07-1/10 | Federal Court appointed Medical Expert, *Herrera v. Pierce County, et al.,* re: medical care at the Pierce County Jail, Tacoma, WA |
| 8/06-8/12 | State Court Appointed Medical Expert, *Farrell v. Allen*, Superior Court of California Consent Decree re medical care in the California Department of Juvenile Justice |
| 6/05 | Member of Technical Assistance Review Team for the Dallas County Jail |
| 11/02-4/03 | Medical Expert for ACLU re Jefferson County Jail, Port Townsend, Washington |
| 4/02-8/06 | Federal Court Medical Expert, *Austin, et. al vs Wilkinson, et al,* Class Action Law Suit re: Prisoner medical care at the Ohio State Penitentiary Supermax Facility |
| 1/02-3/02 | Consultant to the Francis J. Curry, National Tuberculosis Center re: *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template),* |
| 8/01-4/02 | Medical Expert for ACLU re Wisconsin Supermax Correctional Facility, Boscobel, WI |
| 7/01-4/02 | Medical Expert for Ohio Attorney General's Office re Ohio State Prison, Youngstown, OH |
| 1/96-1/14 | Member and Surveyor, California Medical Association Corrections and Detentions Health Care Committee |
| 5/95-6/08 | Medical Expert for the Office of the Special Master, *Madrid vs Alameida*, Federal Class Action Law Suit re: Prisoner medical care at the Pelican Bay State Prison Supermax Facility |
| 3/98-12/98 | Member, Los Angeles County Department of Public Health Jail Health Services Task Force |
| 2/98 | Medical Expert, Department of Justice Investigation of Clark County Detention Center, Las Vegas, Nevada |
| 6/94 | Surveyor, National Commission on Correctional Health Care, INS Detention Center, El Centro, CA |

**Work Related Committees**

| | |
|---|---|
| 1/14 to present | Member, Editorial Advisory Board, *Correctional Health Care Report* |
| 10/11 to 5/19 | Member, Board of Directors of the National Commission on Correctional Health Care |
| 5/07-10/12 | Liaison to the CDC Advisory Council for the Elimination of Tuberculosis (ACET) from the National Commission on Correctional Health Care |
| 12/04-3/06 | Member of the CDC Advisory Council for the Elimination of Tuberculosis (ACET) Ad Hoc Working Group on the *Prevention and Control of Tuberculosis in Correctional and Detention Facilities: Recommendations from CDC* (MMWR 2006; 55(No. RR-9)) |
| 6/03-8/03 | Member of the Advisory Panel for the Francis J. Curry National Tuberculosis Center and National Commission on Correctional Health Care, 2003: *Corrections Tuberculosis Training and Education Resource Guide* |
| 3/02-1/03 | Member of the Advisory Committee to Develop the *Tuberculosis Control Plan for the Jail Setting: A Template (Jail Template)*, Francis J. Curry, National Tuberculosis Center |
| 6/01-1/15 | Director's Cabinet San Francisco Department of Public Health |
| 3/01 | Consultant to Centers for Disease Control on the Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings (MMWR 2003; 52(No. RR-1)) |
| 9/97-6/02 | Member, Executive Committee of Medical Practice Group, San Francisco Department of Public Health |
| 3/97-3/02 | American Correctional Health Services Association Liaison with American Public Health Association |
| 3/96-6/12 | Chairperson, Bay Area Corrections Committee (on tuberculosis) |
| 2/00-12/00 | Medical Providers' Subcommittee of the Office-based Opiate Treatment Program, San Francisco Department of public Health |
| 12/98-12/00 | Associate Chairperson, Corrections Sub-Committee, California Tuberculosis Elimination Advisory Committee |
| 7/94-7/96 | Advisory Committee for the Control And Elimination of Tuberculosis, San Francisco Department of Public Health |
| 6/93-6/95 | Managed Care Clinical Implementation Committee, San Francisco Department of Public Health |
| 2/92-2/96 | Tuberculosis Control Task Force, San Francisco Department of Public Health |
| 3/90-7/97 | San Francisco General Hospital Blood Borne Pathogen Committee |
| 1/93-7/93 | Medical Staff Bylaws Committee, San Francisco Department of Public Health |

**ACADEMIC APPOINTMENT**

| | |
|---|---|
| 1980-2015 | Assistant Clinical Professor University of California, San Francisco |

**PROFESSIONAL AFFILIATIONS**

Society of Correctional Physicians, Member of President's Council, Past-Treasurer and Secretary
American Correctional Health Services Association, Past-President of California Chapter
American Public Health Association, Jails and Prison's Subcommittee
Academy of Correctional Health Professionals

## PROFESSIONAL PRESENTATIONS

*Caring for the Inmate Health Population: A Public Health Imperative,* Correctional Health Care Leadership Institutes, July 2015

*Correctional Medicine and Community Health,* Society of Correctional Physicians Annual Meeting, October, 2014

*Identifying Pulmonary TB in Jails: A Roundtable Discussion*, National Commission on Correctional Health Care Annual Conference, October 31, 2006

*A Community Health Approach to Correctional Health Care,* Society of Correctional Physicians, October 29, 2006

*Prisoners the Unwanted and Underserved Population*, *Why Public Health Should Be in Jail*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 10/12/04

*TB in Jail: A Contact Investigation Course, Legal and Administrative Responsibilities,* Francis J. Curry National Tuberculosis Center, 10/7/04

*Public Health and Correctional Medicine,* American Public Health Association Annual Conference, 11/19/2003

*Hepatitis in Corrections,* CA/NV Chapter, American Correctional Health Services Association Annual Meeting, 1/17/02

*Correctional Medicine*, San Francisco General Hospital Medical Center, Medical Grand Rounds, 12/16/02

*SuperMax Prisons*, American Public Health Association Annual Conference, 11/8/01

*Chronic Care Programs in Corrections,* CA/NV Chapter, American Correctional Health Services Association Annual Meeting, 9/19/02

*Tuberculosis in Corrections - Continuity of Care*, California Tuberculosis Controllers Association Spring Conference, 5/12/98

*HIV Care Incarcerated in Incarcerated Populations*, UCSF Clinical Care of the AIDS Patient Conference, 12/5/97

*Tuberculosis in Correctional Facilities*, Pennsylvania AIDS Education and Training Center, 3/25/93

*Tuberculosis Control in Jails*, AIDS and Prison Conference, 10/15/93

*The Interface of Public Health and Correctional Health Care*, American Public Health Association Annual Meeting, 10/26/93

*HIV Education for Correctional Health Care Workers*, American Public Health Association Annual Meeting, 10/26/93

## PUBLICATIONS

*Structure and Administration of a Jail Medical Program. Correctional Health Care: Practice, Administration, and Law*. Kingston, NJ: Civic Research Institute. 2017.

*Structure and Administration of a Jail Medical Program – Part II*. Correctional Health Care Report. Volume 16, No. 2, January-February 2015.

*Structure and Administration of a Jail Medical Program – Part I*. Correctional Health Care

Report. Volume 16, No. 1, November-December 2014.

*Pain Behind Bars: The Epidemiology of Pain in Older Jail Inmates in a County Jail.* Journal of Palliative Medicine. 09/2014; DOI: 10.1089/jpm.2014.0160

*Older jail inmates and community acute care use.* Am J Public Health. 2014 Sep; 104(9):1728-33.

*Correctional Health Care Must be Recognized as an Integral Part of the Public Health Sector,* Sexually Transmitted Diseases, February Supplement 2009, Vol. 36, No. 2, p.S3–S4

*Use of sentinel surveillance and geographic information systems to monitor trends in HIV prevalence, incidence, and related risk behavior among women undergoing syphilis screening in a jail setting.* Journal of Urban Health 10/2008; 86(1):79-92.

*Discharge Planning and Continuity of Health Care: Findings From the San Francisco County Jail,* American Journal of Public Health, 98:2182–2184, 2008

*Public Health Behind Bars,* Deputy Editor, Springer, 2007

*Diabetes Care in the San Francisco County Jail,* American Journal of Public Health, 96:1571-73, 2006

*Clinical Practice in Correctional Medicine, 2nd Edition*, Associate Editor, Mosby, 2006.

*Tuberculosis in the Correctional Facility,* Mark Lobato, MD and Joe Goldenson, MD, *Clinical Practice in Correctional Medicine, 2nd Edition,* Mosby, 2006.

*Incidence of TB in inmates with latent TB infection: 5-year follow-up.* American Journal of Preventive Medicine. 11/2005; 29(4):295-301.

*Cancer Screening Among Jail Inmates: Frequency, Knowledge, and Willingness* Am J Public Health. 2005 October; 95(10): 1781–1787

*Improving tuberculosis therapy completion after jail: translation of research to practice.* Health Education Research. 05/2005; 20(2):163-74.

*Incidence of TB in Inmates with Latent TB Infection, 5-Year Follow-up,* American Journal of Preventive Medicine, 29(4), 2005

*Prevention and Control of Infections with Hepatitis Viruses in Correctional Settings,* Morbidity and Mortality Reports, (External Consultant to Centers for Disease Control),Vol. 52/No. RR-1 January 24, 2003

*Randomized Controlled Trial of Interventions to Improve Follow-up for Latent Tuberculosis Infection After Release from Jail,* Archives of Internal Medicine, 162:1044-1050, 2002

*Jail Inmates and HIV care: provision of antiretroviral therapy and Pneumocystis carinii pneumonia prophylaxis*, International Journal of STD & AIDS; 12: 380-385, 2001

*Tuberculosis Prevalence in an urban jail: 1994 and 1998*, International Journal of Tuberculosis Lung Disease, 5(5):400-404, 2001

*Screening for Tuberculosis in Jail and Clinic Follow-up after Release*, American Journal of Public Health, 88(2):223-226, 1998

*A Clinical Trial of a Financial Incentive to Go to the Tuberculosis Clinic for Isoniazid after Release from Jail*, International Journal of Tuberculosis Lung Disease, 2(6):506-512,1998

**AWARDS**
Armond Start Award of Excellence, Society of Correctional Physicians, 2014
Award of Honor, San Francisco Board of Supervisors, 2014
Award of Honor, San Francisco Health Commission, 2014
Certificate of Appreciation, San Francisco Public Defender's Office, 2014
Certificate for Excellence in Teaching, California Department of Health Services, 2002
Employee Recognition Award, San Francisco Health Commission, July 2000
Public Managerial Excellence Award, Certificate of Merit, San Francisco, 1997

**LICENSURE AND CERTIFICATION**
Medical Board of California, Certificate #A32488
Fellow, Society of Correctional Physicians
Board Certified in Family Practice, 1979-1986 (Currently Board Eligible)