UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **SACV 20-835 JGB (SHKx)** | Date | May 26, 2020 |
|---|---|---|---|
| Title | ***Melissa Ahlman, et al. v. Don Barnes, et al.*** | | |

Present: The Honorable     JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ/NOE U. PONCE | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:**     **Order (1) GRANTING-IN-PART and DENYING-IN-PART Plaintiffs' Application for Temporary Restraining Order or Preliminary Injunction (Dkt. No. 41); and (2) GRANTING Plaintiffs' Motion for Provisional Class Certification (Dkt. No. 42) (IN CHAMBERS)**

Before the Court are (1) Plaintiffs' Application for Temporary Restraining Order or Preliminary Injunction and (2) Plaintiffs' Motion for Provisional Class Certification. ("Application," Dkt. No. 41; "Motion," Dkt. No. 42.)  The Court held a hearing on May 19, 2020. After considering the papers filed in support of and in opposition to the Motion and Application, the Court GRANTS the Motion and GRANTS-IN-PART and DENIES-IN-PART the Application.

## I.   BACKGROUND

On April 30, 2020, Plaintiffs filed their complaint against Defendants Don Barnes and Orange County.  ("Complaint," Dkt. No. 1.)  The Complaint alleges five causes of action: (1) Unconstitutional Conditions of Confinement in Violation of the Fourteenth Amendment to the U.S. Constitution; (2) Unconstitutional Punishment in Violation of the Fourteenth Amendment to the U.S. Constitution; (3) Unconstitutional Conditions of Confinement in Violation of the Eighth Amendment to the U.S. Constitution; (4) Discrimination on the Basis of Disability in Violation of Title II of the ADA; and (5) Discrimination on the Basis of Disability in Violation of Section 504 of the Rehabilitation Act.  (Id.)

Plaintiffs filed the Motion and the Application on May 11, 2020.  (Motion; Application.) In support of the Application, Plaintiffs filed:

- Exhibit A ("Takei Declaration," Dkt. No. 41-3);
- Exhibit B ("Wagner Declaration," Dkt. No. 41-4);
- Exhibit C ("Parker Declaration," Dkt. No. 41-5);
- Exhibit D ("Goldenson Declaration," Dkt. No. 41-6);
- Exhibit H ("Ramirez Declaration," Dkt. No. 41-10);
- Exhibit I ("Trace Declaration," Dkt. No. 41-11);
- Exhibit J ("Second Wagner Declaration," Dkt. No. 41-12);
- Exhibit K ("Seif Declaration," Dkt. No. 41-13);
- Exhibit L ("Miranda Declaration," Dkt. No. 41-14);
- Exhibit M ("Esparza Declaration," Dkt. No. 41-15);
- Exhibit N ("Godinez Declaration," Dkt. No. 41-16);
- Exhibit O ("Farias Declaration," Dkt. No. 41-17);
- Exhibit P ("Lentz Declaration," Dkt. No. 41-18);
- Exhibit Q ("Ahlman Declaration," Dkt. No. 41-19);
- Exhibit R ("Bonilla Declaration," Dkt. No. 41-20);
- Exhibit S ("Ortiz Declaration," Dkt. No. 41-21);
- Exhibit T ("Hernandez Declaration," Dkt. No. 41-22);
- Exhibit U ("Herrera Declaration," Dkt. No. 41-23);
- Exhibit V ("Trace Declaration," Dkt. No. 41-24);
- Exhibit W ("Cardone Declaration," Dkt. No. 41-25);
- Exhibit X ("Baguiao Declaration," Dkt. No. 41-26);
- Exhibit Y ("Castillo Declaration," Dkt. No. 41-27);
- Exhibit Z ("Kauwe Declaration," Dkt. No. 41-28);
- Exhibit AA ("Saem Declaration," Dkt. No. 41-29);
- Exhibit BB ("Campbell Declaration," Dkt. No. 41-30);
- Exhibit CC–NN ("Grievance Declarations," Dkt. Nos. 41-31–41-42).

Defendants opposed both the Motion and the Application on May 12, 2020. ("Application Opposition," Dkt. No. 44; "Motion Opposition," Dkt. No. 47.)   In support of the Motion Opposition, Defendants filed Evidentiary Objections.[1] ("Motion Objections," Dkt. No 48.)  In support of the Application Opposition, Defendants filed:

---

[1] To the extent that the Court relies on objected-to evidence, the objections are overruled.  Capitol Records, LLC v. BlueBeat, Inc., 765 F. Supp. 2d 1198 n.1 (C.D. Cal. 2010). "District courts, though, 'may give . . . inadmissible evidence some weight . . . [to] prevent[ ] irreparable harm before trial.' "  Weride Corp. v. Kun Huang, 379 F .Supp. 3d 834, 845 (N.D. Cal. 2019) (quoting Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009)).  For the purposes of the preliminary injunction, "evidentiary issues 'properly go to weight rather than admissibility.' " Id. (quoting Go Daddy Operating Co., LLC v. Ghaznavi, 2018 WL 1091257, at *14 (N.D. Cal. Feb. 28, 2018).  Thus, the Court takes the objections under advisement in considering the Motion and Application.

- Declaration of Martin Ramirez ("M. Ramirez Declaration," Dkt. No. 44-2);
- Declaration of Joseph Balicki ("Balicki Declaration," Dkt. No. 44-10);
- Declaration of C. Hsien Chian ("Chian Declaration," Dkt. No. 44-15);
- Declaration of D. Kevin Dunn ("Dunn Declaration," Dkt. No. 44-22);
- Request for Judicial Notice ("Defendants' RJN," Dkt. No. 45);
- Evidentiary Objections ("Application Objections," Dkt. No. 46).

On May 13, 2020, Plaintiffs replied in support of the Application. ("Application Reply," Dkt. No. 49.) On May 14, 2020, Plaintiffs replied in support of the Motion. ("Motion Reply," Dkt. No. 50.) On May 18, 2020, Plaintiffs submitted several supplemental declarations. The Court held a telephonic hearing on May 19, 2020.

## II.   FACTS

On December 31, 2019, China reported incidents of a pneumonia of unknown cause to the World Health Organization. Since then, that infectious disease, which came to be known as coronavirus disease 2019 (COVID-19), has swept the globe, infecting millions and killing over three hundred thousand people. COVID-19 is particularly dangerous to people who are older or have certain health conditions and disabilities, including diabetes, lung disease, heart disease, and compromised immune systems. (Goldenson Declaration ¶ 27; Parker Declaration ¶ 19.)

COVID-19 has proven to be extremely contagious: it is airborne and survives on surfaces for days.[2] To limit the spread of this potentially fatal disease, the governor of California—along with leaders around the globe—ordered residents to stay home, avoid non-essential contacts, and to keep six feet away from others wherever possible.

At least 369 inmates at the Orange County Jail ("Jail") have been infected with COVID-19.[3] COVID-19 is particularly dangerous in jails and prisons, where inmates are often unable to practice the recommended social distancing, lack access to basic hygienic necessities, and are regularly exposed to correctional officers and staff who move in and out of the Jail. (Goldenson Declaration ¶¶ 17–19.) The Centers for Disease Control ("CDC") has issued special guidance that offer strategies to help prevent COVID-19 infection in prisons and jails ("CDC Guidelines").[4]

---

[2] See Neeltje van Doremalen, Ph.D., et al., Aerosol and Surface Stability of SARS-CoV-2 as Compared with SARS-CoV-1, N. England J. Med. 2020; 382:1564-1567 https://www.nejm.org/doi/full/10.1056/NEJMc2004973 (last accessed May 15, 2020.)

[3] Orange County Sheriff's Department, COVID-19 in OC Jails (May 18, 2020), https://www.ocsd.org/about_ocsd/covid_19.

[4] Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities, Centers for Disease Control and Prevention (March 23,

The CDC Guidelines recommend "placing cases and individuals with symptoms under medical isolation, quarantining their close contacts, and facilitating necessary medical care, while observing relevant infection control and environmental disinfection protocols and wearing recommended [personal protective equipment]."

### A. Jail Facilities & Housing

The Jail houses inmates across four facilities:

- **Theo Lacy** has a rated capacity of 2,080 occupants.[5] It is composed of a large number of barrack style dorms, seven module units where people are housed in two-person cells that share common day rooms and shower facilities, and two module units where people are housed in single-person cells that share common day rooms and shower facilities.

- **The Men's Central Jail** has a rated capacity of 1,219 occupants. It is composed primarily of module units where people are housed in cells that vary in size from four to eight occupants; occupants share toilet and shower facilities. There are also dormitory style units where occupants share common day rooms, shower, and toilet facilities.

- **The Women's Central Jail** has a rated capacity of 274 occupants. It is composed primarily of dormitory style units which sleep up to 30 occupants in one unit, where occupants share toilet and shower facilities. There is also one unit where people are housed in single cells and share shower facilities.

- **The Intake and Release Center** has a rated capacity of 407 occupants. It is composed primarily of module units where people are housed in single-person cells that share common day rooms and shower facilities.

(Complaint ¶ 49.) Collectively, the Orange County Jail has a total of 51 medical isolation cells. (Id.)

### B. Response to COVID-19

---

2020) https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html

[5] The rated capacity of a facility means the maximum number of incarcerated occupants that a facility's cells and dormitories were designed to hold in conformity with Title 15 regulations (maintained by BSCC) and Title 24 regulations (maintained by the California Building Standards Commission). (Complaint ¶ 49.) The rated capacity does not include housing dedicated for health care or disciplinary separation housing. (Id.) The actual capacity of the facilities as identified by Defendants is significantly larger than the rated capacity. (Compare Complaint ¶ 49 with Balicki Declaration, Exhibit A.)

### 1.  Population Reduction Efforts

Since the outbreak, Defendants have reduced the Jail's population.  (Balicki Declaration ¶ 6.)  However, they have failed to meet the 50% target reduction rate set by Defendants' own Correctional Health Services.  (Id.)  Early release is available for vulnerable individuals, but only if those individuals have less than sixty days remaining on their sentence. (M. Ramirez Declaration ¶ 9.)  Early release is not available for pre-trial detainees.  (Id.)  Additionally, the California Judicial Council reduced bail to $0 for many offenses, allowing some pretrial detainees to await trial on bail.  (Id. ¶ 9.)

Despite these population reduction measures, 2,826 individuals remain in the Jail.  (Balicki Declaration ¶ 6, Exhibit A.)  As of May 12, 2020, the actual capacity of each facility was:

- Central Men's Jail:          500
- Central Women's Jail:     106
- IRC:                                411
- Theo Lacy:                      1746

(Id., Exhibit A.)  Of the individuals remaining in the Jail, Defendants have identified 488 detainees who are medically vulnerable and at heightened risk of serious infection and death.  (Complaint ¶ 7; Application at 5.)  However, it is not clear where the medically vulnerable individuals are currently housed.

### 2.  Quarantine Efforts

Joseph Balicki, a Commander in the Orange County Sheriff's Department ("OCSD") assigned to the Custody Operations Command, submits that the Jail uniformly quarantines new arrivals at the Jail for 14 days and tests them before release into the jail generally.  (Balicki Declaration ¶ 7.)  However, it appears that the quarantine is only a partial one, as "[i]nmates who are quarantined or in isolation continue to have access to the dayroom where they can shower and use the telephones." (Id. ¶ 14.)  Additionally, groups of quarantined individuals are mixed together.  (Miranda Declaration ¶¶ 22, 25; Esparza Declaration ¶ 7; Godinez Declaration ¶11.)

The testimony of many inmates, who submit that new arrivals and individuals with known exposure are not always quarantined contradicts Officer Balicki's testimony.  (See, e.g., Seif Declaration ¶ 10; Wagner Declaration ¶ 14.)  For example, one new arrival, whose father had COVID-19, was not quarantined before he was moved into the general population.  (Wagner Declaration ¶ 14.)  Another inmate was not quarantined after a trip to the emergency room.  (Ortiz Declaration ¶¶ 18–19.)  These inconsistent quarantine practices have led to a cluster of new infections in at least one instance.  (See Miranda Declaration ¶¶ 8, 25; Godinez Declaration ¶¶ 8–9; Goldenson Declaration ¶ 45; Farias Declaration ¶¶ 6–10; Lentz Declaration ¶¶ 5–11.)

### 3. Facility-Wide Social Distancing Opportunities

The Jail has implemented procedures to allow inmates to socially distance.  (Balicki Declaration ¶ 9.)  However, limits of the Jail's design and capacity precludes full social distancing for the current inmate population.  Multiple inmates sleep in the same room, with beds less than six feet apart.  (Ahlman Declaration ¶¶ 7–8, 11–14; Bonilla Declaration ¶¶ 6–7; Ramirez Declaration ¶ 19; Lentz Declaration ¶ 12.)  Inmates share the common spaces and phones, where it is impossible to remain six feet apart.  (Ramirez Declaration ¶¶ 18, 19; Bonilla Declaration ¶¶ 6–7; Ortiz Declaration ¶¶ 5–7.)  Some have been placed in overcrowded holding units.  (Ahlman Declaration ¶ 5.)

The Jail allows symptomatic individuals to mingle in common areas with asymptomatic ones.  (Hernandez Declaration ¶¶ 6– 10, 30; Ramirez Declaration ¶¶ 21.)  Inmates are also transferred within the Jail, increasing the risk of exposure.  (Miranda Declaration ¶¶ 4, 6, 9–12; Godinez Declaration ¶¶ 7, 10–13.)

### 4. Availability of Cleaning Supplies, Personal Hygiene Supplies, and Personal Protective Equipment

Inmates receive cleaning supplies including soap, disinfectant and towels.  (Balicki Declaration ¶ 10.)  However, they do not receive sufficent cleaning supplies to keep their living areas clean and disinfected.  (See, e.g., Ahlman Declaration ¶¶ 18–20; Bonilla Declaration ¶ 12, 16; Baguiao Declaration ¶¶ 14–15; Campbell Declaration ¶ 20; Castillo Declaration ¶ 19; Esparza Declaration ¶ 12; Godinez Declaration ¶ 17; Hernandez Declaration ¶¶ 11–12; Miranda Declaration ¶¶ 17, 24–25; Trace Declaration ¶ 18; Wagner Declaration ¶ 15; Farias Declaration ¶ 13.)  Some inmates report requesting soap but not receiving any for days.  (See, e.g., Trace Declaration ¶ 2.)  Others report that multiple housing sectors must share a single bottle of cleaning solution.  (Ramirez Declaration ¶ 14.)  Inmates also receive facial coverings.  (Balicki Declaration ¶ 11.)  Some inmates report that the cloth masks provided are not replaced for weeks or are made from blood- and feces-stained sheets.  (See Ramirez Declaration ¶¶ 10–11 & 14–15, 17.)

### 5. Testing

The Jail has a policy to test individuals with COVID-19 symptoms as well as asymptomatic individuals before they are released from quarantine.  (Chiang Declaration ¶¶ 12, 13.)  On many ocassions, however, inmates were not tested after exposure to an individual with a confirmed case of COVID-19.  (Seif Declaration ¶ 9; Herrera Declaration ¶¶ 6,10; Wagner Declaration ¶ 14.)  The Jail does not test the cellmates of symptomatic individuals or entire units when there are multiple confirmed cases.  (Ramirez Declaration ¶¶ 20–23.)  Inmates awaiting the outcome of a COVID-19 test have been allowed to return to the general population.  (Id.)

//

**C.  State of the Outbreak**

To date, there have been 369 positive tests for COVID-19.[6]  As of May 12, 2020, all but one of the confirmed COVID-19 tests had come from the Central Men's Jail.[7]  (Balicki Declaration ¶ 8.)

### III.    LEGAL STANDARDS

**A.  Provisional Class Certification**

Courts in the Ninth Circuit "routinely grant provisional class certification for purposes of entering injunctive relief."  Carrillo v. Schneider Logistics, Inc., 2012 WL 556309, at *9 (C.D. Cal. Jan. 31, 2012) (citing Baharona-Gomez v. Reno, 167 F.3d 1228, 1233 (9th Cir. 1999).  Federal Rule of Civil Procedure 23 ("Rule 23") governs the litigation of class actions.  A party seeking class certification must establish the following prerequisites:

> (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  After satisfying the four prerequisites of numerosity, commonality, typicality, and adequacy, a party must also demonstrate one of the following: (1) a risk that separate actions would create incompatible standards of conduct for the defendant or prejudice individual class members not parties to the action; (2) the defendant has treated the members of the class as a class, making appropriate injunctive or declaratory relief with respect to the class as a whole; or (3) common questions of law or fact predominate over questions affecting individual members and that a class action is a superior method for fairly and efficiently adjudicating the action.  See Fed. R. Civ. P. 23(b)(1)–(3).[8]

---

[6] Orange County Sheriff's Department, COVID-19 in OC Jails (May 26, 2020), https://www.ocsd.org/about_ocsd/covid_19.

[7] While the Orange County Sherriff's Department releases information every week day regarding the number of Jail-wide positive tests, it does not break those numbers down by facility.  The Court must therefore rely upon the break down provided in the Balicki Declaration, which accounts for only 322 of the 369 positive tests.  It is possible, therefore, that the other facilities may now have more confirmed COVID-19 tests.

[8] While some circuits have adopted an "ascertainability" prerequisite to certification, the Ninth Circuit has not.  Briseno v. ConAgra Foods, Inc., 844 F.3d 1121, 1124 n.4 (9th Cir. 2017) ("ConAgra cites no other precedent to support the notion that our court has adopted an 'ascertainability' requirement.  This is not surprising because we have not.  Instead, we have addressed the types of alleged definitional deficiencies other courts have referred to as 'ascertainability' issues . . . through analysis of Rule 23's enumerated requirements.").

A trial court has broad discretion regarding whether to grant a motion for class certification.  See Bateman v. Am. Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010).  However, "[a] party seeking class certification must affirmatively demonstrate compliance with [Rule 23]—that is, the party must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011).  A district court must conduct a "rigorous analysis" that frequently "will entail some overlap with the merits of the plaintiff's underlying claim."  Id. at 351.  "Courts typically proceed claim-by-claim in determining whether the Rule 23 requirements have been met, particularly as to the Rule 23(a)(2) and (b)(3) requirements of common questions and predominance."  Allen v. Verizon California, Inc., 2010 WL 11583099, at *2 (C.D. Cal. Aug. 12, 2010).

Rule 23 further provides that "[w]hen appropriate, an action may be brought or maintained as a class action with respect to particular issues," Fed. R. Civ. P. 23(c)(4), or the "class may be divided into subclasses that are each treated as a class under this rule," Fed. R. Civ. P. 23(c)(5).  "This means that each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action."  Betts v. Reliable Collection Agency, Ltd., 659 F.2d 1000, 1005 (9th Cir. 1981).

## B.  Preliminary Injunction

"A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted).  An injunction is binding only on parties to the action, their officers, agents, servants, employees and attorneys and those "in active concert or participation" with them.  Fed. R. Civ. P. 65(d).

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 20 (2008).  The Ninth Circuit employs the "serious questions" test, which states "'serious questions going to the merits' and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest."  Alliance for Wild Rockies v. Cottrell, 632 F.3d 1127, 1135 (9th Cir. 2011).  "A preliminary injunction is an extraordinary and drastic remedy; it is never awarded as of right."  Munaf v. Geren, 553 U.S. 674, 690 (2008) (citations omitted).

## IV.   DISCUSSION

## A.  Class Certification

For purposes of the emergency injunctive relief, Plaintiffs seek provisional certification of the following classes:

---

- **The Pre-Trial Class:** "[A]ll current and future pre-trial detainees incarcerated at the Orange County Jail"
- **Post-Conviction Class:** "[A]ll current and future post-conviction prisoners incarcerated at the Orange County Jail from the present until the COVID-19 pandemic has abated"

(Motion at 2.) For both the pre-trial and post-conviction classes, Plaintiffs additionally seek provisional certification of the following sub-classes

- **Medically-Vulnerable Subclass:** "[A] subclass of all persons who, by reason of age or medical condition, the CDC has identified as particularly vulnerable to injury or death if they were to contract COVID-19"
- **Disability Subclass:** "[A] subclass of all persons within the Medically Vulnerable Subclasses who are vulnerable because of a disability as defined in federal law"

(Id.) Federal judges around the country have provisionally certified similar classes of detainees brining claims arising from the COVID-19 pandemic. See, e.g., Roman v. Wolf, No. 5:20-cv-768, (TJH) (PHV) (C.D. Cal. Apr. 23, 2020), Dkt. No. 52; Zepeda Rivas v. Jennings, 2020 WL 2059848, at *1 (N.D. Cal. Apr. 29, 2020); Mays v. Dart, 2020 WL 1812381, at * 4 (N.D. Ill. Apr. 9, 2020); Wilson v. Williams, 2020 WL 1940882, at *8 (N.D. Ohio Apr. 22, 2020). In a sparse Opposition, Defendants argue with minimal citation to the law that the proposed classes and subclasses fail to meet the requirements of Rule 23. (See generally Motion Opposition.) Defendants are mistaken.

### 1. Numerosity

A class satisfies the prerequisite of numerosity if it is so large that joinder of all class members is impracticable. Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998). To be impracticable, joinder must be difficult or inconvenient but need not be impossible. Keegan v. American Honda Motor Co., 284 F.R.D. 504, 522 (C.D. Cal. 2012). There is no numerical cutoff for sufficient numerosity. Id. However, forty or more members will generally satisfy the numerosity requirement. Id.

In their Motion, Plaintiffs estimate that there 3,047 individuals incarcerated in the Jail. (Motion at 13.) Relying on the most recent data collected by the California Board of State and Community Corrections, they further estimate that approximately 57% of Jail population is being held pretrial and 43% of the population is serving a sentence of incarceration. (Id.) Based on these estimates both the Pre-Trial and Post-Conviction classes likely have over 1,000 individuals. Additionally, Plaintiffs estimate that "40% of the Pre-trial and Post-conviction Classes are expected to be members of the Disability Subclasses, with an even greater number being a part of each Medically-Vulnerable Subclass." (Motion at 13.) Based on that figure about 1,200 inmates will be members of the Disability Subclass and at least 1,200 will be members of the Medically-Vulnerable Subclass.

Defendants cryptically respond that numerosity is not satisfied because "[t]here is no issue that the class is so numerous that joinder of members is impracticable." (Motion Opposition at 4.) But despite their contention that "the Orange County Sheriff's Department can provide a specific number as to the inmates in custody on a particular day," they fail to provide any number—even an estimate—that the Court can use to assess numerosity. (See id.) The Court therefore relies on the figures provided by Plaintiffs and finds the class is sufficiently numerous that joinder of all class members would be impracticable for both classes and both subclasses.

### 2. Commonality

The commonality requirement is satisfied when plaintiffs assert claims that "depend upon a common contention . . . capable of classwide resolution—which means that a determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart, 564 U.S. at 350; see also id. ("What matters to class certification . . . is not the raising of common questions . . . but, rather, the capacity of a classwide proceeding to generate common answers apt to drive the resolution of the litigation.") (internal quotation marks and citations omitted). Differences among putative class members can impede the generation of such common answers. Id. In the Ninth Circuit, "Rule 23(a)(2) has been construed permissively. . . . The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003).

Plaintiffs argue that commonality is satisfied because all class members are incarcerated in Defendants' Jail during the COVID-19 pandemic and all are subject to the same policies that they now argue are unconstitutional. (Motion at 15–16.) Defendants argue that commonality is not satisfied because "[e]ach individual has a specific medical profile." (Motion Opposition at 4.) While that may be the case, Plaintiffs challenge Defendants' institution-wide response and seek institution-wide injunctive relief. Accordingly, the relevant questions such as deliberate indifference will be decided on a classwide, rather than individual, basis. See Armstrong v. Davis, 275 F.3d 849, 868 (9th Cir. 2001) ("Commonality is satisfied where the lawsuit challenges a system-wide practice or policy that affects all of the putative class members."). The Court therefore finds Plaintiffs have established commonality for both classes and both subclasses.

### 3. Typicality

"The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992). The typicality inquiry focuses on the claims, not the specific facts underlying them. Just Film, Inc. v. Buono, 847 F.3d 1108, 1116 (9th Cir. 2017). "The requirement is permissive, such that 'representative claims are typical if they are reasonably coextensive with those of absent class members; they need not be substantially identical.'" Id. (quoting Parsons v. Ryan, 754 F.3d 657, 685 (9th Cir. 2014)). "Measures of typicality include

whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  Id. (internal quotations and citations omitted).  The applicability of different defenses to the class representative will preclude typicality if "there is a danger that absent class members will suffer if their representative is preoccupied with defenses unique to it."  Id. (quoting Hanon, 976 F.2d at 508).

Here, Plaintiffs are individuals incarcerated at Defendants' Jail who assert that the conditions of confinement at the Jail during the COVID-19 violate their constitutional and other statutor rights.  (Motion at 17.)  They advance the same legal arguments for the proposed class.  Defendants appear to argue that typicality is not met because "each individual Plaintiff's claim is subject to unique defenses." (Motion at 17.)  But they fail to identify specifically what those individual defenses are—if Plaintiffs' claims were truly subject unique defenses that would distract them from prosecuting the class claims, presumably Defendants would be able to readily identify them.  Because they cannot do so, the Court finds that Plaintiffs are typical of the proposed classes and subclasses.

### 4. Adequacy

In determining whether a proposed class representative will adequately protect the interests of the class, the court asks whether the proposed class representatives and their counsel have any conflicts of interest with any class members and whether the proposed class representatives and their counsel will prosecute the action vigorously on behalf of the class.  Hanlon, 150 F.3d at 1020.

Plaintiffs represent that they have no conflicts with the proposed classes and subclasses.  (Motion at 18.)  Additionally, Plaintiffs' counsel represents that they will prosecute this action vigorously and have experience litigating similar class actions in the same area of law.  (Id. at 19.) Defendants do not appear to challenge adequacy.  Accordingly, the Court finds the adequacy requirement is satisfied.

### 5. Rule 23(b) Requirements

Plaintiffs seek to certify their proposed sub-class under Rule 23(b)(2).  (Motion at 19–20.)  Rule 23(b)(2) permits certification of a class seeking declaratory or injunctive relief where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  In the Ninth Circuit, "[i]t is sufficient to meet the requirements of Rule 23(b)(2) [when] class members complain of a pattern or practice that is generally applicable to the class as a whole."  Rodriguez I, 591 F.3d at 1125 (9th Cir. 2010) (internal citation and quotation marks omitted) (finding certification under Rule 23(b)(2) proper where "proposed members of the class each challenge Respondents' practice of prolonged detention of detainees without providing a bond hearing and seek as relief a bond hearing with the burden placed on the government").  Thus, the critical inquiry is "whether class members

seek uniform relief from a practice applicable to all of them." Rodriguez I, 591 F.3d at 1125.

Here, Plaintiffs challenge the conditions at the Jail and Defendants' alleged insufficient response to the COVID-19 pandemic.  They allege that the conditions of confinement violate their federal constitutional and statutory rights.  And they seek uniform injunctive relief: an order compelling Defendants to release members of the Disabled and Medically-Vulnerable subclasses and mitigate the dangers of COVID-19 within the Jail.  See Parsons v. Ryan, 754 F.3d 657, 689 (9th Cir. 2014) (Rule 23(b)(2) satisfied where state department of corrections established policies and practices that placed "every inmate in custody in peril" and all class members sought essentially the same injunctive relief).  For purposes of this inquiry, "[t]he fact that some class members may have suffered no injury or different injuries from the challenged practice does not prevent the class from meeting the requirements of Rule 23(b)(2)."  Id.  Here, a single injunction would provide relief to each class member.  See Wal-Mart, 564 U.S. at 360.  Accordingly, the Court concludes Rule 23(b)(2)'s requirements are satisfied.[9]

## B.  Preliminary Injunction

### 1.  Success on the Merits or Serious Questions

Defendants argue that Plaintiffs are not likely to succeed on the merits for three reasons: (1) Plaintiffs failed to exhaust administrative remedies; (2) Plaintiffs fail to establish deliberate indifference; and (3) Plaintiffs fail to establish that Defendants discriminated against any members of the Disability Subclass.

#### a.  Exhaustion

The Prison Litigation Reform Act of 1995 ("PLRA") provides that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Defendants argue that Plaintiffs' section 1983 claims must fail because they have failed to exhaust their administrative remedies.  Plaintiffs, however, have submitted evidence that they filed

---

[9] Defendants make several additional arguments in the Motion Opposition which are wholly untethered to the law.  For example, they argue about predominance and ongoing litigation by members of the class.  (Motion Opposition at 4.)  As considerations relevant to Rule 23(b)(3) classes, such arguments are inappropriate here—where Plaintiffs seek certification of Rule 23(b)(2) classes.  Additionally, Defendants advance an obscure argument that appears to conflate ascertainability and standing.  (Id. at 7.)  The Ninth Circuit does not recognize an ascertainability requirement.  See Briseno, 844 F.3d at 1125 n.4.  Moreover, even if the proposed class included individuals without standing (and it does not, Defendant's argument on that point is incomprehensible), the existence of putative members without standing does not defeat certification.

grievances with the Jail.   (See Grievance Declarations.)   The Jail refused to adjudicate some of the grievances and denied others but failed to adjudicate the appeal.  (Id.)  "When prison officials improperly fail to process a prisoner's grievance, the prisoner is deemed to have exhausted available administrative remedies."  See Andres v. Marshall, 867 F.3d 1076, 1079 (9th Cir. 2017); see also Karas v. Marciano, 2017 WL 6816858, at *4 (C.D. Cal. Nov. 13, 2017) ("When a prisoner submits a [grievance] but never receives a response thereto, the administrative remedies are 'rendered effectively unavailable by defendants' actions.'"). Accordingly, the Court concludes that Plaintiffs have exhausted available administrative remedies for their section 1983 claims.

### b.   Deliberate Indifference

Plaintiffs challenge the conditions of their confinement under both the Eighth and Fourteenth Amendments.  To succeed under either amendment, Plaintiffs must establish "deliberate indifference" on the part of Defendants.  Farmer v. Brennan, 511 U.S. 825, 846 (1994) (Eight Amendment); Kingsley v. Hendrickson, 135 S.Ct. 2466, 2473–74 (2015) (Fourteenth Amendment).   As the Ninth Circuit has explained, "[d]eliberate indifference is the conscious or reckless disregard of the consequences of one's acts or omissions.  It entails something more than negligence but is satisfied by something less than acts or omission for the very purpose of causing harm or with knowledge that harm will result."  Gantt v. City of Los Angeles, 717 F.3d 702, 708 (9th Cir. 2013).

To succeed on their Eighth Amendment claim, Plaintiffs need to prove both objective and subjective deliberate indifference.  Farmer, 511 U.S. at 842.  Their Fourteenth Amendment claim, however, requires only that they prove objective deliberate indifference.  Gordon v. Cty. of Orange, 888 F.3d 1118, 1124–25 (9th Cir. 2018) ("[C]laims for violations of the right to adequate medical care brought by pretrial detainees against individual defendants under the Fourteenth Amendment must be evaluated under an objective deliberate indifference standard") (internal quotations omitted).

### i.   Objective Deliberate Indifference

To satisfy the objective prong, Plaintiffs must show an "objectively intolerable risk of harm."  Farmer, 511 U.S. at 842.  The Ninth Circuit has established a four-part test to determine objective deliberate indifference:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved—making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

Gordon, 888 F.3d at 1125.  Plaintiffs have satisfied all four elements.

The risk of harm within the Jail is undeniably high: at least 369 inmates have contracted COVID-19 and the Jail lacks the ability to contain the infection.  Because the virus is contagious, absent some dramatic change in course, the uninfected inmates are likely to contract the disease if they remain in the Jail.  And the 488 medically vulnerable inmates are likely to get very sick and possibly die.

The parties vigorously debate whether Defendants have complied with the CDC Guidelines.  A review of the evidence submitted suggests that although Defendants may have a policy to comply with the CDC Guidelines, actual compliance has been piecemeal and inadequate.[10]  Defendants claim to give inmates soap and other personal hygiene supplies, but inmates report that they have not been given enough soap to frequently wash or clean their living spaces.  (Compare Balicki Declaration ¶ 10 with Trace Declaration ¶ 2.)  Defendants claim to quarantine new arrivals and those with a known exposure, but inmates declare that Defendants allow quarantined individuals to use the same common spaces as the general population.  (Compare Balicki Declaration ¶ 7 with ¶ 14.)  Defendants claim to be testing inmates, but inmates report that Defendants are not testing all suspected cases. (Compare Chiang Declaration ¶¶ 12, 13 with Seif Declaration ¶ 9; Herrera Declaration ¶¶ 6,10; Wagner Declaration ¶ 14.)  Defendants claim that they have a policy to allow inmates to social distance, but inmates report that their bunks are not six feet apart and that social distancing is impossible in the common areas given the number of people.  (Compare Balicki Declaration ¶ 9 with Ahlman Declaration ¶¶ 7–8, 11–14; Bonilla Declaration ¶¶ 6–7; Ramirez Declaration ¶ 19; Lentz Declaration ¶ 12.)

At the May 19, 2020 hearing Defendants insisted that the Court should ignore these inmate accounts because they are stale—compliance with the CDC Guidelines is evolving at the CDC Guidelines themselves are evolving.  However, the current version of the relevant CDC Guidelines was issued March 23, 2020.  If the Defendants were not in compliance with the CDC Guidelines over a month after the Guidelines were issued (when most of the inmate declarations were signed) there is no reason to expect that they have since come into compliance.  Moreover, Plaintiffs have submitted recent supplemental declarations demonstrating that the noncompliance is ongoing.  For example, on May 13, 2020, an inmate was tested for COVID-19 after exhibiting symptoms but left in the tank with others who had not

---

[10] To the extent that the OCSD officer testimony submitted by Defendants conflicts with the inmate testimony submitted by Plaintiffs, the Court finds the inmate testimony more credible.  The officer testimony is general, brief, and only broadly describes the Jail's policies—it fails to explain with specificity how the policies have been implemented and enforced and the degree of compliance.  Conversely, the inmate testimony describes repeatedly and in exacting detail Defendants' failures to implement the CDC Guidelines.  Inmate testimony is replete with examples; officer testimony is devoid of it.  Moreover, dozens of inmates submit corroborating declarations; while only three OCSD representatives submit declarations.

been infected.  (Ahlman Supplemental Declaration ¶ 3.)  These continuing compliance failures are not isolated incidents that effect a single Plaintiff.  When Defendants fail to quarantine symptomatic individuals or provide sufficient cleaning supplies, all inmates are at risk.  Finally, Defendants have submitted no persuasive evidence contradicting the accounts of the inmates. While they submit testimony from three OCSD officers stating broadly that OCSD has policies to provide cleaning supplies, to quarantine individuals, and to test those with symptoms, Defendants fail to provide any specific examples of actual compliance with these policies (e.g., detailed explanations of quarantine practices, numbers of cleaning supplies distributed, etc.).

As Plaintiffs argued at the hearing, the numbers speak for themselves.  Defendants' broad and unsupported claim of compliance is belied by the fact that there are 369 confirmed COVID-19 cases in the Jail—up from only 26 confirmed cases less than a month ago on April 22, 2020.[11]   Assuming a current Jail population of 2,826, the rate of COVID-19 infection at the Jail is 12.4%.  That number is astronomical compared to the rate of infection in the Orange County general population, which is about 0.14%.[12]  An individual incarcerated at the Jail is nearly one hundred times more likely to get COVID-19 than the average resident of Orange County.[13]

At the hearing, Defendants argued that the number of confirmed COVID-19 cases is skyrocketing due to the increased availability of testing.  The below chart maps the OCSD's reported testing results from April 22, 2020 through May 18, 2020.   It reveals there has been no recent dramatic surge in testing.  Indeed, the rate of testing has remained relatively consistent since April 22, 2020, with the largest number of tests given on May 5, 2020—three weeks ago.  Defendants, therefore, cannot simply explain away the soaring number of confirmed cases with a claim of increased testing.  Moreover, of the 369 confirmed COVID-19 cases in the Jail, only 302 have recovered to date, meaning that are 57 inmates who likely contracted the virus within the past two weeks.

//
//
//
//
//
//
//
//

---

[11] https://www.ocsd.org/documents/sheriff/COVIDStats4.22.20.pdf

[12] Johns Hopkins University, COVID-19 Status Report, Orange County https://bao.arcgis.com/covid-19/jhu/county/06059.html

[13] Given the dramatic disparity between the rates of infection at the Jail and in the general population, Defendants argument that Plaintiffs may be safer in the Jail than they would out of it is statistically absurd.  (See Application Opposition at 21-22.)

**Jail COVID-19 Testing Results**
**April 22, 2020 – May 18, 2020[14]**

| Date | Total Tests[15] | New Tests[16] | Positive Tests | Negative Tests | Recovered |
|------|------|------|------|------|------|
| April 22, 2020 | 63 | N/A | 26 | 35 | 10 |
| April 23, 2020 | 68 | 5 | 23 | 27 | 12 |
| April 24, 2020 | 147 | 79 | 82 | 56 | 14 |
| April 27, 2020 | 182 | 35 | 93 | 42 | 17 |
| April 28, 2020 | 226 | 44 | 96 | 63 | 20 |
| April 29, 2020 | 227 | 1 | 117 | 89 | 22 |
| April 30, 2020 | 331 | 4 | 122 | 189 | 22 |
| May 1, 2020 | 387 | 56 | 168 | 199 | 23 |
| May 4, 2020 | 459 | 72 | 219 | 220 | 27 |
| May 5, 2020 | 649 | 190 | 227 | 258 | 31 |
| May 6, 2020 | 673 | 24 | 241 | 279 | 33 |
| May 7, 2020 | 708 | 35 | 251 | 305 | 41 |
| May 8, 2020 | 738 | 30 | 259 | 320 | 54 |
| May 11, 2020 | 762 | 24 | 289 | 363 | 100 |
| May 12, 2020 | 793 | 31 | 322 | 398 | 117 |
| May 13, 2020 | 848 | 85 | 331 | 427 | 126 |
| May 14, 2020 | 886 | 38 | 335 | 498 | 135 |
| May 15, 2020 | 907 | 21 | 335 | 495 | 135 |
| May 18, 2020 | 979 | 72 | 350 | 543 | 196 |
| May 19, 2020 | 990 | 11 | 360 | 596 | 199 |
| May 20, 2020 | 1,013 | 23 | 364 | 609 | 235 |
| May 21, 2020 | 1,031 | 18 | 364 | 627 | 252 |
| May 22, 2020 | 1,050 | 19 | 365 | 645 | 261 |
| May 26, 2020 | 1,118 | 68 | 369 | 702 | 302 |

Based on all the evidence submitted, the Court concludes that Defendants are not complying meaningfully with the CDC Guidelines.  Defendants are correct that the CDC Guidance "is not a statute, nor is it a mandate."  (See Application Opposition at 5.)  What Defendants fail to appreciate with this argument, however, is that the CDC Guidance provide

[14] Data pulled from daily .pdfs published on Orange County Sheriff's Department, COVID-19 in OC Jails at https://www.ocsd.org/about_ocsd/covid_19.

[15] This figure also includes tests with pending results.  The daily pending results figure has not been included in the chart.

[16] The Court calculated the number of new tests given each day by taking the total test figure for each day and subtracting the total test figure from the day before.

guidance regarding the appropriate response to the risk presented by COVID-19.  The suggestions laid out in the CDC Guidelines represent expert medical advice regarding measures needed to limit the spread of COVID-19.  An institution that is aware of the CDC Guidelines and able to implement them but fails to do so demonstrates that it is unwilling to do what it can to abate the risk of the spread of infection.  In other words, failure to comply demonstrates deliberate indifference toward the health and safety of the inmates.  See Wilson v. Williams, 2020 WL 1940882, at *1 (N.D. Ohio April 22, 2020) (finding Defendants acted with deliberate indifference, where despite some proactive measures by Defendants, the prisoners were unable to socially distance and where the prison had "shockingly limited available testing . . .").  It is not enough for Defendants to nominally comply with some portions of the Guidelines sometimes so that they can claim "we are testing" and "we are providing soap"—they must fully and consistently comply so that the compliance is an effective tool to abate the spread of infection.

Moreover, the CDC Guidelines focus their advice on prevention and management of single suspected cases.  They do not contemplate hundreds of infections within the population.  Accordingly, the CDC Guidelines represent the floor, not the ceiling, of an adequate response to COVID-19 at the Jail, with at least 369 COVID-19 cases.  As the rate of infection rises, so must the required response.  The amount of care required in a prison with no suspected cases is far different than the amount of care required in an institution with hundreds of cases: one bar of soap a week may not be deliberately indifferent where there are no infections but it certainly is where—as here—there are hundreds of infected individuals with new cases daily.  See Hernandez v. Cty. Of Monterey, 110 F. Supp. 3d 929, 942–45 (N.D. Cal. 2015) (finding that "known noncompliance" with CDC tuberculosis guidelines "strongly indicates deliberate indifference to a substantial risk of serious harm" and ordering officials to implement tuberculosis prevention policies).  Rates of COVID-19 infection at the Jail are skyrocketing, and Plaintiffs have demonstrated a likelihood of establishing that Defendants are deliberately indifferent to that fact.

### ii.    Subjective Deliberate Indifference

To succeed on their Eight Amendment claim, Plaintiffs must also prove subjective deliberate indifference.  In other words, they must show that Defendants "knew[] of and disregard[ed] an excessive risk to inmate health or safety."  Estate of Ford v. Ramirez-Palmer, 301 F.3d 1043, 1050 (9th Cir. 2002) (quoting Farmer, 511 U.S. at 834 (1994)).  Defendants undoubtedly know of the risks posed by COVID-19 infections.  Indeed, Defendant Barnes has been repeatedly warned by several organizations—including a group of Orange County Sherriff deputies—of the dangers from COVID-19 in the Jail.[17]  Defendants also knew, by way of the CDC

---

[17]  See, e.g., Letter from Jacob Reisberg and Daisy Ramirez, ACLU of Southern California, to Sheriff-Coroner Donald Barnes, Re: COVID-19 Policy in Orange County Jails (Mar. 12, 2020) (ACLU So Cal warning sheriff of risks); Letter from Transforming Justice, et al., to Sheriff Don Barnes, et al., Re: COVID-19 Containment in Orange County Jails and Courthouses (Mar. 17,

Guidelines, that failure to take certain precautionary measures would result in an increase in the spread of infections.  The Court concludes that Plaintiffs have established the likelihood of subjective deliberate indifference.  Accordingly, Plaintiffs have shown a likelihood of success on their Eight Amendment claim.

### c.   Disability Claims

Defendants argue that Plaintiffs have not established a likelihood of success on their ADA and Unruh Act claims because they "do not allege, and cannot show, that Defendants discriminated against them because of their medical condition or other disability."  (Application Opposition at 21.)  In response, Plaintiffs assert that they do not need to show intentional discrimination, the law only requires that they demonstrate that Defendants likely failed to provide reasonable accommodation.  (Application Reply at 9.)  Indeed, the Ninth Circuit has held a defendant's failure to provide reasonable accommodations is "sufficient to demonstrate discrimination 'by reason of' disability." McGary v. City of Portland, 386 F.3d 1259, 1265-66 (9th Cir. 2004).  Because Plaintiffs have demonstrated that the Jail has failed to make reasonable accommodations to allow members of the Disabled Class to participate safely in the programs of the Jail, Plaintiffs have demonstrated a likelihood of success on their disability claim.

### 2.   Likelihood of Irreparable Harm

A plaintiff must demonstrate she is likely to suffer irreparable harm in the absence of a preliminary injunction.  See Winter, 555 U.S. at 20.  The Ninth Circuit cautions that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." Caribbean Marine Servs. v. Baldridge, 844 F.2d 668, 674 (9th Cir. 1988).  A plaintiff seeking injunctive relief must demonstrate that "remedies available at law, such as monetary damages, are inadequate to compensate" for the injury.  Herb Reed Enters., LLC v. Fla. Entm't Mgmt., 736 F.3d 1239, 1249 (9th Cir. 2013).  "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting Elrod v. Burns, 427 U.S. 347, 373 (1976)).

Plaintiffs have established a likelihood of irreparable harm.  There are at least 369 cases of COVID-19 in the Jail.  Without additional measures to abate the spread, more inmates will contract the disease.  Undoubtedly some will die.  Certainly, there is no greater irreparable harm than death.  Helling v. McKinney, 509 U.S. 25, 33 (1993) (holding that the Constitution protects those in detention against "a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year." ); see also

---

2020) (multiple community organizations); Letter from Tom Dominguez, Ass'n of Orange County Deputy Sheriffs, to Sheriff Don Barnes (Mar. 25, 2020) (deputies); Letter from Transforming Justice Orange County, et al., to Sheriff Don Barnes, et al., Re: COVID-19 in Orange County Jails (Apr. 6, 2020) (multiple community organizations)

Unknown Parties v. Johnson, 2016 WL 8188563, at *15 (D. Ariz. No. 18, 2016), (finding evidence of "medical risks associated with . . . being exposed to communicable diseases" adequate to establish irreparable harm).

### 3. Balance of the Equities and Public Interest

Where the government is the opposing party, balancing of the harm and the public interest merge.  See Nken v. Holder, 556 U.S. 418, 435 (2009).  Thus, the Court asks whether any significant "public consequences" would result from issuing the preliminary injunction. Winter, 555 U.S. at 24.

Plaintiffs request extensive and explicit injunctive relief, which falls broadly into two categories.  First, seek an order requiring Defendants to "[r]elease [members of the Medically-Vulnerable and Disability Subclasses] within twenty-four hours." (Complaint at 61.)  Second, they seek several remedial measures aimed at reducing the risk at the Jail, including an order requiring Defendants to "[i]mmediately adopt mitigation efforts to protect all Class Members not immediately released." (Complaint at 61–64.)  Because the public consequences of the two categories of injunctions are different, the Court will assess them separately.

### i. Mandating Compliance with CDC Guidelines

The balance of equities and public interest tilt heavily Plaintiffs' favor when contemplating compliance with the CDC Guidelines.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." Melendres, 695 F.3d at 1002 (quotation omitted).  Moreover, there can be no public interest in exposing vulnerable persons to increased risks of severe illness and death.  "Faced with . . . preventable human suffering, [the Ninth Circuit] ha[s] little difficulty concluding that the balance of hardships tips decidedly in plaintiffs' favor." Hernandez v. Sessions, 872 F.3d 976, 996 (9th Cir. 2017) (quoting Lopez v. Heckler, 713 F.2d 1432, 1437 (9th Cir. 1983)).

Defendants argue that the balance of equities tilts in their favor because their "weighty interests are those of the general public in the orderly administration of the jails and in maintaining public safety." (Application Opposition at 22.)  This argument fails for two reasons. First, it inappropriately relies on a decision in which the Fifth Circuit found that enjoining a prison from following state law represented irreparable injury to the prison.  See Valentine v. Collier, 956 F.3d 797, 803 (5th Cir. 2020) ("The district court's injunction prevents the State from effectuating the Legislature's choice and hence imposes irreparable injury.")  Here, Plaintiffs do not attempt to enjoin Defendants from following state law but to comply with guidelines issued by a federal agency.  Second, compliance with CDC guidelines promotes the orderly administration of jails—an inmate population with a skyrocketing rate of infection is far from orderly.  Accordingly, mandating compliance with the CDC Guidelines in the Jail serves the public interest.

//

### ii.    Release of Medically Vulnerable and Disabled Subclasses

Plaintiffs, however, have not met their burden to prove that the balance of equities tilts in favor of releasing all medically vulnerable and disabled inmates.  There are myriad risks of releasing incarcerated individuals without any consideration of crime committed, propensity to violence, or flight risk.  Concerns that released inmates would commit crimes is far from "speculative"—many of the individuals in the proposed class have committed or are charged with violent crimes.  Moreover, some pre-trail inmates may pose a flight risk.  Such a haphazard release of inmates could present a threat to public safety.  Because it is plausible that the Jail could mitigate many of the risks presented by COVID-19 with better compliance with the CDC Guidelines, Plaintiffs have not met their burden to demonstrate that the need for release outweighs the risks of releasing of 488 inmates without individualized assessments.[18]

## V.    CONCLUSION

The Court GRANTS Plaintiffs' Motion.  The Court further GRANTS-IN-PART and DENIES-IN-PART Plaintiffs' Application as follows:

- Defendants shall provide adequate spacing of six feet or more between incarcerated people so that social distancing can be accomplished in accordance with CDC guidelines;

- Defendants shall effectively communicate to all incarcerated people, including low literacy and non-English-speaking people, sufficient information about COVID-19, measures taken to reduce the risk of transmission, and any changes in policies or practices to reasonably ensure that individuals are able to take precautions to prevent infection;

- Defendants shall ensure that each incarcerated person receives, free of charge, an individual supply of hand soap and paper towels sufficient to allow frequent hand washing and drying each day; an adequate supply of clean implements for cleaning such as sponges and brushes and disinfectant hand wipes or disinfectant products effective against the virus that causes COVID-19 for daily cleanings;

- Defendants shall ensure that all incarcerated people have access to hand sanitizer containing at least 60% alcohol;

- Defendants shall provide access to daily showers and daily access to clean laundry, including clean personal towels and washrags after each shower;

---

[18] Because the Court denies Plaintiffs' request to release the Medically-Vulnerable class, it need not decide several issues raised in the Application Opposition, including whether Plaintiffs are entitled to pursue section 2241 habeas relief.

- Defendants shall require that all Jail staff wear personal protective equipment, including CDC-recommended surgical masks, when interacting with any person or when touching surfaces in cells or common areas;

- Defendants shall require that all Jail staff wash their hands, apply hand sanitizer containing at least 60% alcohol, or change their gloves both before and after interacting with any person or touching surfaces in cells or common areas;

- Defendants shall take the temperature of all class members, Jail staff, and visitors daily (with a functioning and properly operated and sanitized thermometer) to identify potential COVID-19 infections;

- Defendants shall assess (through questioning) each incarcerated person daily to identify potential COVID-19 infections.

- Defendants shall conduct immediate testing for anyone (class members, Jail staff and visitors) displaying known symptoms of COVID-19;

- Defendants shall ensure that individuals identified as having COVID-19 or having been exposed to COVID-19 receive adequate medical care and are properly quarantined (without resorting to cohorting, if possible), in a nonpunitive setting, with continued access to showers, recreation, mental health services, reading materials, phone and video visitation with loved ones, communications with counsel, and personal property;

- Defendants shall respond to all emergency (as defined by the medical community) requests for medical attention within an hour;

- Defendants shall provide sufficient disinfecting supplies, free of charge, so incarcerated people can clean high-touch areas or items (including, but not limited to, phones and headphones) between each use;

- Defendants shall waive all medical co-pays for those experiencing COVID-19-related symptoms.

All other requests for relief in the Application are DENIED.


**IT IS SO ORDERED.**